## IN THE UNTIED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

|  |  |
|---|---|
| | * |
| **UNITED STATES OF AMERICA *ex rel.* LORI L. CARVER,** | * |
| | * |
| Plaintiff, | * |
| | * **CIVIL ACTION** |
| v. | * |
| | * **NUMBER:13-392** |
| **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C.,  XIULU RUAN, M.D.; JOHN PATRICK COUCH, M.D.;** | * |
| | |
| Defendants. | |

---

## FILED *IN CAMERA* AND UNDER SEAL

---

### FALSE CLAIMS ACT COMPLAINT

COMES NOW *Qui Tam* Plaintiff and Relator, **LORI L. CARVER**, on behalf of the UNITED STATES OF AMERICA, and files this Complaint against Defendants **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C., XIULU RUAN, M.D.** and **JOHN PATRICK COUCH, M.D.** (sometimes collectively referred herein as "Defendants") pursuant to the *Qui Tam* provisions of the False Claims Act, *as amended*, *31 U.S.C. §§ 3729-3733* ("FCA") for various violations committed by the Defendants. The violations are more specifically set forth and described in the Statement of Material Evidence attached hereto and incorporated herein as if fully set forth.

### INTRODUCTION

1

1.     LORI L. CARVER ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against Defendants **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C., XIULU RUAN, M.D.** and **JOHN PATRICK COUCH, M.D.** for treble damages, penalties, attorney fees and costs, pursuant to the *qui tam* provisions of the False Claims Act, *as amended*, *31 U.S.C. §§3729-3733* ("FCA") for violations committed by the Defendants.  The violations arise out of the submission of false and/or fraudulent claims by Defendants for payment to federally-funded Medicare programs as well as other government agencies and federally-funded health care programs as a result of referrals that were illegal under the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b).*

2.     This Complaint describes Defendants' practices of implementing schemes and practices to defraud Medicare and other governmental agencies, as well as private pay insurers and worker's compensation insurers, in violation of the Prohibited Physician Referral provisions of *42 U.S.C. §1395nn* (sometimes referred to as the "Stark Law")*,* the Federal Anti-Kickback provisions of *42 U.S.C. §§1320a-7b* (sometimes referred to as the "Anti-Kickback Law").  These practices include, but are not limited to, a financial relationship with outside testing entities for the receipt of compensation/benefits in exchange for sample referrals, a financial relationship with outside pharmaceutical providers for the receipt of compensation/benefits in exchange for prescription of the provider's products, altering or restricting patient medical records/chart entries to enable the submission of reimbursement claims for unnecessary treatment, the submission of reimbursement claims for the use of medical supplies and equipment not actually used,

2

a financial relationship with an in house/captive pharmacy to enable prescription referral quotas and to control the prescription products sold, the submission of reimbursement claims for in-house testing not actually performed or performed by less reliable means in order to increase reimbursement revenues, and the submission of reimbursement claims for physician office visits that did not take place.

3.      These illegal compensation schemes which violate the FCA, Stark and Anti-Kickback laws alleged herein were devised and implemented before Relator began her employment with Defendants, or were devised and implemented by the Defendants while Relator was employed but without Relator's input.  Relator was in no way a planner or initiator of the fraudulent schemes, and was ignored or overruled when she voiced objections to same.  Relator made inquiries regarding the methodology involved, avoided direct involvement as much as possible, and voiced objections when able to do so.  Despite same, the schemes continued and/or were incresed during Relator's employment, and, upon information and belief, continue still.

4.      Relator brings this action based on her direct knowledge, and/or upon knowledge provided by reliable sources within the employ of the Defendants or with outside vendors, and also on information and belief.  None of the actionable allegations set forth in this Complaint are based on a prior public disclosure as referred to in *31 U.S.C. §3730(e) (4)*, and Relator believes she is an original source of the facts alleged in this Complaint.

## JURISDICTION AND VENUE

5.      The acts proscribed by *31 U.S.C. S 3729 et seq.* and complained of herein occurred in the Southern District of Alabama and Defendants among others, do business in the Southern District of Alabama. Therefore, this Court has subject matter jurisdiction over this case and all Defendants pursuant to *31 U.S.C. 3732(a)*, as well as under *28 U.S.C. § 1345*.

6.      This Court has personal jurisdiction over the Relator because she resides in the Southern District of Alabama and conducts business herein.

7.      This Court has personal jurisdiction over all Defendants because all Defendants are located within the Southern District of Alabama and act as the provider of healthcare services and products to Medicare, Medicaid, and private insurance beneficiaries within the Southern District of Alabama.   Each Defendant regularly performs services and submits claims for payment to Medicare and Medicaid, as well as others, and accordingly is subject to the jurisdiction of this Court.

8.      Venue is proper within the Southern District of Alabama pursuant to *28 U.S.C. §§ 1391 (a) (1)* and *(2)*, because Defendants have offices within the Southern District of Alabama, and have performed numerous acts proscribed by *42 U.S.C. § 1395nn, 42 U.S.C. § 1320a-7b (b)* and *31 U.S.C. §3729, et seq*, within the Southern District of Alabama.

## PARTIES

9.     *Qui Tam* Plaintiff and Relator, **LORI L. CARVER** ("Relator"), resides in the Southern District of Alabama and was employed as the clinical supervisor for Defendant **PHYSICIAN'S PAIN SPECIALISTS OF ALABAMA, PC, ("PPS")** since early 2011. Relator began her employment with said Defendant as a medical assistant in July 2010. As both a medical assistant and then as the clinical supervisor, Relator worked under the direct supervision of Defendants **XIULU RUAN, M.D. ("RUAN")** and **JOHN PATRICK COUCH, M.D. ("COUCH"),** the owners/shareholders of Defendant **PPS**.

10.     Defendant **PHYSICIAN'S PAIN SPECIALISTS OF ALABAMA, PC** is an Alabama professional corporation that was incorporated on July 3, 1997 with its principle office located at 2001 Springhill Avenue, Mobile, AL 36607.  It also operates a second clinic at 4682 Airport Blvd., Mobile, AL 36608.   Defendant **PPS** provides healthcare services, describing its general business purpose as "Pain Management Doctors".   As a provider of healthcare services, Defendant provides medical care and treatment, orders outside testing and diagnostic measures, and prescribes narcotic medications for patients who are covered by federal healthcare programs within the Southern District of Alabama.

11.     Defendant **XIULU RUAN, M.D.** is a licensed Alabama physician residing and practicing medicine in the Southern District of Alabama.   Dr. Ruan is an owner and shareholder of Defendant **PPS**.

12.     Defendant **JOHN PATRICK COUCH, M.D.** is a licensed Alabama physician residing and practicing medicine in the Southern District of Alabama.   Dr. Couch is an owner and shareholder of Defendant **PPS**.

13.     All Defendants are health care providers and suppliers who participate in the submission of reimbursement claims to federal healthcare programs.

## FEDERAL HEALTHCARE PROGRAMS

### The Medicare, Medicaid and Tricare Programs

14.     Title XVIII of the Social Security Act, *42 U.S.C. §§ 1395, et seq.*, established the Health Insurance for the Aged and Disabled, popularly known as the Medicare program. The United States Department of Health and Human Services ("DHHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer contracts with insurance companies or Medicare contractors on behalf of DHHS. Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

15.     CMS enters into contracts and pays for health care services provided to Medicare beneficiaries through insurance companies acting as Medicare ("fiscal intermediaries") contractors with the responsibility to process and pay health care claims under Medicare Part A which covers hospital and post-hospitalization services. *42 U.S.C. §§ 1395c-1395i-2 (1992)*. Medicare Part B is a federally subsidized, voluntary

insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services *42 U.S.C. §§ 1395k, 1395l, 1395x(s)*, outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors ("carriers") process and pay claims for these services.

16.     Defendants submitted or caused to be submitted fraudulent claims for reimbursement to the United States through several Medicare Part B contractors in and around the Southern District of Alabama.

17.     Medicaid is a federally assisted grant program for the states enabling them to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels of services, and administrative and operational procedures. The state directly pays the providers for Medicaid services, with the state obtaining the federal reimbursement share of the payment from accounts drawn on funds from the United States Treasury. *42 C.F.R. §§ 430.0-430.30* (1994). The State of Alabama, through the Alabama Medicaid Agency ("Alabama Medicaid") participates in the Medicaid program.

18.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through Alabama Medicaid in Alabama and the Southern District of Alabama.

19.     TRICARE Management Activity, formerly known as CHAMPUS, ("TRICARE") is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. *10 U.S.C. §§ 1079, 1086*; *32 C.F.R. Part 199*. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

20.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through TRICARE in the Southern District of Alabama.

21.     Defendant **PPS** also provides healthcare to private insurance entities and worker's compensation carriers.  While not federal healthcare programs, the submission of false claims to private entities impacts the cost of medical care across the board, thereby increasing the overall cost to federal healthcare programs, and further escalating the healthcare crisis currently affecting the United States government and its citizens.

22.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from private insurance entities for healthcare services rendered in the Southern District of Alabama.

23.    Federal healthcare programs depend on physicians and other health care professionals to exercise independent judgment in the best interests of patient care. Financial incentives tied to referrals corrupt the health care delivery system in ways that harm the federal programs and their beneficiaries. Corruption of medical decision-making can result when a physician refers patient healthcare to an entity on the basis of the physician's financial relationship and self-interest instead of the patient's medical needs.

24.    Federal healthcare programs also depend on physicians and other health care professionals to submit claims for reimbursement based upon the provision of medical care and the use of medical supplies that are reasonable, necessary and actually employed in the healthcare provided to the programs' beneficiaries.  Submitting claims for reimbursement for services and supplies not actually used or not medically necessary, and/or which are directly tied to the financial interests of the physician provider, corrupt the health care delivery system in ways that harm the federal programs and their beneficiaries. Corruption of medical decision-making can result when a physician performs procedures and runs tests on the basis of the physician's financial relationship and self-interest instead of the patient's medical needs.


**Defendants Participation in Federal HealthCare Programs**

25.    As clinical supervisor, Relator has firsthand knowledge that Defendants **PPS**, **RUAN** and **COUCH** accept and provide treatment to beneficiaries of Medicare, Medicaid, Tricare and other third party insurers.  It was an integral function of the revenues generated by the medical practice.

26.    As a condition of the Defendants' participation in these federal healthcare programs, Defendants are responsible for compliance with the legal and proper billing and reimbursement rules required by these programs. This responsibility is both stated and implied throughout various claim forms, conditions of participation, and Medicare and Medicaid program participation documents, all of which contain certifications of truth and accuracy which are signed by the provider or its authorized representative(s) and submitted to the above referenced Federal HealthCare Programs for payment.

27.    Defendants regularly and routinely prepared the necessary reimbursement applications and material for submission to the appropriate Medicare, Medicaid or Tricare office.  Among other things, the applications certified that the providers would abide by relevant federal regulations, including *42 C.F.R. §424.57*, and subsection (c)(l), mandating that a provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements", including the Federal Anti-Kickback and Stark laws.

28.    Defendants further certified and acknowledged "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions."  Accordingly, Defendants expressly certified an understanding that payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the Federal Anti-Kickback statute and the Stark law.

## APPLICABLE LAW

### The False Claims Act

29.     *Section 3729* of The False Claims Act ("FCA") provides in pertinent part and imposes liability on any person or entity who:

> "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; …".

30.     A proven violation of the FCA renders the person or entity liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.  *31 U.S.C. § 3729(a) (1)-(3).*

31.     Falsely certifying compliance with the Stark and Anti-Kickback laws in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.  *United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88 (3rd Cir. 2009) (citations omitted); United State ex rel. Repko v. Guthrie Clinic, 557 F. Supp. 522 (M.D. Penn., 2008) (citations omitted).*

32.     The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) (reprinted* in *1986, U.S.C.C.A. 5266*).  Proof of a specific intent to defraud is not required.  *31 U.S.C. § 3729(b)(1)(B).*

**Stark Law (Physicians Self-Referral Law)**

33.     The "Stark" statute, *42 U.S.C. §1395nn,* commonly known as the Physician Self-Referral statute, prohibits physicians from making a referral to an entity for the furnishing of designated health services, if a physician has a direct or indirect financial relationship (ownership or compensation) with an entity that provides any of the health services identified in the statute ("designated health services" or "DHS").  The Stark law also prohibits entities from billing for services provided pursuant to a prohibited referral. If a financial relationship exists, all referrals and associated claims are illegal unless specifically exempted by statute. *42 U.S.C. § 1395nn (a) (1) (A) and (B).*  In other words, the physician cannot refer patients to the entity for DHS and the entity cannot submit a claim to CMS for such DHS unless the financial relationship fits in a statutory or regulatory exception.

34.     Liability under the Stark law requires three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship; and (3) none of the Stark exceptions apply.

35.     Under the Stark law, a physician has a "financial relationship" with an entity if he has either "an ownership or investment interest in the entity" or "a compensation arrangement" with it. *42 U.S.C. §1395nn (a) (2)*.  An ownership or investment interest in the entity may be an equity interest, a debt relationship or indirect ownership through controlling entities.

36.     A "compensation arrangement" where there is "any arrangement involving remuneration between a physician . . . and an entity . . . ." *43 U.S.C. § 1395nn (h) (1) (A)*.  "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *43 U.S.C. § 1395nn (h)(1)(B)*.  The exceptions concerning the definition of remuneration set forth in *43 U.S.C. § 1395nn(c)* are not applicable in this case.

37.     The Stark law defines "referral" as "the request by a physician for the item or service", and thereby makes the physician a "referring physician" under the Act. *43 U.S.C. § 1395nn(h)(5)(A)*.

38.     The Stark law defines Designated Healthcare Services to include outpatient prescription drugs and clinical laboratory services. *43 U.S.C. § 1395nn(h)(6)(J)* and *(A)* respectively.

39.     Once the *Qui Tam* Plaintiff or government establishes proof of each element of a violation of the Stark law, the burden shifts to the defendants to establish that the

conduct was protected by an exception. *United States ex rel. Kosenske v. Carlisle HMA, Inc., at 95 (citation omitted).*

40.    In contrast to the Federal Anti-Kickback Statute, violations of the Stark law are civil matters.   Stark law violations are not crimes.   The Stark law is a strict liability statute that is violated whenever a prohibited referral is made or a prohibited claim is submitted, regardless of whether the health care provider intended, knew or should have known that the law prohibited the actions it took.

**Anti-Kickback Law**

41.    The Federal Anti-Kickback Act ("Anti-Kickback") makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person - (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program. *42 U.S.C. §1320a-7b (b) (1) and (2).*

42.    The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. *42 U.S.C. §1320a-7b(c)(1)*.   Any ownership interest or compensation arrangement that constitutes a financial relationship under the Stark law would also constitute remuneration as defined by the Anti-Kickback statute, unless a kickback safe harbor applies.

43.     Knowing and willful conduct is a necessary element of this criminal offense. *42 U.S.C. §1320a-7b(b)(1)*.   An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v Stacks*, 157 F.3d 833, 837-8 (11th Cir. 1998). The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v Greber,* 760 F.2d 68 (3d Cir.), *cert denied*, 474 U.S. 988 (1985).

44.     HHS has published safe harbor regulations that define practices that are not subject to the prohibitions of the Anti-Kickback statute because such practices would unlikely result in fraud or abuse. *See 42 C.F.R. §1001.952*.   The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

45.     The schemes alleged herein as violations of the FCA and the Anti-Kickback statute do not meet the requirements for any of the published safe harbor exceptions. The schemes alleged herein are likely to result in fraud or abuse.

## **ALLEGATIONS**

46. Paragraphs 1 through 45 are incorporated as if fully set forth herein.

15

47. Relator witnessed and otherwise was made aware of several schemes and practices at Defendants' clinics which amount to violations of the FCA and illegal compensation schemes whereby the defendants received kickbacks ("Stark payments") in exchange for the referral of designated healthcare services.  These fraudulent schemes have resulted in false certifications of compliance, thereby tainting all resulting claims submitted to federal healthcare programs from at least July 2010 to the present.

48.  These schemes are detailed in Relator's attached Disclosure, but are summarized as follows:

    **A.**    **Re-use of Disposable Needles**.  Defendants implemented a policy to clean or attempt to clean, and then reuse, disposable needles in radiofrequency procedures, epidural procedures and pain pump re-fill procedures.  Defendants thereafter sought and obtained reimbursements from federal healthcare programs (and other private insurers) in amounts that reflected the expected use (and presumed cost) of the disposable needles.   This scheme not only generated fraudulent reimbursement revenues for the medical practice, but also significantly endangered patient safety.

    **B.**    **Urine Drug Screens.**  Defendants used inferior technology (panel read cups) to conduct urine drug screens, but thereafter sought and obtained reimbursements from federal healthcare programs (and other private insurers) in amounts that reflected the use of more advanced technology (machine readers).  The decision to use the inferior technology was based upon the material/supply

costs differences between the two methodologies.  Stated differently, Defendants billed for using the machine readers but actually used the less expensive panel read cups, thereby minimizing costs and increasing profits to the medical practice.  This scheme generated fraudulent reimbursement revenues for the medical practice, and further resulted in unnecessary medical costs due to the increased need for referrals to outside testing laboratories.  This was because of the reduced reliability of the panel read cups compared to the machine readers, and the resulting greater frequency of "flagged" readings.

C.   **Urine Lab Testing Kick-backs.**  Defendants also ignored, disregarded or suppressed urine test results in order to refer a greater number of urine samples for outside testing.  This scheme was to enable the Defendants to meet "quotas" to generate illegal compensation in the form of kick-backs from the outside urine testing laboratories.   This scheme increased costs to federal healthcare programs (and other private insurers) by causing unnecessary medical treatment conducted only to facilitate the Defendants financial relationship with the labs.

D.   **Billing Physician Rates for Patient Medical Care Provided by Staff.**  Defendants sought and obtained reimbursements from federal healthcare programs (and other private insurers) for physician office visits when patients were actually seen by staff.   This scheme generated fraudulent reimbursement revenues for the medical practice, and further endangered patient safety.

E.   **Unnecessary Medical Procedures Scheduled and Performed.**  Defendants implemented a scheme to alter or restrict patient medical records

and chart entries in order to allow the scheduling of unnecessary procedures and minimize the likelihood of reimbursement denials by federal healthcare programs (and private insurers).   Specifically, Defendants restricted employees from charting that patients were "doing well" and had "no complaints" in order to allow such patients to be called and scheduled for procedures on days when the physicians' schedules were not full.   The absence of positive chart notes reduced the likelihood that a third party payor would question to procedure as necessary. This scheme generated fraudulent reimbursement revenues for the medical practice, resulted in unnecessary medical treatment, constituted fraudulent alteration or restriction of patient medical records, and further endangered patient safety by exposing patients to risks associated with the procedures.

**F**.     **DNA Testing Kick-backs.**   Defendants received and accepted illegal compensation in the form of kick-backs from an outside DNA testing laboratory in exchange for patient sample referrals.   This scheme promoted the Defendants financial relationship with the lab, and corrupted the independent judgment of the physicians.

**G**.     **Pharmaceutical Prescription Kick-backs**.   Defendants received and accepted kick-back payments and benefits for the prescription of pharmaceuticals to patients at the practice.   This scheme promoted the Defendants financial relationship with the pharmaceutical providers, and corrupted the independent judgment of the physicians.   It also endangered

patient safety by encouraging pharmaceutical prescription for secondary gain instead of patient need.

**H**.   **Captive Pharmacy**.   The Defendants refer patients to an in-house pharmacy located at the West Mobile clinic in order to control the purchase of brand name pharmaceuticals in order to meet quotas to meet "quotas" to generate illegal compensation in the form of kick-backs from the pharmaceutical providers.  This scheme enabled and facilitated the kick-back arrangement, and increased costs to federal healthcare programs (and other private insurers) by causing unnecessary medical expenses incurred only to facilitate the Defendants financial relationship with the providers.


49.   These schemes, independently and in concert with one another, encouraged and resulted in numerous false or fraudulent claims for payment or approval from the United States Government, caused to be made or used numerous false records or statements material to false or fraudulent claims against the United States Government,  and constituted prohibited compensation arrangements where there is an improper arrangement involving remuneration between the defendants and other entities providing designated healthcare services in violation of the Stark law and the Federal Anti-Kickback statute.  Upon information and belief, these schemes are still in place and being used by the defendants, thereby constituting an ongoing pattern and practice of fraudulent claims and improper kickbacks.

## DEFENDANTS KNOWLEDGE OF FRAUD

50.     The Defendants, individually and through authorized officers, themselves devised and implemented the fraudulent schemes and compensation arrangements, or knowingly accepted the compensation payments in exchange for the referral quotas. Defendants therefore knew of the illegality of their conduct, and engaged in it despite such knowledge.   Defendants took steps to conceal the conduct, or conspired with others to take steps to conceal the conduct.   Alternatively, Defendants engaged in the conduct recklessly and without regard to the potential for creating and encouraging false claims and prohibited compensation schemes.

## ILLEGAL FINANCIAL RELATIONSHIPS OF DEFENDANTS

51.     Defendants received and accepted compensation from outside testing labs for referrals of urine sample testing and DNA testing.   Defendants further hold an ownership interest in the captive pharmacy to which patients were referred.

## <u>COUNT I</u>

### (False Claims Act – Presentation of False Claims *31 U.S.C. § 3729 (1)*)

52.     *Qui Tam* Plaintiff and Relator re-alleges, adopts and incorporates by reference paragraphs 1 through 51 as if fully set forth herein.

53.     Defendants knowingly submitted false and fraudulent claims and payment request certifications to agents and officials of the United States Government in violation

of *31 U.S.C. Section 3729(a)(I)*. As a result of this conduct, the United States and the American taxpayers have suffered actual damages.

## COUNT II

**(False Claims Act; False Records or Statements *31 U.S.C. § 3729 (2)*)**

54.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 53 as though fully set forth herein.

55.     Defendants knowingly constructed or used, or caused to be constructed or used, false records, documents and statements in order to get the payment and/or approval of false or fraudulent claims and payment certifications by officials and agents of the United States government in violation of *31 U.S.C. Section 3729(a) (2)*, and as a result of this conduct, the United States and the American taxpayers have suffered actual damages.

## COUNT III

**(False Claims Act- Stark Violation – Outside Testing Laboratories)**

56.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 55 as though fully set forth herein.

57.     The compensation arrangements between Defendants and the outside urine and DNA testing laboratories are financial relationships under the Stark law.

58.     Defendants referred patients to the outside urine and DNA testing laboratories for the furnishing of designated health services for which payment may be made under the Social Security Act in violation of the Stark law. *42 U.S.C. §1395nn (a)(1)(A).*

59.     Defendants conspired to and did knowingly refer patients to the outside laboratories notwithstanding the existence of the prohibited financial relationships among them in violation of the Stark law, and Defendants unlawfully submitted claims to Medicare, Alabama Medicaid, and other Federal HealthCare Programs (as well as private pay insurers) for goods and services supplied to patients as a result and/or in connection with of such referrals.

60.     The referrals made by the defendants did not qualify for any other statutory or regulatory exception from the Stark law's referral prohibition.

61.     As a consequence of such unlawful referrals, claims and payments, the Defendants have knowingly caused the submission of substantial fraudulent charges which Defendants unlawfully billed to Medicare, Medicaid, TRICARE and other Government healthcare payors (as well as to private pay insurers) for designated health services from July 2010 up and through April 2013, and upon information and belief, also did so both prior to and since said dates.

62.     As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT IV

### (False Claims Act – Anti-Kickback Law– Outside Testing Laboratories)

63.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 62 as though fully set forth herein.

64.     In exchange for test referrals to the laboratories, the Defendants knowingly and willfully received remuneration prohibited under the Anti-Kickback. *42 U.S.C. §1320a-7b(b)(1).*

65.     The Defendants continued to receive remuneration in exchange for referring patient samples for testing while also continuing to bill for services furnished pursuant to the referrals prohibited by the Anti-Kickback statute, and did so with actual knowledge of the illegality of such compensation arrangement and billings.

66.     As a consequence of such unlawful referrals, claims and payments, the Defendants have knowingly caused the submission of substantial charges which Defendants unlawfully billed to Medicare, Medicaid, TRICARE and other Government healthcare payors (as well as private insurers) for designated health services from July 2010 up and through April 2013, and upon information and belief, also did so both prior to and since said dates, all in violation of the Anti-Kickback statute.

67.    As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT V

**(False Claims Act- Stark Violation – Pharmaceutical Prescriptions)**

68.    *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 67 as though fully set forth herein.

69.    The compensation arrangements between Defendants and the pharmaceutical providers are financial relationships under the Stark law.

70.    Defendants wrote prescriptions for medications supplied by the pharmaceutical providers, who in turn furnished designated health services for which payment was and continues to be made under the Social Security Act in violation of the Stark law. *42 U.S.C. §1395nn (a)(1)(A).*

71.    Defendants conspired to and did knowingly write said prescriptions notwithstanding the existence of the prohibited financial relationships among them in violation of the Stark law, and Defendants unlawfully submitted claims to Medicare, Alabama Medicaid, and other Federal HealthCare Programs (as well as private pay insurers) for goods and services supplied to patients as a result and/or in connection with of such prescriptions.

72.    The prescriptions made by the defendants did not qualify for any other statutory or regulatory exception from the Stark law's designated health services referral prohibition.

73.    As a consequence of such unlawful referrals, claims and payments, the Defendants have knowingly caused the submission of substantial fraudulent charges which Defendants unlawfully billed to Medicare, Medicaid, TRICARE and other Government healthcare payors (as well as to private pay insurers) for designated health services from July 2010 up and through April 2013, and upon information and belief, also did so both prior to and since said dates.

74.    As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT VI

**(False Claims Act – Anti-Kickback Law– Pharmaceutical Prescriptions)**

75.    *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 74 as though fully set forth herein.

76.    In exchange for writing prescriptions for medications supplied by the pharmaceutical providers, the Defendants knowingly and willfully received remuneration prohibited under the Anti-Kickback. *42 U.S.C. §1320a-7b(b)(1).*

77.    The Defendants continued to receive remuneration in exchange for writing said prescriptions while also continuing to bill for services furnished pursuant to the referrals prohibited by the Anti-Kickback statute, and did so with actual knowledge of the illegality of such compensation arrangement and billings.

78.    As a consequence of such unlawful referrals, claims and payments, the Defendants have knowingly caused the submission of substantial charges which Defendants unlawfully billed to Medicare, Medicaid, TRICARE and other Government healthcare payors (as well as private insurers) for designated health services from July 2010 up and through April 2013, and upon information and belief, also did so both prior to and since said dates, all in violation of the Anti-Kickback statute.

79.    As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT VII

**(The False Claims Act – *31 U.S.C. § 3729*)**

**Stark and Anti-Kickback Violations**

80.    Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 79 as though fully set forth herein.

81.    The Defendants knowingly presented or caused to be presented false and fraudulent claims for payment to federally-funded health insurance programs, in violation of *31 U.S.C. §3729(a)(1)*.

82.    The Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, *inter alia*, *31 U.S.C. §3729(a)(2)*.

83.    The United States of America, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to pay for medical services and products provided to individuals insured by the Federal HealthCare Programs. Many of the false claims submitted were directly related to Stark and Anti-Kickback violations set forth previously in this Complaint.

84.    As a result of Defendants' actions, the United States has been, and will continue to be, severely damaged.

## COUNT VIII

### (Conspiracy - *31 U.S.C. § 3729 (3), (4) and (7)*)

85.    Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

86.     Defendants, as usual and customary business practices, conspired to and paid kickbacks, both directly and indirectly, overtly and covertly, in cash and in kind, to Defendant DPG and its physicians in exchange for patient referrals and engaged in other illegal and prohibited financial arrangements with Defendant DPG and its physicians, in violation of the Stark Law, *42 U.S.C. § 1395nn*, the Anti-Kickback Law, 4*2 U.S.C. § 1320a-7b (b)* and various other federal laws and regulations.

87.     Individually and collectively, Defendants, using the illegal health care referral system they created to defraud the United States, submitted false and/or fraudulent claims to the United States and also made false and/or fraudulent statements and certifications to the United States through their fraudulent participation in the Medicare and Medicaid programs. As a result, defendants received millions of dollars in actual damages in false and fraudulent payments from the United States for health care and related services provided to Medicare and Medicaid program beneficiaries.

88.     Defendants, between and amongst themselves, and others conspired to defraud the United States by having false or fraudulent claims paid or allowed, and knowingly making, using, or causing to be made or used false records or statements to increase the obligations of payment by the United States.

89.     As a result of Defendants' actions, the United States has been, and will continue to be, severely damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, *Qui Tam* Plaintiff and Relator, LORI L. CARVER, acting on her behalf and on behalf of the UNITED STATES OF AMERICA, demands and prays that judgment be entered in favor of Relator and the United States against Defendants, jointly and severally, as follows:

(a)      that Defendants be ordered to immediately cease and desist all activities, policies and practices of the medical practice which endanger patient health and safety and expose patients to unnecessary risks;

(b)      that Defendants be ordered to immediately terminate any financial relationships with testing laboratories and pharmaceutical providers;

(c)      that Defendants be ordered to immediately cease the submission and or causing the submission of any further false claims or in any way from otherwise violating *31 U.S.C. §3729 et seq.,* or from further violating *42 U.S.C. §1395(nn) et seq.,* or from further violating *42 U.S.C. §1320(a)-7(b) et seq,*

(d)      that judgment be entered in Relator's' favor and against Defendants for treble the amount of the actual damages incurred by the United States of America, plus civil penalties of not less than Five Thousand, Five Hundred ($5,500.00) Dollars nor more than Eleven Thousand ($11,000.00) dollars per claim, as provided by *31 U.S.C.*

*§3729(a)*, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants together with penalties for specific claims to be identified at trial after full discovery.

(e)     that Relator be awarded the maximum amount allowed pursuant to the Stark statutes, Anti-Kickback Act and False Claims Act as cited and referenced herein;

(f)     that judgment be granted for Relator and the United States and against Defendants for any costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator's in the prosecution of this suit;

(g)     that the United States and Relator's recover any and all damages available to them as a result of Defendants' stated violations of the Stark Laws, Anti- Kickback Laws and the False Claims Act;

(h)     that Relator and the United States be entitled to any and other relief that they are entitled to, whether by law or equity;

(i)     that Relator and the United States be granted any other and further relief as Court deems just and proper upon the evidence submitted.

## DEMAND FOR JURY TRIAL

Plaintiff and Relator, LORI L. CARVER  respectfully demands trial of these claims by struck jury.

DATED this 1st day of August, 2013.


Respectfully submitted,


By/s/Richard H. Holston_____
RICHARD HOLSTON, HOLSR 5536


By/s/ Gregory Vaughan_____
GREGORY VAUGHAN, VAUGG 6227
Post Office Box 195
Mobile, AL 36601
(251) 432-8883
(251) 432-8884 Facsimile


## CERTIFICATE OF SERVICE

I do hereby certify that I have on August 1, 2013 filed the foregoing pleading with

the Clerk of the Court **UNDER SEAL** and have served the following counsel for the

United States of America via certified U.S. Mail as follows:


Eric Holder, Esq.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


Deidre L. Colson, Esq.
Asst. U.S. Attorney, Civil Division
U.S. Attorney, Southern Dist. Of AL
Riverview Plaza, Suite 600

31

63 South Royal Street
Mobile, AL 36602
deidre.colson@usdoj.gov

Douglas J. Rosenthal, Esq.
Trial Attorney
United States Department of Justice
Civil Division, Fraud Section
600 E Street, N.W.
Bldg. BCN-6932
Washington, DC 20004
Douglas.J.Rosenthal@usdoj.gov


\s\ *GREGORY VAUGHAN*
GREGORY VAUGHAN (VAUGG 6227).


TO THE CLERK OF COURT:

> **FILED *IN CAMERA* AND UNDER SEAL**

**ONLY UPON ORDER OF THE COURT ONCE THIS COMPLAINT IS UNSEALED,**

**PLEASE SERVE DEFENDANTS AS FOLLOWS:**

**PHYSICIANS PAIN SPECIALIST OF ALABAMA, PC**
c/o John Patrick Couch, Registered Agent
2001 Spring Hill Ave.
Mobile, AL 36607

**JOHN PATRICK COUCH, MD**
2001 Spring Hill Ave.
Mobile, AL 36607

**XIULU RUAN, MD**
2001 Spring Hill Ave.
Mobile, AL 36607