# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. LORI L. CARVER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION 13-0392-WS-N ) |
| PHYSICIANS' PAIN SPECIALISTS OF ALABAMA, P.C., et al., | ) ) ) |
| Defendants. | ) |

## ORDER

This matter is before the Court on the motion of defendant Castle Medical, LLC ("Castle") for judgment on the pleadings. (Doc. 125). The parties have filed briefs in support of their respective positions, (Docs. 125, 133, 136), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted.

## BACKGROUND

The relator in this False Claims Act case was employed by defendant Physicians Pain Specialists of Alabama, P.C. ("Pain"). In August 2013, she filed this action against Pain and against the two doctors ("Ruan" and "Couch") who owned Pain. (Doc. 1). In August 2014, she filed a first amended complaint that added a pharmacy as a defendant. (Doc. 8). In October 2016, the government filed its notice of non-intervention. (Doc. 24). The relator then filed a second amended complaint that added four more defendants, including Castle. (Doc. 29). In December 2016, the government gave notice of non-intervention as to this pleading. (Doc. 30).

Of the eight defendants named in the second amended complaint, only Castle continues the fight. The three defendants added along with Castle were dismissed without prejudice on the relator's unopposed request, and the other defendants have suffered entry of default. (Docs. 93, 99-100, 122-23).

The second amended complaint is 56 pages long. It incorporates the relator's Supplemental Disclosure Statement of Material Evidence ("Disclosure Statement"), (*id*. at 22), itself 37 pages long. (Doc. 29-1). The parties agree that these documents allege nine different schemes against varying sets of defendants. (Doc. 133 at 15; Doc. 136 at 2). Only one of these schemes implicates Castle. Similarly, while the second amended complaint asserts eight causes of action, only three are alleged against Castle.

The alleged scheme, in a nutshell, is that Castle and Ruan reached and fulfilled an agreement pursuant to which Ruan, in exchange for monthly payments of $7,000, referred to Castle all urine drug screen ("UDS") testing. This arrangement is said to violate both the Stark Law and the Anti-Kickback Statute. Count III alleges that Castle violated the False Claims Act by violating the Stark Law. Count IV alleges that Castle violated the False Claims Act by violating the Anti-Kickback Statute. Count VIII alleges that Castle conspired with Pain and other defendants to violate the False Claims Act. (Doc. 29 at 42-46, 52-54).

Castle's motion for judgment on the pleadings is brought pursuant to Rule 12(c). Castle argues thereunder that Counts III, IV and VIII fail to state a claim on which relief against Castle can be granted. Castle also argues that these counts are not pleaded with the specificity required by Rule 9(b). (Doc. 125 at 1, 5).

## DISCUSSION

"Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. District Attorney's Office*, 592 F.3d 1237, 1255 (11th Cir. 2010) (internal quotes

omitted). "We accept all the facts in the complaint as true and view them in the light most favorable to the nonmoving party." *Id*. The Court "need not accept as true, however, conclusory legal allegations made in the complaint." *Andrx Pharmaceuticals, Inc. v. Elan Corp.*, 421 F.3d 1227, 1230 n.1 (11th Cir. 2005). The parties agree that the adequacy of a pleading challenged under Rule 12(c) is measured and determined as it is for a challenge under Rule 12(b)(6). (Doc. 125 at 6; Doc. 133 at 9). "In order to survive a motion to dismiss, … claims of fraud … also must satisfy the requirements of Fed.R.Civ.P. 9(b)." *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

With nuances and exceptions not relevant here, the Stark Law prohibits a physician from making a referral, for services otherwise covered under Medicare, to an entity with which he has a financial relationship. 42 U.S.C. § 1395nn(a)(1). The Stark Law also prohibits the payment of any Medicare claim for services provided in violation of this provision. *Id*. § 1395nn(g)(1). The Anti-Kickback Statute makes it a felony to offer or pay any remuneration to induce a person to refer an individual for the furnishing of any service for which payment may be made under a federal health care program. 42 U.S.C. § 1320a-7b(b)(2)(A). Castle concedes that violation of the Stark Law or the Anti-Kickback Statute can support a claim under the False Claims Act. (Doc 125 at 7). *See McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1257, 1259 (11th Cir. 2005) (violation of the Anti-Kickback Statute can form the basis for a False Claims Act claim); *see also United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3rd Cir. 2009) ("Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.").

Castle raises a number of arguments in support of its motion, but one is dispositive. "[T]he False Claims Act is a fraud statute for the purposes of Rule 9(b)." *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1309 (11th Cir. 2002) (internal quotes omitted). Therefore, "complaints

alleging violations of the False Claims Act are governed by Rule 9(b)." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005); *accord United States ex rel. Walker v. R&F Properties, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005). As Castle asserts, the second amended complaint does not satisfy the particularity standard of that rule.

"To state a claim under the False Claims Act with particularity, the complaint must allege facts as to time, place, and substance of the defendant's alleged fraud, and the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Corsello*, 428 F.3d at 1012 (internal quotes omitted). There are two parts to this burden. First, the plaintiff must "provid[e] the 'who,' what,' 'where,' 'when,' and 'how' of improper practices." *Id*. at 1014. Second – and this is the critical point in this case – she must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Id*.

"The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311. "Without the *presentment* of such a claim, … there is simply no actionable damage to the public fisc as required under the False Claims Act." *Id*. (emphasis in original). "The submission of a claim is thus … the *sine qua non* of a False Claims Act violation." *Id*. "As such, Rule 9(b) … does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reasons for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id*. Rather, "[b]ecause it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances." *Corsello*, 428 F.3d at 1013. At a minimum, "some indicia of reliability must be given in the

complaint to support the allegation of an *actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311 (emphasis in original). Firm enforcement of Rule 9(b) in this context "ensures that the relator's strong financial incentive to bring an FCA claim – the possibility of recovering between fifteen and thirty percent of a treble damages award – does not precipitate the filing of frivolous suits." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).

Counts III and IV allege generally that Castle unlawfully submitted claims to Medicare for goods and services supplied as a result of the referrals and kickbacks made unlawful by the Stark Law and the Anti-Kickback Statute. (Doc. 29 at 43, ¶ 63; *id*. at 45, ¶ 73).[1] The relator points to nothing in the body of the second amended complaint that provides any factual support for the allegation that Castle actually submitted false claims. Instead, she points to her attached Disclosure Statement for the proposition that Pain's billing department supervisor told her that "Medicare comprises approximately 60% of the practice's third-party-payor revenue." (Doc. 29-1 at 3).[2] According to the relator, this single

---

[1] Counts III and IV also allege that Pain, Ruan and Couch billed Medicare for services furnished pursuant to the unlawful referrals and kickbacks. (Doc. 29 at 43, ¶ 65; *id*. at 45-46, ¶¶ 72-73). The relator does not explain why these defendants would be billing Medicare for services provided by Castle but, in any event, she makes clear in her brief that Castle's liability under these counts is based only on the submission of claims by Castle. (Doc. 133 at 20-21 ("The complaint also specifies the method of determining false claims at issue during the relevant time period – namely, … all claims submitted to Medicare *by Castle* for UDS services referred by Couch and Ruan from February, 2013 to May, 2015.") (emphasis added)).

[2] In its reply brief, Castle argues the Court cannot consider the Disclosure Statement because it does not constitute a "written instrument" for purposes of Rule 10(c). (Doc. 136 at 2-4). However, it was Castle that first directed the Court to the Disclosure Statement, inviting the Court at least six times in its principal brief to review specific portions of that document. (Doc. 125 at 11, 13, 14, 15, 18-19). It was also Castle that advised the Court it could consider "those documents that are attached to the pleadings." (*Id*. at 7). Having opened the door to the Court's consideration of the Disclosure Statement, Castle cannot now force it shut. But the Court need consider only those particular portions of this voluminous document specifically cited by the parties.

statement provides indicia of reliability sufficient to survive scrutiny under Rule 9(b). (Doc. 133 at 14, 15, 16, 17-18, 26). The statement, however, plainly will not carry the heavy burden the relator places upon it.[3]

First, the statement does not, as the relator asserts in her brief, assert with particularity that 60% of Pain's patients were covered by Medicare. All it says is that a majority of Pain's *revenue* (not patients) from *third-party* payors (not all payors, including uninsured patients and the uninsured expenses of insured patients) comes from Medicare.[4] For all this statement shows, Pain might have had relatively few Medicare patients, with those patients responsible for a disproportionately high percentage of the practice's third-party payor revenue. For all this statement shows, Pain's patient base might be predominantly self-paying.

---

[3] The relator asks the Court to take judicial notice of an affidavit submitted in support of an application for a search warrant in the doctor defendants' criminal case. (Doc. 133 at 13 n.4). As noted, the Court may consider judicially noticed facts in resolving a Rule 12(c) motion, *Cunningham*, 592 F.3d at 1255, and records in other judicial proceedings may sometimes be judicially noticed. *E.g., Cash Inn, Inc. v. Metropolitan Dade County*, 938 F.2d 1239, 1243 (11th Cir. 1991). But even if the Court may properly take judicial notice of the affidavit and the factual assertions made therein, it can neither take judicial notice of the accuracy of those assertions nor transport those assertions into the second amended complaint. *E.g., Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1279-80 (11th Cir. 1999); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). These and other cases (including those cited by the relator) reflect that judicially noticed facts can be utilized to determine if the complaint states a claim for relief, but they do not suggest such facts can be used to satisfy Rule 9(b) when the complaint itself does not do so and the complaint does not purport to incorporate the extrinsic document. The relator identifies no authority to the contrary. In any event, the factual assertions made in the affidavit do not address, and therefore do not rectify, the fatal flaw in the relator's pleading as discussed in text.

[4] The relator assumes rather than demonstrates that percentage of revenue correlates perfectly with percentage of patient base, (Doc. 133 at 16, 18), but she offers no justification for that assumption. It is not difficult to envision that older patients eligible for Medicare incur greater medical expenses on average than younger patients not covered by that program.

Even assuming that a significant percentage of Pain's patient base is covered by Medicare, the statement says nothing about the only patients that matter – those obtaining UDS testing. Such testing is typically done at the request of an employer or substance abuse treatment facility, while Medicare generally covers persons at least 65 years of age or with permanent disabilities. It thus may be that UDS testing of Pain's patients skews towards patients not covered by Medicare; certainly the relator has provided no reason to believe otherwise.[5] In addition, the relator has pointed to no allegation regarding the size of either Pain's patient base or of the subset of that class that received UDS testing by Castle.

For all these reasons, it is doubtful the relator has pleaded with adequate particularity that Castle performed any UDS testing on any Medicare patients referred from Pain under the alleged referral/kickback arrangement. The ultimately fatal flaw in her pleading, however, is her patent failure to plead with particularity that, assuming it performed such UDS testing, Castle then billed the government for such services.

The relator admits she never worked for Castle,[6] so she plainly has no firsthand awareness of Castle's billing practices. Nor does she assert that anyone at Castle ever provided her any information regarding those practices. Instead, the relator relies exclusively on the assumption that, if Castle performed UDS testing on Medicare patients, it must have billed Medicare for those tests. While the assumption is not illogical, it falls far short of pleading submission to Medicare with the particularity required by Rule 9(b).

In *Clausen*, the relator alleged only that the defendant's practices "resulted in the submission of false claims for payment to the United States." 290 F.3d at

---

[5] The relator again simply assumes that those sent to Castle for testing "necessarily included" Medicare patients. (Doc. 133 at 17-18). Indeed, she mechanically posits, without any defensible justification, that Medicare was the "predominant payor" for the patients referred to Castle. (*Id*. at 1).

[6] (Doc. 29 at 16, ¶ 28.1). Instead, she was employed as clinical supervisor for Pain. (*Id*. at 8, ¶ 9).

1312. No sample claim was provided, no amount of any claim was identified, and the complaint described "[n]o policies about billing or even second-hand information about billing practices." *Id*. The Eleventh Circuit held the pleading inadequate. As noted, a relator cannot rest simply on her *ipse dixit* that false claims "must have been submitted, were likely submitted, or should have been submitted." *Id*. at 1311. "[W]e cannot … presume what [the defendant's] billing policies were and assume [the defendant] actually billed the Government in whole or in part for all tests it took the trouble to order …." *Id*. at 1313 n.23 (internal quotes omitted). More generally, "[w]e cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government …." *Id*. at 1312 n.21. Not even a "pattern of improper practices of the defendants leads to the inference that fraudulent claims were submitted to the government …." *Corsello*, 428 F.3d at 1013. These pronouncements make perfectly clear that the mere fact the defendant *performed* a test on a Medicare patient does not adequately support an allegation the defendant *submitted a claim* for the test. That, however, is precisely the mental leap on which the relator exclusively relies.

As in this case, the relator in *Clausen* was a "corporate outsider." 290 F.3d at 1314. "But, while an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the False Claims Act, neither the Federal Rules nor the Act offer any special leniency under these particular circumstances …." *Id*.[7]

The relator cites a number of cases in support of her position, (Doc. 133 at 10-13, 19-21), but none of them can rescue her claims. It is true that "[w]e

---

[7] The *Clausen* Court suggested a more lenient standard might be appropriate if the evidence of fraud "was uniquely held by the defendant." 290 F.3d at 1314 n.25. The relator does not invoke this lower standard and thus cannot claim any benefit from it. In any event, *Clausen* ruled that the complaint was ineligible for consideration under this standard because the relator could obtain from the government itself information reflecting its receipt of claims from the defendant, *id*., and that conclusion would appear to apply equally here.

evaluate whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis," *Atkins*, 470 F.3d at 1358, but this case is captured by *Clausen*. Indeed, it is also captured by *Atkins*, where a complaint failed to satisfy Rule 9(b) when it merely alleged the defendants submitted false claims and when the relator claimed no firsthand knowledge of such submissions, was not involved in billing, coding, filing or submitting claims at the one facility where he worked, and had "never stepped foot" in other facilities named as defendants. *Id*. at 1359.

It is likewise true that "[a] relator can also provide the required indicia of reliability by showing that he personally was in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." *United States ex rel. Mastej v. Health Management Associates, Inc.*, 591 Fed. Appx. 693, 707 (11th Cir. 2014). The relator, however, was nowhere near being in a position to know whether Castle actually submitted false claims.[8] Similarly, while "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the

---

[8] The relator in *Mastej* had been vice-president for six years of the parent company defendant and then CEO of one hospital defendant for eight months. As vice-president, he attended many meetings where the billing and submission of claims to Medicare was discussed, and as CEO he was familiar with the hospital's Medicare patients, services and revenues and gained personal knowledge of the other hospital defendant's submission of false claims from conversation with the CEO of that hospital. 591 Fed. Appx. at 695-96, 707-08. The experience and knowledge of the relator here does not remotely resemble that of the relator in *Mastej*.

Even in *Mastej*, the necessary indicia of reliability disappeared the moment the relator left the defendants' employment, and after that point he could not plead with particularity either that the unlawful practices continued or that the defendants continued to submit false claims. 591 Fed. Appx. at 709. Here, the relator first identifies Castle as providing UDS testing pursuant to a referral/kickback arrangement in February 2013, (Doc. 29-1 at 19), and her employment with Pain ended "a short time" later, (*id*.), in April 2013. (Doc. 133 at 15). Applying *Mastej* here, as the relator requests, requires her to plead with particularity that Castle submitted false Medicare claims on UDS testing performed in this narrow two-month window.

defendants may have a sufficient basis for asserting that the defendants actually submitted false claims," *id*. at 704 (citing *Walker*, 433 F.3d at 1360), the relator here has no such first-hand knowledge of Castle's billing practices and was never employed by Castle.[9]

It is also generally true that the particularity requirement of Rule 9(b) must be read with Rule 8(a)(2) ("short and plain statement of the claim") and Rule 8(e)(1) ("simple, concise, and direct" allegations). *Hill v. Morehouse Medical Associates, Inc.*, 2003 WL 22019936 at *3 (11th Cir. 2003).[10] Rule 8, however, cannot excuse a failure to plead fraud with the particularity required in False Claims Act cases by published Eleventh Circuit decisions.[11]

The relator insists that, whenever relators "involved in management and decision-making" are "able to allege general – but reliable – information, their claims regularly survive motions to dismiss even if the allegations are not hypertechnical and specific." (Doc. 133 at 11). This is far too broad a statement to accept at face value. More precisely, managers (or even non-managers) with sufficiently direct and precise information regarding the defendant's billing practices may be able to survive Rule 9(b). None of the relator's cited cases

---

[9] The relator in *Walker* worked for the defendant as a nurse practitioner and knew from personal experience that she was given no unique provider identification number ("UPIN") but instead was always told which doctor's UPIN she would be billing under. The office administrator told the relator that the defendant followed the same practice for all nurse practitioners and physician assistants and always billed their services as having been rendered under the immediate personal supervision of a physician even though the relator knew they often did not work under such supervision. 433 F.3d at 1352-53, 1360. The relator here has never worked for Castle and has been told nothing about its billing practices.

[10] *See also Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1051 (11th Cir. 2015) ("In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by" Rule 9(b)).

[11] The relator in *Hill* worked as a coder and biller for the defendant and observed false claims being submitted, 2003 WL 22019936 at *1, *4, a situation wholly unlike that of the relator here.

support the more forgiving rule she espouses,[12] and she cannot satisfy the more demanding standard the Eleventh Circuit maintains.[13]

As noted, Count VIII alleges that Castle conspired with others to violate the False Claims Act.[14] Castle argues that the inadequate pleading of the substantive

---

[12] The Court has already addressed *Walker*, *Mastej* and *Hill*. The relator's only other appellate authority is *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217 (11th Cir. 2012). The relators in *Matheny* alleged that the defendants, in an annual report to the government, falsely certified they had complied with their obligation to return overpayments. *Id*. at 1221. Because a specific submitted document was identified, the Eleventh Circuit ruled that *Clausen* and its progeny did not apply and that these allegations satisfied Rule 9(b) without additional allegations regarding personal knowledge of the document's submission. *Id*. at 1225. The relator here points to no specific, unique document as having been submitted to the government.

The relator's remaining authorities are trial court decisions, most from outside the Eleventh Circuit. To the doubtful extent they lend colorable support to her position, they are incapable of superseding the controlling appellate precedent on which this opinion is based.

[13] In its reply brief, Castle points out an additional assertion in the Disclosure Statement: that, after Castle became the exclusive lab for UDS testing, "patients began to complain that they were getting billed by Castle for payments not covered by their insurance." (Doc. 29-1 at 19; Doc. 136 at 11-12). Although the relator does not rely on this statement, the Court considers it because Castle discusses it. While the statement confirms that Castle billed private insurers for UDS testing, it says nothing about whether Castle also billed Medicare for such testing.

[14] The relator suggests that Count VIII alleges that Castle conspired to violate the Stark Law and the Anti-Kickback Statute. (Doc. 133 at 3). While the body of Count VIII alleges such a conspiracy, it also alleges a conspiracy to violate the False Claims Act. (Doc. 29 at 53-54). Assuming without deciding that there is such a thing as a separate cause of action for conspiracy to violate the Stark Law or the Anti-Kickback Statute, the second amended complaint asserts no such claim. The introduction to the second amended complaint clarifies that suit is brought to redress "conspiracy to submit … false and/or fraudulent claims" and "conspiracies to defraud Medicare," (*id*. at 4), which descriptions clearly limit Count VIII to a conspiracy to violate the False Claims Act. Moreover, the style of Count VIII identifies the statutory basis of the claim as "31 U.S.C. § 3729 (3), (4) and (7) [sic]," which implicates only the False Claims Act. In short, Count VIII injects no conspiracy cause of action other than conspiracy to violate the False Claims Act in violation of 31 U.S.C. § 3729(a)(1)(C).

claims dooms the conspiracy claim as well. (Doc. 25 at 22-23, 24). The relator offers no response.

It appears that the Eleventh Circuit requires the actual submission of a false claim in order to sustain a conspiracy claim under the False Claims Act. First, "[t]he submission of a claim is … the *sine qua non* of a False Claims Act violation." *Clausen*, 290 F.3d at 1311. Second, an essential element of a conspiracy claim is "that the United States suffered damages as a result of the false or fraudulent claim," *Corsello*, 428 F.3d at 1014 (internal quotes omitted), and it is not easy to see how the government could suffer damage from a conspiracy that does not result in the submission of a false claim. This is especially so given *Clausen*'s statement that, "[w]ithout the *presentment* of such a [false] claim, … there is simply no actionable damage to the public fisc as required under the False Claims Act." 290 F.3d at 1311 (emphasis in original).

Because *Clausen* did not involve a conspiracy claim,[15] and because *Corsello* resolved the conspiracy claim on other grounds,[16] they do not directly answer the question. In *Atkins*, however, the panel resolved both the substantive claims and the conspiracy claim on a single ground – the failure to plead with particularity the submission of a false claim. 470 F.3d at 1354, 1357-60; *id*. at 1358-59 ("In the case at hand, the complaint fails rule 9(b) for want of sufficient indicia of reliability to support the assertion that the defendants submitted false claims."). The Court therefore concludes that the failure to plead with particularity the submission of a false claim to the government is fatal to a False Claims Act conspiracy claim. Because, as discussed above, the second amended

---

[15] Although the original complaint included such a claim, the first and second amended complaints – the only pleadings addressed by the Eleventh Circuit – did not. 290 F.3d at 1303-04, 1305-06 & 1304 n.6.

[16] Dismissal of the conspiracy claim was upheld because the complaint contained no specific allegations of any agreement or overt act. 428 F.3d at 1014.

complaint does not satisfy Rule 9(b) in this regard, the relator's conspiracy claim fails along with her substantive claims.

In short, Castle's motion for judgment on the pleadings is due to be granted. Castle seeks as relief the dismissal with prejudice of all claims against it and entry of judgment in its favor. (Doc. 125 at 24). The relator proposes no different relief.

## CONCLUSION

For the reasons set forth above, Castle's motion for judgment on the pleadings is **granted**. All claims asserted against Castle are **dismissed with prejudice**. Judgment shall be entered in favor of Castle by separate order.[17]

DONE and ORDERED this 27th day of October, 2017.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[17] By statute, an action "may be dismissed only if the court and Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b)(1). The government has not consented to this disposition of the action as to Castle, but such consent is not required. "The consent requirement in § 3730(b)(1) applies only to voluntary dismissals." *Jallali v. Nova Southeastern University, Inc.*, 486 Fed. Appx. 765, 767 (11th Cir. 2012); *accord Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 797 n.5 (7th Cir. 2009); *United States ex rel. Mergent Services v. Flaherty*, 540 F.3d 89, 91 (2nd Cir. 2008); *United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 934 (8th Cir. 2001); *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 344 (9th Cir. 2000); *United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 722 n.5 (9th Cir. 1994).