Case 1:13-cv-00392-WS-N   Document 174-1   Filed 02/15/18   Page 1 of 56

U.S. ex rel., Heesch v. Diagnostic Physicians Group, P.C., Not Reported in F.Supp.3d...

2014 WL 1948326

2014 WL 1948326
Only the Westlaw citation is currently available.
United States District Court,
S.D. Alabama,
Southern Division.

UNITED STATES of America ex rel.,
Christian M. HEESCH, Plaintiff,
v.
DIAGNOSTIC PHYSICIANS GROUP, P.C.; IMC–
Diagnostic and Medical, P.C .; IMC–Northside
Clinic, P.C.; Infirmary Medical Clinics, P.C.; &
Infirmary Health Systems, Inc., Defendants.

Civil Action No. 11–0364–KD–B.
|
Signed May 15, 2014.

**Attorneys and Law Firms**

James B. Newman, Helmsing, Leach, Herlong, Newman & Rouse, P.C., Mobile, AL, Samuel C. Rosten, Edward A.R. Miller, Jones Walker LLP, Mobile, AL, Daniel James Martin, Jones Walker LLP, Birmingham, AL, for Defendants.

**Opinion**

### ORDER

KRISTI K. DuBOSE, District Judge.

 **\*1** This action is before the Court on the motion to reconsider filed by Plaintiff Christian M. Heesch (the Relator). (Doc. 207) Upon consideration and for the reasons set forth herein, the motion is DENIED.

On April 11, 2014, the Court entered an order denying the Relator's motion for leave to file his fourth amended complaint and granting defendants IMC–Diagnostic and Medical, PC, Infirmary Medical Clinics, PC, and Infirmary Health Systems, Inc. (the Infirmary Defendants) motion to dismiss the Relators' third amended complaint as to them. (Doc. 173)[1] The Relator has now filed a motion to reconsider "pursuant to Federal Rules of Civil Procedure 59 and/or 60".

As an initial consideration, Rule 60(a) provides for corrections based on clerical mistake, oversight or omissions. Rule 60(b) provides six specific grounds for relief. Since the Relator has failed to brief the Court as to which applies, the Court will not make his argument for him. "District courts are under no obligation to distill every potential argument in favor of a counseled party's position." *OMV Associates Ltd. Partnership v. TriMont Real Estate Advisors, Inc.*, 484 Fed. Appx. 299, 305 (11th Cir.2012) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) *(en banc )*). However, Rule 59 contains only one paragraph that could be relevant: Paragraph(e). Rule 59(e) provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Thus, the Court will address the Relator's motion as a Rule 59(e) motion to alter or amend a judgment. *See Jallali v. Nova Southeastern University, Inc .,* 486 Fed. Appx. 765, 766 (11th Cir.2012) (reviewing the district court's Rule 59(e) analysis in an appeal from an order granting defendant's motion to dismiss).

"There are only two grounds for granting a Rule 59(e) motion for reconsideration: (1) 'newly-discovered evidence'; or (2) correcting 'manifest errors of law or fact." ' *Caraway v. Secretary, U.S. Dept. of Transp.*, 550 Fed. Appx. 704,2013 WL 6570942, \*6 (11th Cir. Dec. 16, 2013) (quoting *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir.2007) (internal quotation marks omitted). "Rule 59(e) is not an appropriate vehicle to 'relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.' " *Frantz v. Walled,* 513 Fed.Appx. 815, 822 (11th Cir.2013) (citing *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir.2005)).

The Relator argues that the order is based upon clear errors of law and fact and that he should be relieved from the order to prevent manifest injustice. As to the latter, the Relator states that the statute of limitations has expired as to the dismissed claims, despite what may be revealed during discovery.

The Relator argues that the Court "mistakenly concluded that 'there is no allegation of any specific act of retaliation by the Infirmary Defendants or even that Infirmary Defendants acted in concert with [Diagnostic Physicians Group, P.C. (DPG) ] regarding the Relator's harassment or termination." (Doc. 173, p. 5) In support,

the Relator points out that in paragraph 54 of his third amended complaint, he specifically alleged that Barre Sanders was the Administrator for DPG and the Infirmary Defendants. [2] He argues that the Court did not include this fact in its analysis. The Relator also argues that he "generally" assigned acts of retaliation to the Infirmary Defendants by using the word "Defendants" and that he made specific factual allegations of retaliation, harassment and termination by the Infirmary Defendants acting through Sanders. [3]

**\*2** The Relator also argues that in his proposed fourth amended complaint he specifically plead the inextricable intertwined relationship between DPG and the Infirmary Defendants and provided evidence in support in his reply. He points out that from this evidence, the Court found it "reasonable to infer that the Infirmary Defendants had the capacity to exert some control over a physicians continued employment with DPG" and "that the Infirmary Defendants had some control over the amount of compensation that the Relator received" such that "it is plausible ... that the Relator had an 'employer type' relationship with the Infirmary Defendants ... (Doc. 173, pp. 4–5.) The Relator argues that combining the Court's conclusion with the overlooked fact that Sanders is both an Administrator for DPG and the Infirmary Defendants and with the specific factual allegations regarding Sanders' harassment of the Relator and Sander's involvement with the DPG Board, his amended complaints were sufficient to state the Relator's claims against the Infirmary Defendants.

The Court finds no basis to reconsider its decision. The Court did not overlook the fact that Sanders is an Administrator for both DPG and the Infirmary Defendants. As previously stated, even construing the fourth amended complaint liberally, there is no *allegation* of any specific act of retaliation by the Infirmary Defendants.

The issues presented by the Relator either were raised and considered or could have been raised in the Relator's response to the Infirmary Defendants' motion to dismiss or in the Relators' response to the Infirmary Defendants' opposition to the motion for leave to file the fourth amended complaint. Rule 59(e) is not an appropriate vehicle to relitigate old issues or raise arguments in support that could have been raised before judgment was entered. *Frantz,* 513 Fed.Appx.at 822 (citation omitted). Accordingly, the motion for reconsideration is denied.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1948326

Footnotes

1   The Relator did not name IMC–Northside Clinic, P.C., as a defendant in his complaint. However, it is named as a defendant in the United States' complaint in intervention.

2   "54. Specifically, when Dr. Heesch succeeded in temporarily implementing institutional guidelines to achieve adherence to sound clinical guidelines and radiation safety standards, Barre Sanders ("Sanders"), Administrator of Defendants, promptly reported to Dr. Heesch's colleagues in a formal DPG physician meeting that there had been a decline in reimbursement "thanks to Dr. Heesch", implying that Dr. Heesch's efforts had an adverse impact on DPG physicians financial interests. Dr. Heesch's safety guidelines were subsequently circumvented by DPG, led by F. Martin Lester, M.D. ("Lester"), President of DPG, and administrator Sanders." (Doc. 66, p. 18).

3   The Relator also argues that Dr. Lester's statement that a "Board, or whatever it is" voted to terminate the Relator coupled with Dr. Lester's suggestion that the Relator could ask Sanders about staying to take care of patients, is a sufficient allegation to render plausible that the "Board, or whatever it is" that voted to terminate the Relator may include Sanders or other officers, employees or agents of the Infirmary Defendants.

---

**End of Document**                                         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

United States ex rel. Keeler v. Eisai, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 12049081

2013 WL 12049081
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

United States of America, et al.,
ex rel. Michael Keeler, Plaintiffs,
v.
Eisai, Inc., Defendant.

Case No. 09-22302-CV-WILLIAMS
|
Signed 04/01/2013

**Attorneys and Law Firms**

Joyce R. Branda, United States Department of Justice, Commercial Litigation Branch, Washington, DC, Mark Alan Lavine, United States Attorney's Office, West Palm Beach, FL, Steven Frederick Grover, Gary Michael Farmer, Jr., Steven R. Jaffe, Seth Michael Lehrman, Farmer Jaffe Weissing Edwards Fistos & Lehrman PL, James Paul Gitkin, Salpeter Gitkin, LLP, Fort Lauderdale, FL, for Plaintiffs.

Cheryl Zak Lardieri, Goodell De Vries Leech & Dann LLP, Boston, MD, Eben S. Flaster, Goodell, DeVries, Leech & Dann, LLP, Philadelphia, PA, Patricia Elaine Lowry, Squire Patton Boggs (US) LLP, West Palm Beach, FL, Thomas J. Cullen, Jr., Goodell DeVries Leech & Dann LLP, Baltimore, MD, Ashley C. Parrish, Kevin Dinan, Jamie A. Lang, Joseph Sedwick Sollers, III, Mark A. Jensen, King & Spalding, LLP, Washington, DC, Justin Daniel Jacobson, LawCraft, Plantation, FL, for Defendant.

**Opinion**

## ORDER

KATHLEEN M. WILLIAMS, UNITED STATES DISTRICT JUDGE

**\*1 THIS MATTER** is before the Court on Relator's Motion to Amend Order of Dismissal under Rules 60(a) and (b) and Rule 59(e) (DE 236). The motion seeks three things: (1) to clarify the Court's January 31, 2013 Order of Dismissal to state that the case is not dismissed with prejudice as to other parties in interest that might be able to make out a claim; (2) to revise that Order to state that the dismissal is without prejudice as to Mr. Keeler (since he may be able to join with others or the Government to provide missing information necessary to form a claim); and (3) to allow Relator leave to file a fourth amended complaint based on "rich," newly-discovered of fraud that he obtained in discovery and which "adds an extremely high indicia of reliability to Relator's allegations." Essentially, the motion is one for reconsideration and to amend the Complaint.

The Court has reviewed the motion and the record and concludes that under any standard, Relator's requests must be denied. As to the first, Relator has not shown how he has been affected by the Court's order to the extent it may affect other potential plaintiffs or relators. *See* Mot. at 5 (stating that the United States "should not be prejudiced if a relator's allegations are challenged under Rule 9(b)"). As to the remaining grounds – which raise similar issues –Relator has not shown that dismissal with prejudice was not warranted. *See Corsello v. Lincare, Inc., 428 F.3d 1008, 1014-15 (11th Cir. 2005)* (holding that trial court did not err in denying relator's request to file an amended complaint where there was a repeated failure to cure deficiencies in three prior complaints).

Finally, as Mr. Keeler acknowledges in his reply, he has neither attached a proposed complaint for the Court to review in accordance with Local Rule 15.1 nor has explained how his allegations would withstand the scrutiny required by Federal Rule of Civil Procedure 9(b). In any event (and aside from the fact that, as Defendant sets forth, this motion is a totally inappropriate vehicle for the relief requested), allowing Mr. Keeler to use documents obtained in discovery to overcome pleading hurdles would circumvent the purpose of Rule 9(b). *See, e.g., United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 229, 231 (1st Cir. 2004)* ("[A] qui tam relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery."). Indeed, in *United States ex. rel. Clausen v. Laboratory Corp. of Am., Inc., 290 F.3d 1301 (11th Cir. 2002)*, the Eleventh Circuit warned of a situation where "a plaintiff does not specifically plead the minimum elements of their allegation, [and is able] to learn the complaint's bare essentials through discovery and may needlessly harm a defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings,

2013 WL 12049081

and, at worst, are baseless allegations used to extract settlements." *Id.* at 1313 n.24 (citation omitted).

**\*2** Accordingly, it is hereby **ORDERED AND ADJUDGED** that Relator's Motion (DE 236) is **DENIED.** Although Relator suggests that he may seek to re-file the motion, he is warned that having dismissed this action and denied reconsideration, the proper avenue for challenging the Court's rulings is an appeal. (*See* DE 256, at 1 ("[T]he Court will need to see and evaluate Relator's additional allegations and/or evidence in order

to determine if it is proper to vacate or modify its Order.") Any further filings in this action may result in the imposition of sanctions.

**DONE AND ORDERED** in chambers in Miami, Florida, this 1$\underline{^{st}}$ day of April, 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 12049081

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4760864

2012 WL 4760864
Only the Westlaw citation is currently available.
United States District Court,
S.D. Alabama,
Southern Division.

William Henry PITTMAN, Plaintiff,
v.
ALABAMA DEPARTMENT OF
PUBLIC SAFETY, Defendant.

Civil Action No. 12–0347–WS–C.
|
Oct. 4, 2012.

**Attorneys and Law Firms**

J. Christopher Klotz, Klotz Law Firm, Pensacola, FL, for Plaintiff.

William G. Parker, Jr., Montgomery, AL, for Defendant.

Opinion

**ORDER**

WILLIAM H. STEELE, Chief Judge.

**\*1** This closed matter comes before the Court on "Plaintiff's Petition for Reconsideration of Final Order and for Permission to Amend–In a Necessary Party" (doc. 28).

Plaintiff, William Henry Pittman, who has at all times been represented by counsel herein, filed this action against defendant, Alabama Department of Public Safety, alleging constitutional deprivations with respect to the administration and enforcement of Alabama's sex offender registry laws. The Department (which was the only named defendant) promptly moved to dismiss the First Amended Complaint on the ground that Pittman's claims are barred by Eleventh Amendment immunity. Pittman opposed the motion, citing case law allowing suits against state officials for prospective injunctive relief to stop ongoing violations of federal law. However, Pittman's pleadings did not name a state official as a defendant, and he never requested leave of court to amend his complaint to name a state official (rather than the Department, a state agency) as defendant. On September

21, 2012, the undersigned entered an Order (doc. 26) and Judgment (doc. 27) granting defendant's motion to dismiss and dismissing this action without prejudice on Eleventh Amendment immunity grounds.

Now, Pittman seeks reconsideration of the September 21 Order and Judgment, reasoning that he has decided that he wishes to name a state official as a defendant and that "[i]t would foster judicial economy to allow the amendment of the complaint rather than require a whole new case filing." (Doc. 28, at 1.) Pittman cites neither case law nor any Federal Rule of Civil Procedure that he contends supports his motion.

As an initial matter, Pittman's Petition for Reconsideration is misguided because it disregards the stringent legal standard governing such requests. It is hornbook law that "[i]n the interests of finality and conservation of scarce judicial resources, reconsideration of an order is an extraordinary remedy and is employed sparingly." *Longcrier v. HL–A Co.,* 595 F.Supp.2d 1218, 1246 (S.D.Ala.2008) (citations omitted). In that regard, the Supreme Court has confirmed that motions to reconsider "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 485 n. 5, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (citation omitted); *see also Richardson v. Johnson,* 598 F.3d 734, 740 (11th Cir.2010) (similar); *Mays v. U.S. Postal Service,* 122 F.3d 43, 46 (11th Cir.1997) ("a motion to reconsider should not be used by the parties to set forth new theories of law"). Under Rule 59(e), Fed.R.Civ.P., "a party may move for reconsideration only when one of the following has occurred: an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." *Longcrier,* 595 F.Supp.2d at 1247 (citations and internal punctuation omitted). Pittman makes no pretense of aligning his arguments for relief from the September 21 Order and Judgment to any of these discrete categories that might permit reconsideration.

**\*2** To the extent that Pittman is attempting to frame his "Petition for Reconsideration" as a mere routine motion for leave to amend the Amended Complaint under Rule 15, such an argument fails for two distinct reasons. First, prior to entry of the September 21 Order and Judgment, Pittman never requested leave to amend

his pleading to include the Director of the Alabama Department of Public Safety as a separate defendant. When confronted with the Department's request for dismissal on Eleventh Amendment immunity grounds, Pittman made no attempt to correct his pleading error, but instead elected to argue that Eleventh Amendment immunity was inapplicable. Having chosen the path of debating the Department's Eleventh Amendment immunity argument, rather than correcting the underlying pleading defect, Pittman cannot now be heard to object that this Court should have allowed him another opportunity to amend his pleadings before dismissing the action without prejudice. After all, as a matter of well-settled law, "[a] district court is not required to grant plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend [ ] or requested leave to amend before the district court." *U.S. ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1303 (11th Cir.2010)* (citation omitted). [1] Certainly, it is not a proper use of a motion for reconsideration to make a brand-new request to amend the pleadings because a previous strategic decision not to seek that available amendment proved unwise or unsuccessful. Having chosen to confront the Eleventh Amendment issue head-on by arguing the law, rather than sidestepping it by fixing his pleadings, Pittman will not be rescued from the natural, foreseeable consequences of that decision via motion to reconsider.

Second, even if it were appropriate for Pittman to seek amendment of the pleadings via motion to reconsider, his motion would fail because the Rule 15 liberal amendment policy has no application in the postjudgment context. *See Czeremcha v. International Ass'n of Machinists and Aerospace Workers, AFL–CIO, 724 F.2d 1552, 1556 n. 6 (11th Cir.1984)* (Rule 15(a) motion to amend is "inappropriate É if the court has clearly indicated either that no amendment is possible or that dismissal of the complaint also constitutes dismissal of the action"). [2] Insofar, then, as Pittman wants to amend his complaint at this time, he cannot bypass the stringent legal standard under Rule 59(e) for setting aside the September 21 Judgment by relying on the Rule 15(a) liberal amendment policy. Rather than invoking the well-worn proposition that leave to amend is freely given in the interests of justice, Pittman must first show that reopener is appropriate pursuant to Rule 59(e), and that the interests favoring reopener outweigh competing considerations of protecting the finality of judgments and the expeditious termination of litigation. Pittman has made no such showing, and has indeed articulated no legal argument for why relief from the September 21 Judgment might be appropriate or permissible at this juncture.

*3 For all of the foregoing reasons, Plaintiff's Permission for Reconsideration of Final Order and for Permission to Amend–In a Necessary Party (doc. 28) is **denied.**

DONE and ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4760864

Footnotes

1   *See also Novoneuron Inc. v. Addiction Research Institute, Inc ., 2009 WL 1132344, *2 (11th Cir. Apr. 28, 2009)* ("Novoneuron had the benefit of counsel, but did not request leave to further amend its complaint. Instead, it filed a response to the Appellees' motion to dismiss. The district court was not obligated to *sua sponte* grant Novoneuron leave to amend É."); *Quinlan v. Personal Transport Services Co., 2009 WL 1564134, *2 (11th Cir. June 5, 2009)* ("we never have stated that a district court *sua sponte* must allow a plaintiff an opportunity to amend where it dismisses a complaint *without prejudice* "); *Bazrowx v. Scott, 136 F.3d 1053, 1054–55 (5th Cir.1998)* (dismissal of *pro se* complaint without granting leave to amend was proper where dismissal was without prejudice).

2   *See also Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir.2006)* ("[T]he plaintiff requested further leave to amend only *after* the district court dismissed her first amended complaint. If made subsequent to the entry of judgment, such requests, whatever their merit, cannot be allowed unless and until the judgment is vacated under, say, Fed.R.Civ.P. 60."); *Building Industry Ass'n of Superior California v. Norton, 247 F.3d 1241, 1245 (D.C.Cir.2001)* ("Ordinarily postjudgment amendment of a complaint under Rule 15(a) requires reopening of the judgment pursuant to Rule 59(e) or 60(b)."); *Nextel Spectrum Acquisition Corp. v. Hispanic Information and Telecommunications Network, Inc., 571 F.Supp.2d 59, 65 (D.D.C.2008)* ("Once a final judgment has been entered, a motion to amend a complaint under Rule 15(a) should

**Pittman v. Alabama Dept. of Public Safety, Not Reported in F.Supp.2d (2012)**

2012 WL 4760864

not be granted unless the plaintiff first satisfies Rule 59(e)'s more stringent standard for setting aside that judgment.") (citations and internal quotation marks omitted)

---

**End of Document**                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)

2016 WL 3961840

2016 WL 3961840
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

United States of America ex rel. Gerry
Phalp and Matt Peoples, Plaintiffs,
v.
Lincare Holdings, Inc. and Lincare, Inc. d/
b/a Diabetic Experts of America, Defendants.

CASE NO. 10-cv-21094-KMW
|
Signed 01/11/2016

**Attorneys and Law Firms**

Susan Torres, U.S. Attorney's Office, Miami, FL,
Lindsey Lazopoulos Friedman, Curtis Bradley Miner,
Stephanie Anne Casey, Colson Hicks Eidson, Coral
Gables, FL, Daniel E. Gustafson, Gustafson Gluek
PLLC, Minneapolis, MN, Charles J. Kocher, Patrick
Howard, Simon Bahne Paris, Saltz Mongeluzzi Barrett
& Bendesky, PC, Philadelphia, PA, Daniel Allen, Jose
M. Bautista, Bautista & Allen, Kansas City, MO, for
Plaintiffs.

Lawrence Phillip Ingram, Andrew Brian Albritton,
Michael S. Hooker, Jessica Kirkwood Alley, Phelps
Dunbar, LLP, Tampa, FL, for Defendants.

### ORDER

KATHLEEN M. WILLIAMS, UNITED STATES
DISTRICT JUDGE

**\*1 THIS MATTER** came before the Court on Relators
Matt Peoples and Gerry Phalp's motion for partial
summary judgment (DE 217) and Defendants Lincare
Holdings, Inc. and Lincare, Inc.'s motion for summary
judgment. (DE 220). Both motions are fully briefed.
Also before the Court is Relators' fully briefed motion
seeking leave to supplement (DE 294) their summary
judgment briefing with previously unpleaded facts.
Relators contend that those facts demonstrate that
outbound sales calls were made by Diabetic Experts of
America [1] to customers of non-party Med4Home, Inc.,

which relied on the Holdings database for predicate
information to make those calls.

### I. BACKGROUND

In Count I of the Second Amended Complaint ("SAC"), a
presentment claim, Relators seek recovery from Diabetic
Experts for the claims it presented to the government
derived from telemarketing of Medicare beneficiaries
in violation of 42 U.S.C. § 1395(m)(a)(17). In Count
II, a make-or-use claim, Relators argue that Holdings
provided Diabetic Experts with improper sales leads
generated from Holdings' database of patient information
and that Diabetic Experts used those leads to make the
calls alleged in Count I. (DE 285).

The Court assumes familiarity with the July 13, 2015
order (the "July Order") granting Defendants' motion
for summary judgment on the six threshold exemplars
("Original Exemplars"). (DE 283). Following that
order granting partial summary judgment in favor of
Defendants, the Parties submitted a joint status report
outlining what claims may remain. (DE 285). Defendants
assert that the July Order resolves all viable claims in
the SAC, that the Court need not address the pending
motions, and that the Court should enter judgment in their
favor. Relators contend that the SAC's claims arising out
of Diabetic Experts' unsolicited sales calls to customers
of Med4Home and Lincare Pharmacy Services Inc. d/b/
a Reliant Pharmacy ("Reliant") are unaffected (or even
bolstered) by the Court's previous summary judgment
analysis.

Relators affirmatively seek summary judgment against
both Diabetic Experts and Holdings on the claims
submitted for payment to the government derived from
outbound telemarketing calls, but concede that issues of
fact regarding Defendants' knowledge preclude summary
disposition in their favor on the scienter element. [2]
Defendants argue that if any claims are properly
before the Court, Defendants are nonetheless entitled to
summary judgment because they had written consent to
make telephone contact. After careful consideration of
the arguments presented in the motions for summary
judgment pending before the Court, and in the context
of the July Order, the Court allows that while the
claims concerning Med4Home can be read into the broad
language of the SAC, [3] the Court concludes that those
claims cannot survive a summary judgment challenge.

### A. Relators' Motion to Supplement

**\*2** The remaining dispute[4] in this False Claims Act case concerns Diabetic Experts' telemarketing of its diabetic testing supplies to Medicare beneficiaries who were customers of Med4Home. The July Order rendered many of the facts presented in the Parties' respective summary judgment motions irrelevant to the disposition of the remaining issues. To fill this vacuum, Relators request permission to supplement the summary judgment record with three new exemplars ("New Exemplars").[5] The Original Exemplars at issue in the July Order concerned Diabetic Experts' practice of contacting Lincare customers and submitting claims to the government based on Lincare AOBs. In the July Order, the Court found that the telephone contacts specifically identified in the SAC came within an exception to the statute and did not support False Claims Act liability because 1) Diabetic Experts was not a separate supplier and 2) Lincare had sold an item of DMEPOS[6] to the Original Exemplar beneficiaries within fifteen months of the telephone contacts in question. (DE 283 at 46). Now, Relators assert that the New Exemplars sustain their claims. Furthermore, they argue that, even absent exemplars, Relators' "direct, personal knowledge of Diabetic's unsolicited telemarketing campaign of Med4Home beneficiaries," is sufficient to proceed to trial. (DE 303 at 11).

Defendants argue that Relators have expanded their claims as their case has evolved through discovery and motion practice and that by presenting the New Exemplars, Relators are pursuing an unpleaded theory of liability. Relators respond that they have not asserted a new theory, which the Court has determined will not be allowed,[7] but instead have articulated additional instances of fraud under the original theory of liability. This argument is problematic because the course of these proceedings indicates that Relators' theory has not, in fact, been consistent throughout the case.

The Court has reviewed Relators' initial disclosures to the government and the inarguable focus of those disclosures is the allegedly misleading bundling of diabetic test strips with a free diabetes blood sugar monitor. (DE 306-1; 306-2). There is no discussion of telephone contact being improper for failure to comply with the statutory or regulatory supplier standards. (DE 306-1; 306-2). And,

although Med4Home and Reliant are mentioned in passing, the disclosures are explicit that "[t]he sole targets for the solicitations are Lincare's respiratory equipment patients who are covered by Medicare"[8] and "100% of our sales leads were from Lincare's database or respiratory services customers."[9] The Peoples disclosure contains no reference to Med4Home[10] or Reliant and makes clear that "[Peoples's] job was to contact the Lincare respiratory services customers and sell them the diabetic monitoring equipment." (DE 306-2 at 3). Nevertheless, drawing all reasonable inferences from the record and the arguments in favor of Relators, the Court will treat the disclosures as consistent with claims represented by the New Exemplars.

**\*3** Federal Rule of Civil Procedure 56(e)(4) permits a Court to enter an appropriate order that is "designed to encourage proper presentation of the record." See Advisory Committee Note (2010) to FED. R. CIV. P. 56(e)(4). Accordingly, Relators' motion to supplement (DE 294) is granted and Relators' supplement, Relators' briefing, and Defendants' response are considered here. Relators have pointed out that "[t]his targeted evidence squarely responds to the Court's exemplar and subpart inquiries that arose in connection with the July 13, 2015 Order." (DE 303 at 2). Thus, except where they have referenced previous statements of material facts and attendant exhibits, this supplemental briefing contains the essential facts, which are not subject to genuine dispute, for the Court's discussion.

### B. New Exemplars

As evidence of the viability of their remaining claims, "Relators submit three exemplars of unsolicited, outbound telemarketing calls to Med4Home customers, including screenshots of the calls and the corresponding billing to Medicare." (DE 294 at 2; DE 294-6; DE 295-4; DE 295-5). These New Exemplars, Relators claim, show that Diabetic Experts called Med4Home customers to sell diabetic supplies and then billed the government for the initial shipment, as well as subsequent reorders.

The first New Exemplar provided by Relators ("New Exemplar 1") is a redacted screenshot of a Diabetic Experts customer service interface that reflects contact with a customer made by Diabetic Experts sales representative Ina Schaefer between May and August of 2009. (DE 294-6 at 2). Although there is no supporting documentation demonstrating submission to or payment

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)
2016 WL 3961840

by the government, there are two unattributed and unauthenticated handwritten notations at the bottom of the exhibit page reading "Medicare paid $192.98 on 6/5/09" and "Unicor paid $48.24 on 8/17/09." (DE 294-6 at 2).

Defendants point out that the screenshot also indicates that "[patient] gets O $^2$ from LC." (DE 294-6 at 2). Defendants submit the affidavit of corporate compliance officer Jenna Pedersen as evidence that "LC" stands for Lincare, that New Exemplar 1 reflects data for a Lincare and not a Med4Home patient, and that Lincare made a sale to that beneficiary in the fifteen months preceding the May telephone contact. (Jenna Pedersen Oct. 13, 2015 Affidavit DE 301-1 ¶¶ 4-7). The Pedersen Affidavit also provides an AOB signed by the beneficiary. (DE 301-1 at 7). That AOB is titled:

Lincare

Patient Agreement and Consent.

(DE 301-1 at 7). It includes a broadly worded consent allowing the beneficiary to be contacted by "supplier [Lincare] and its affiliates." [11] (DE 301-1 at 7). Relators do not rebut Defendants' characterization of New Exemplar 1 as a Lincare customer who was supplied by Diabetic Experts.

The second New Exemplar ("New Exemplar 2") contains records of a February 2008 call made by Diabetic Experts sales representative Cari Scales. (DE 295-4 at 7). An October 14, 2008 communication from Centers for Medicare & Medicaid Services ("CMS") Benefit Integrity Support Center demonstrates that charges were submitted under Diabetic Experts' identifying number for service dates from October 2 through December 31, 2008. (DE 295-4 at 4-5). New Exemplar 2 also contains an AOB. (DE 295-4 at 6). That AOB is titled:

Lincare and its affiliates

Patient Agreement and Consent.

(DE 295-4 at 6). It, too, includes a broadly worded consent allowing the beneficiary to be contacted by "supplier [Lincare] and its affiliates." (DE 295-4 at 6).

The third and final New Exemplar ("New Exemplar 3") contains records of a March 2008 call made by Diabetic Experts sales representative Maxine Fleming. (DE 295-5 at 7). A September 29, 2008 communication from Noridian [12] indicates that charges were submitted under Diabetic Experts' identifying number for service dates from August 6 through November 4, 2008. (DE 295-5 at 4-5). New Exemplar 3 also contains an AOB. (DE 295-5 at 6). That AOB is titled:

Lincare and its affiliates

Patient Agreement and Consent.

*4  (DE 295-5 at 6). As with the two previous AOBs, it includes a broadly worded consent allowing the beneficiary to be contacted by "supplier [Lincare] and its affiliates." (DE 295-5 at 6).

While the Court noted in the July Order that some of the Original Exemplar AOBs lacked consent language, those Original Exemplars are no longer at issue. Furthermore, the Court did not explore the consent issue at that time. The Court conducted a thorough analysis of a separate exception to the statute and concluded that it applied to all six of the Original Exemplars, which were presented as characteristic of the claims pleaded in the SAC. Here, it is undisputed that all three of the New Exemplars contain consents to contact.

C. Relators' Personal Knowledge

Relators insist that even if the New Exemplars are insufficient, Phalp and Peoples "have direct, personal knowledge of Diabetic's unsolicited telemarketing campaign of Med4Home beneficiaries." (DE 303 at 11; DE 294-5 ¶ 5; DE 297 ¶ 15). Phalp states that he worked at Diabetic Experts from October 2008 to October 2009. [13] (DE 294-5 ¶ 5). Phalp's resume reflects that he worked for "Lincare/Med4Home Pharmacy/Diabetic Experts of America" during that time period. [14] (DE 217-17 at 2).

Phalp's deposition testimony demonstrates that he knew, generally, about the practice of calling Med4Home

customers on behalf of Diabetic Experts. Phalp explained that he made outbound calls using "Med4Home leads," because "[c]ustomers who were Med4Home customers were also customers we were allowed to call on." (Gerry Phalp Oct. 16, 2014 Deposition DE 217-13 at 175:7-15). Although Phalp did not "specifically remember calling on Med4Home patients," he did recall that those leads could be "called on through an internal database" by "pull[ing] up a computer screen," that had been "made available to [him]." (DE 217-13 at 175:20-22; 178:1-6). Phalp has also submitted a declaration stating that he has personal knowledge that Diabetic Experts sales representatives placed calls to customers of Med4Home, using the Holdings database to facilitate those calls. (DE 294-5).

*5 Phalp's declaration expands on, and loosely comports with, his deposition testimony that although he recalled only "one lady who primarily worked on Med4Home leads ... [and he] wasn't usually seated close to her to know what her process may have entailed," there were calls being made from the Diabetic Experts call center to Med4Home customers. (DE 217-13 at 176:13-22). Thus, despite his ignorance of his colleagues' process, Phalp claims to be certain that calls were being made to Med4Home customers. Phalp also states that the call notes attached to his declaration reflect a transaction that arose out of an unsolicited phone call by Diabetic Experts sales representative Schaefer to a Med4Home beneficiary. (DE 294-5 ¶¶ 7-8). The transaction that Phalp references is New Exemplar 1 and appears to involve a Lincare, rather than a Med4Home, beneficiary. (DE 294-5 ¶¶ 7-8; DE 301 at 19).

Although he could not remember at his deposition whether Schaefer was the only Diabetic Experts representative who called Med4Home customers,[15] Phalp stated in his declaration, which he signed and filed after the July Order, that he observed three representatives making calls. (DE 294-5 ¶ 5). He attributed this change in testimony to a lapse in memory that was remedied after having his recollection refreshed (after the Court's July Order) by reviewing his April 2010 call notes provided to the government and reviewing the July 30, 2014 declaration of Maxine Fleming. (294-5 ¶ 4).

During his time at Diabetic Experts, Phalp personally observed Diabetic Experts representatives Fleming, Schaefer, and Scales making sales calls like the ones demonstrated by the New Exemplars. (294-5 ¶ 6). These observations are, however, limited by the disclaimer Phalp made during his deposition. When questioned regarding the "procedures that others may have used in calling on Med4Home's patients," Phalp cautioned "I don't know that I can speak accurately about someone else's process." (DE 217-13 at 176:6-12).

There are temporal limitations to Phalp's knowledge as well. Phalp cannot have first-hand personal knowledge of the initial outbound sales calls made in New Exemplars 2 and 3: the phone contact presented in New Exemplar 2 took place in February 2008 (DE 295-4 at 7) and the phone contact presented in New Exemplar 3 took place in March 2008 (DE 295-5 at 7). According to his declaration, Phalp began work in October 2008. (DE 294-5 ¶ 5). The call presented in New Exemplar 1 did, however, take place during the time that Phalp worked at Diabetic Experts. And it is undisputed that Phalp worked at Diabetic Experts at a time when Scales, Fleming, and Schaefer worked there. Therefore, he could have personally observed sales representatives of Diabetic Experts making calls to customers of Med4Home, but he could not have observed the initial calls that generated New Exemplars 2 and 3.

Phalp concludes his declaration by stating that the "unsolicited, outbound telemarketing calls to Med4Home customers placed by Fleming, Schaefer, and Scales yielded approximately 300 new write-ups of diabetic equipment and supplies per month." (DE 294-5 ¶ 9). These write-ups (sometimes called "new patient setups") indicate that "a sale is complete." (Diabetic Experts call center supervisor Kim Smith Oct. 1, 2014 Deposition DE 231-19 at 229:8-18). But the basis for Relators' personal knowledge of what happens between the time a sale is "complete" and the time a claim is presented to or paid by the government is not clear or even explicitly discussed.

Relators do not aver that they possess specific knowledge about the process by which Diabetic Experts submitted claims to the government or, in turn, received payment. It is undisputed that Phalp and Peoples both worked in sales. Relators neither spent time in billing while employed by Lincare, nor had any personal involvement with or any personal knowledge about the specifics of billing the government.

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)
2016 WL 3961840

**\*6** Not only did Phalp not work in billing and collections, but he also did not know anybody in that department. [16] (*See* DE 217-12 at 65:22-66:22). In fact, while Phalp understood the requirements of his job in sales, he was not familiar with other job functions. (*See* DE 217-12 at 67:3-11).

> Q: I think you've indicated you were not familiar with what billing and collections employees did at Lincare, correct?

> Phalp: Correct.

(DE 217-12 at 70:7-10).

> Q: You don't know, for instance, whether the shipment was billed to Medicare, do you?

> Phalp: I wasn't in the billing department, no sir.

(DE 217-13 at 146:11-15).

And while Phalp may have had some limited knowledge of billing protocols, Peoples knew no specifics regarding billing or collections:

> Q: You didn't have anything to do with billing or collections; is that correct?

> Peoples: That's correct.

> Q: Is it fair to say it was kind of a ... larger operation of which you were just a part?

> Peoples: Yes.

(DE 142-3 51:5-10).

Peoples' involvement ended once he placed an order for fulfillment. [17] In his limited role, Peoples did not recall selling to Med4Home customers; he believed he had been hired to "mak[e] phone calls to Lincare patients" and did so using call sheets provided by Kim Smith, Diabetic Experts call center manager, that "came from a list of local Lincare patients." (DE 142-3 20:11-14, 23:1-10). With the exception of calls based on purchased sales leads not pleaded in the SAC or at issue here, Peoples had no recollection of calling anyone other than Lincare customers. (DE 142-3 132:22-134:4).

### D. Other Evidence of the Scheme

In order to draw all reasonable inferences in favor of Relators, the Court will consider additional evidence of Relators' claims despite their contention that "Relators are, and have always been, the original source of the theory of liability for Diabetic [Experts]' telemarketing of these customers of Holdings' subsidiaries." (DE 303 at 10). For example, Maxine Fleming, one of the Diabetic Experts sales representatives who Phalp observed making unsolicited calls, has also submitted a declaration. (Maxine Fleming July 30, 2014 Declaration DE 100-4). [18] In that declaration, Fleming states that she worked at Diabetic Experts from April 2007 until March 2011. (DE 100-4 ¶ 4). During her time at Diabetic Experts, Fleming worked in close proximity with Relators and other representatives in the single-room call center. (DE 100-4 ¶ 5). Her job was to place calls to Medicare beneficiaries to encourage them to use Diabetic Experts as their supplier of diabetic testing supplies. (DE 100-4 ¶ 6). To identify potential customers, Fleming used a Holdings database that contained information about current Med4Home customers. (DE 100-4 ¶ 9).

**\*7** Additionally, Diabetic Experts call center manager Kim Smith testified that she hired Relators Phalp and Peoples as Diabetic Experts sales representatives to "call[ ] Med4Home customers, people who received unit dose medication, to talk to them about diabetics." (DE 231-19 at 94:5-95:9). To facilitate sales, Smith provided Phalp, Peoples, Fleming, and other Diabetic Experts representatives with access to a database of customer information as well as hard copy "call sheets" [19] that contained information about current Med4Home and Lincare customers. (DE 100-4 ¶ 11). Smith reported on Diabetic Experts' business in progress reports, which were produced during this case. During June 2007, Diabetic Experts "completed call-sheets for the Med4Home Medicare/Medicaid customers as well as the remainder of the call sheets for TX, FL, NY, and SC." (DE 231-27 at 4). During September 2007, Smith reported that Diabetic Experts had "primarily been calling on existing Lincare customers this month as opposed to Med4Home customers. We will continue on this path moving forward." (DE 231-27 at 10).

Lastly, Holdings' compliance department was aware of the sales strategy targeting Med4Home customers. Sean Schultz, a Vice President of Lincare, testified that he knew of the practice of calling Med4Home customers and that it had been cleared through Holdings' compliance

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)

2016 WL 3961840

department. (Sean Schultz January 6, 2015 Deposition DE 231-15 at 79:9-84:22).

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1050 (11th Cir. 2015) (quoting Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014)).

After the movant has met its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e); Matsushita, 475 U.S. at 587. "[I]f the non-movant's response consists of nothing 'more than a repetition of his conclusional allegations,' summary judgment is not only proper, but required." United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc., 597 F. Supp. 2d 1280, 1286 (M.D. Fla. 2009) (quoting Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981)) (granting defense summary judgment where relator lacked direct evidence that defendant caused false claims to be presented); United States ex rel. King v. Solvay S.A., Case No. CV H-06-2662, 2015 WL 8732010, at *3 (S.D. Tex. Dec. 14, 2015) (granting defense summary judgment where circumstantial evidence was not sufficient to raise an issue of material fact as to a violation of the False Claims Act).

**\*8** "Thus, to survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence

for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." Urquilla-Diaz, 780 F.3d at 1050 (citing Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006)); Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita, 475 U.S. at 587) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). For cross-motions for summary judgment, the standard of review "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., Case No. 1:10-CV-1614-AT, 2015 WL 7293156, at *2 (N.D. Ga. Oct. 30, 2015) (citing Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)) (granting defendant's summary judgment motion where evidence showed that defendant reasonably interpreted Medicare rules).

The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). A non-movant relator cannot, however, survive summary judgment by relying on inferences unless he can "establish a sufficient factual basis to support his chain of inferences." United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc., 36 F. Supp. 3d 773, 781 (S.D. Ohio 2014) (granting defendants' summary judgment in false claims act case alleging violations of the Anti-Kickback Statute). This is because "[t]he Court may draw inferences in Relator's favor only to the extent supportable by the record." United States ex rel. Fox Rx, Inc. v. Omnicare, Inc., Case No. 1:11-cv-962-WSD, 2014 WL 2158412, at *4 (N.D. Ga. May 23, 2014) (citation omitted).

### B. The False Claims Act

As discussed in detail in the July Order, the False Claims Act imposes liability on any person who, inter alia:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim [20] for payment or approval; or

**United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)**

2016 WL 3961840

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729. As to both counts alleged in the SAC, the Eleventh Circuit "caselaw is clear: the submission of a false claim is the *sine qua non* of a False Claims Act violation." *Urquilla-Diaz*, 780 F.3d at 1052 (internal quotation and citation omitted). Thus, to prevail on a presentment claim, a relator must provide details of a link between improper practices and the submission of false claims. *See United States ex rel. Klusmeier v. Bell Constructors, Inc.*, 469 Fed.Appx. 718, 721 (11th Cir. 2012). In the same vein, on a make-or-use claim, a relator must connect the improper practice with the government's payment. *Urquilla-Diaz*, 780 F.3d at 1052 ("[T]o prevail on a claim under this subsection, the relator must prove that the government actually paid a false claim."); *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) (finding that there must be a falsehood that affects the government's willingness to pay, because "[i]mproper practices standing alone are insufficient.").

#### C. False Claims Requirements

**\*9** Although this case has advanced well beyond the Court's order denying Defendants' motion to dismiss, it nevertheless behooves the Court to briefly pause to consider the case authorities discussing pleading standards in qui tam matters to give context to the question of whether Relators have adduced sufficient evidence to create a genuine issue of fact regarding presentment or payment of false claims. This is because, even at a relatively advanced stage, "prolix" filings that fail to specifically describe "key elements of fraud," are insufficient to maintain triable claims. *Keeler*, 568 Fed.Appx. at 784, 803 (affirming order that dismissed the third amended complaint three years after the case was filed). Courts focus on the submission or payment of a specific false claim because, in False Claims Act cases, this is not merely a "ministerial act," but rather is a critical element of the claim. *United States ex. rel. Clausen v. Laboratory Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed.Appx. 693, 703 (11th Cir. 2014) (internal citations and quotations omitted; italics in original) ("Because the submission of an actual claim to the government for payment is the *sine qua non* of an FCA violation, a plaintiff-relator must plead the submission of

a false claim with particularity."). Furthermore, requiring relators to precisely articulate a specific fraud "deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel in terrorem settlements." *United States ex rel. Wilson v. Crestwood Healthcare, L.P.*, Case No. CV-11-S-3361NE, 2012 WL 1886351, at *4 (N.D. Ala. May 18, 2012) (dismissing qui tam complaint with prejudice).

At the summary judgment stage, the plaintiff relator must do more than point to some possibility—"a mere scintilla"—that false claims were actually submitted or paid. *Urquilla-Diaz*, 780 F.3d at 1050 (citation omitted). To survive summary judgment, the non-movant relator "must make a showing sufficient to permit the jury to reasonably find on its behalf." *Id.* This showing could be made by presenting exemplar claims that permit a court to determine liability before considering damages. But the summary judgment standard could also be met by a plaintiff-relator without documentary evidence; there is no per se rule requiring exemplars or sample claims. Without exemplar claims submitted to the government, a relator could survive a summary judgment challenge by showing that he held a position and performed a work function that allows him to demonstrate—with specificity and from personal knowledge—that false claims were submitted to or paid by the government.

### III. APPLICATION

The procedural posture of this case is unusual. The Court found that, with the addition of the Original Exemplars to the operative pleading, "the allegations in the Second Amended Complaint at least **minimally** state a cause of action." (DE 56 at 8) (emphasis added). But subsequently, in the July Order, the Court granted summary judgment to Defendants on all six Original Exemplars—the specific claims that had lent credibility to Relators' claims and "propelled" the SAC over the Eleventh Circuit's qui tam pleading hurdles. (DE 283 at 58); *United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed.Appx. 783, 801 (11th Cir. 2014).

Now, in response to the Court's query regarding the existence and viability of any remaining claims, Relators have produced three New Exemplars of calls to Med4Home beneficiaries. With regard to the Court's finding in the July Order that claims regarding Med4Home, Inc. were not pleaded with specificity in

the SAC,[21] Relators point out that Med4Home is not an unpleaded defendant, but is rather another source of beneficiaries for whom Diabetic Experts submitted false claims. The Court assumes, without deciding,[22] that this pleading deficiency is not fatal to the claims and, drawing all reasonable inferences in favor of Relators, the Court now considers the New Exemplars.

**A. Claims Before the Court**

**\*10** Relators contend that one general fact is "beyond dispute on this record":

> Diabetic placed unsolicited telephone calls to Medicare beneficiaries who were customers of Med4Home, and sold them diabetic testing supplies for which Diabetic ***submitted at least one claim to, and received payment from, Medicare*** between April 1, 2007 and November 1, 2012.

(DE 294 at 4) (emphasis added). Defendants point out that there is no record, supplemental or otherwise, that any improper "calls actually were made to patients of either Med4Home or Reliant that resulted in the submission of claims that were paid by the government." (DE 301 at 20 n.27). Relators implicitly acknowledge that their assumption lacks a factual basis, but counter that they are only limited in presenting specific claims regarding Med4Home because "Defendants have refused to provide the claims data for calls made to Med4Home." (DE 297 ¶ 19).

This deficiency cannot, as Relators suggest, be attributed solely to Defendants' failure to produce discovery because a relator has an obligation to identify and articulate the foundational elements of the fraud with specificity at the time of filing the complaint. *See Keeler*, 568 Fed.Appx. at 806 (quoting *Clausen*, 290 F.3d at 1313) ("[T]he Eleventh Circuit warned of a situation where 'a plaintiff does not specifically plead the minimum elements of their allegation, [and is able] to learn the complaint's bare essentials through discovery.' "). Qui tam cases are distinguished from other legal actions in that relator-plaintiffs must possess this information *before* discovery has taken place.[23] And it is unreasonable to infer that Diabetic Experts "submitted at least one claim to, and

received payment from, Medicare," because in the absence of a factual record, courts "cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government." *Clausen*, 290 F.3d at 1312 n.21.

Of the three New Exemplars, only New Exemplar 1 has been in Relators' possession since the outset of the case. New Exemplars 2 and 3 bear bates stamps indicating that they were produced by Defendants during the course of discovery (DE 295-4, 295-5) and Defendants have demonstrated that the documents identified here as New Exemplars 2 and 3 were provided to Relators by Defendants in this case. (Christy Andra October 8, 2015 Declaration DE 299-1 ¶ 3).[24]

**\*11** Relators cite to a decision from the Fifth Circuit, *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, for the proposition that, once a case has proceeded beyond the motion to dismiss stage, Defendants cannot argue that Relators' claims lack sufficient specific facts to continue. *Rigsby*, 794 F.3d 457 (5th Cir. 2015). Essentially, Relators argue that the Court should not foreclose a potentially viable claim by ignoring the developments of the litigation and "rewinding" events to the time the operative pleading was filed. *Rigsby*, 794 F.3d, at 466. But the decision in *Rigsby* is distinguishable both on the facts and the law.

First, the *Rigsby* relators won their test claim, *i.e.* exemplar, while Relators here lost on the Original Exemplars. Significantly, in *Rigsby*, the relators survived summary judgment scrutiny before proceeding to a jury trial, where "the Rigsbys **prevailed** on a single bellwether false claim under the FCA." *United States ex rel. Rigsby v. State Farm Ins. Co.*, Case No. 1:06CV0433 LTS-RHW, 2009 WL 2461733, at \*1 (S.D. Miss. Aug. 10, 2009) (treating defendants' motions to dismiss "as motions for summary judgment" and denying); *Rigsby*, 794 F.3d at 462 (emphasis added).

There, despite a trial record supporting "a high probability that State Farm submitted more than one false claim," the district court had denied relators' request to conduct additional discovery regarding claims like the exemplar. *Rigsby*, 794 F.3d at 469. On that record, the Fifth Circuit reversed, stating "that our decision hinges in large part on the idiosyncratic nature of this case—seldom will a relator in an FCA case present an **already-rendered**

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)

2016 WL 3961840

jury verdict in her favor while seeking further discovery."
*Id.* at 469-70 (emphasis added).

Second, although the Eleventh Circuit has acknowledged that the Fifth Circuit "criticize[s] the stringent requirements of Clausen," it has repeatedly reaffirmed Clausen's principles. Compare *Rigsby*, 794 F.3d at 467 n.6 ("We hasten to add here that we have recently suggested, in the post-*Grubbs*[[25]] FCA context, that additional discovery might be employed to permit plaintiffs to cure certain defects in a complaint."), *with Keeler*, 568 Fed.Appx. at 797 n.19 (noting that *Clausen* remains "binding precedent.") Thus, even as arguably persuasive precedent, *Rigsby* is of limited value because of the "idiosyncratic nature" of the case. *Rigsby*, 794 F.3d at 469. Nevertheless, the Court has considered the development of this litigation; it is one reason that the Court has permitted Relators' supplement and the Court now considers the New Exemplars.

**B. The New Exemplars Do Not Support False Claims Act Liability**

The gravamen of a False Claims Act claim is the submission of a *false* claim. *Urquilla-Diaz*, 780 F.3d at 1052 ("[O]ur caselaw is clear."). Merely alleging a colorable claim that a statute relevant to Medicare has been violated is not sufficient. It is the submission or payment of a false Medicare claim, use of records known to be false, and false certification of compliance with the laws that create False Claims Act liability. *See Mastej*, 591 Fed.Appx. at 706; *A1 Procurement, LLC v. Hendry Corp.*, Case No. 11-23582-CIV, 2012 WL 6214546, at *4 (S.D. Fla. 2012) ("A fundamental requirement of the FCA, regardless of the section allegedly violated, is that the false or fraudulent claims or statements at issue must be objectively false.").

Relators here correctly identify the dispositive issue; "absent valid consent to contact, the telemarketing of Med4Home ... beneficiaries by Diabetic Experts violates the [statute] and therefore the False Claims Act." (DE 303 at 5). It is unrebutted that each of the New Exemplars contains consent to contact by "supplier and its affiliates." The question is whether Diabetic Experts violated a Medicare statute, regulation, or rule when it used a broadly worded consent allowing contact by "supplier and affiliates" to contact a customer of a Lincare affiliate to offer them diabetic supplies.

**\*12** Diabetic Experts is a subpart of Lincare. Med4Home is a wholly owned subsidiary of Lincare, which is, in turn, a subsidiary of Holdings. (Don Crisp Nov. 21, 2014 continued Deposition DE 231-8 110:1-16, 170:7-172:5; Holdings & Subsidiaries Entity Structure 2008 and 2009 DE 100-11 at 2-3). There can be no dispute that Diabetic Experts is an affiliate of Med4Home because they are related by ownership. *See* 42 C.F.R. § 424.57(a).

The statute, 42 U.S.C. § 1395m(a)(17)(A)(i), expressly provides that a supplier may make telephone contact with a beneficiary if: "(i) [t]he individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item." Relators contend that consent to contact that was given when the customer was provided with unit dose medication or oxygen supplies and equipment cannot serve as consent when the entity or affiliate given the consent contacts the customer regarding diabetic supplies.

Relators have not presented the Court with any authority supporting the conclusion that Diabetic Experts was proscribed from contacting customers who consented to being contacted by "supplier and its affiliates." Accordingly, the Court focuses on the statutory text and proceeds from the "understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (citation omitted). It is well established that statutory interpretation begins with the language of the statute and if the statutory language is clear, the inquiry ends. *See King v. Burwell*, —— U.S. ——, 135 S. Ct. 2480, 2489 (2015). A court's construction should avoid rendering any clause, sentence, or word superfluous, void, or insignificant. *See United States v. Aldrich*, 566 F.3d 976, 978 (11th Cir. 2009).

A supplier is prohibited from making unsolicited telephone contacts with individual customers who are enrolled in Medicare unless:

(i) The individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item.

(ii) The supplier has furnished a covered item to the individual and the supplier is contacting the individual only regarding the furnishing of such covered item.

(iii) If the contact is regarding the furnishing of a covered item other than a covered item already furnished to the individual, the supplier has furnished at least 1 covered item to the individual during the 15-month period preceding the date on which the supplier makes such contact.

42 U.S.C. § 1395m(a)(17). All three New Exemplars contain consents to contact in the AOBs, which engages the first exception. See 42 U.S.C. § 1395m(a)(17)(i).

Exception (i) contains three elements. The first, written permission, is easily fulfilled. Each New Exemplar contains a signed AOB with consent to contact: "The undersigned, as or on behalf of Patient, agrees that Supplier and its affiliates may contact Patient at the telephone number specified hereon." (See, e.g., DE 301-1 at 7).

The second element of exception (i) is who can make contact. The Medicare beneficiaries in the New Exemplars gave consent for "Supplier and its affiliates" to call. The "Supplier" in the New Exemplars is, under Relators' theory, Med4Home. [26] Diabetic Experts may use the consent as an affiliate of the supplier because it is related to Med4Home by Lincare's ownership.

**\*13** The third element of exception (i) concerns what topics an entity that has received consent can contact beneficiaries to discuss. Relators seem to argue that the statute's "regarding furnishing of a covered item" language is not meant to apply to Medicare covered items generally, but rather is meant to restrict the consent to already furnished items. Relators' argument tracks their AOB item specificity argument that the Court rejected in the July Order. [27] The argument is that even if Diabetic Experts were permitted to contact Med4Home customers, it could only do so regarding the covered items, or perhaps ones of the same type, that Med4Home had already supplied. The Court has not been provided, and the Court's research does not reveal, any authority for this interpretation of the statute.

In addition, Relators' interpretation does not give effect to the entire statute. If Relators are correct, then exception (i) would become superfluous because exception (ii) already permits contact regarding previously furnished items. Exception (i) refers to "a covered item" while exception

(ii) refers to "such covered item." 42 U.S.C. §§ 1395m(a)(17)(i—ii). The text plainly permits an entity to contact a beneficiary—without written consent—regarding covered items that were already furnished. For example, no written consent is needed for the entity to call to ask if the beneficiary is satisfied with the oxygen previously supplied. In contrast, a consent is required if the entity is calling about another Medicare covered item. [28]

Although Relators cite to current CMS guidance, this does not appear to buttress their argument. Those FAQs provide in pertinent part:

Question 1: Under what circumstances can a DME supplier make telephone contact with a beneficiary regarding a Medicare covered item?

Answer 1: **If the beneficiary gave written permission for the supplier to contact him/her**, if the supplier has already provided a covered item to the beneficiary and the supplier is calling the beneficiary about such covered item or if the beneficiary has already received a covered item from the supplier in the last 15 months.

\* \* \*

Question 3: If a supplier makes solicited contact with a beneficiary for a particular covered item, can the supplier speak with the beneficiary about additional covered items during that same contact?

Answer 3: **No. If this is the first contact ever made by the supplier to the beneficiary**, then the supplier is prohibited from attempting to solicit the purchase of additional covered items since the supplier only had permission to contact the beneficiary regarding the particular covered item prescribed by the physician. **Once the supplier has provided the covered item to the beneficiary, then the exceptions listed in A1 above may be applied.** [29]

Here, there is consent to call. And Defendants argue that CMS-endorsed, form AOB language ("I request payment of authorized Medicare benefits to me or on my behalf for any services furnished by (supplier)") invites the use of broad language in both assignments and consents. (DE 75 ¶ 29). The first exception listed in the statute and discussed in FAQ Question 1 applies. Accordingly, the Court finds that Diabetic Experts'

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)

2016 WL 3961840

practice of calling customers of its affiliate who had consented to contact by affiliates as represented by the New Exemplars are not violations of the statute that could create an objectively false claim when presented to the government. [30] However, because an exemplar is merely one way of making a showing sufficient to defeat summary judgment, the Court will also evaluate Relators' personal knowledge.

### C. Relators Lack Sufficient Relevant Knowledge to Create a Fact Issue

**\*14** Relators contend that they are not required to provide exemplars because Relators' personal knowledge creates an issue of fact that precludes summary judgment for Defendants. Yet in this case, Relators cannot explain the basis for their assertions that fraudulent claims were actually submitted. While Relators steadfastly maintain that they have personal knowledge of the false claims submitted during the course of Defendants' allegedly fraudulent scheme, they acknowledge that they have scant knowledge about claims generated by calls to Med4Home customers. And Relators admittedly have absolutely no knowledge regarding billing and payment. This is insufficient at the summary judgment stage. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587.

What little personal knowledge Relators do have is presented in their depositions and the recent Phalp declaration included with Relators' motion to supplement. Phalp asserts that he "personally observed three sales representatives of Diabetic Experts make unsolicited, outbound sales calls to customers of Med4Home to sell diabetic equipment and supplies using the Lincare Holdings database to facilitate those calls." (DE 294 at 6; 294-5 ¶ 4). Phalp concludes his declaration by stating that the unsolicited telemarketing calls to Med4Home customers placed by Fleming, Schaefer, and Scales "yielded approximately 300 new write-ups of diabetic equipment and supplies per month." (DE 294-5 ¶ 9).

Besides being conclusory, Phalp's testimony regarding the number of "write-ups" is immaterial because Relators do not provide the final link with billing, claims, and payment. As their depositions make clear, Relators cannot establish that connection. (Peoples Depo. DE 142-3 52:1-5) ("It sounds like you basically were in charge of ... making sales calls, but other than that, you really didn't have any involvement in the rest of the process. Is that fair? Yeah."); (Phalp Depo. DE 217-13 at 146:11-15) ("You

don't know, for instance, whether the shipment was billed to Medicare, do you? ... [N]o sir."); (Peoples Depo. DE 142-3 50:3-6) ("Well, I mean, as far as I know I placed the orders for shipment, but I didn't actually ship ... or talk to the shipping department, no."). And neither Relator had any general experience with billing. Phalp knew no one in the billing department or even the job responsibilities and functions of those employees. (Phalp Depo. DE 217-12 at 65:22-66:22; 67:3-11; 70:7-10). Peoples demonstrated the same lack of knowledge. (Peoples Depo. DE 142-3 50:15-16).

Relators were not high-level managers like the vice president and CEO relator in *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, who accessed information about billings, revenues, and payor mix, and attended management meetings where Medicare patients and the submission of claims to the government were discussed. *Mastej*, 591 Fed.Appx. at 708. Relators did not have access to a centralized billing system like the center manager relator in *United States ex rel. Thayer v. Planned Parenthood of the Heartland. Thayer*, 765 F.3d 914, 919 (8th Cir. 2014). Relators' status is more similar to that of the psychiatrist relator in *United States ex rel. Atkins v. McInteer*, who was responsible for the provision of medical care, but could not provide specific information regarding billing and submitting claims for reimbursement. *Atkins*, 470 F.3d 1350, 1359 (11th Cir. 2006). And Defendants here are distinguished from those in *United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.* because Lincare and Holdings have made no admission regarding submission to, or payment from, the government of non-compliant claims. *Walker*, 433 F.3d 1349, 1354 (11th Cir. 2005).

**\*15** Thus, the issue is not, as Defendants assert, that Phalp's declaration is procedurally improper or rests on a faulty evidentiary foundation. The Court need not delve into those questions because Relators simply lack knowledge regarding critical topics. Although Phalp's declaration establishes that he knew sales calls were made, that knowledge is, at best, only a piece of the claim. Neither Relator has personal knowledge of the billing, claims submission, or government payment components of the false claims.

Relators argue that the Kim Smith progress reports and yearly revenues for Diabetic Experts compensate for this deficiency and compel the conclusion that Defendants

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)

2016 WL 3961840

were submitting false claims. But the Court cannot draw this conclusion in the absence of facts that the revenues were generated by outbound telemarketing calls to Med4Home customers that Defendants made when they did not have the customers' consent. To the contrary, the evidence before the Court compels the opposite conclusion; the Court has only seen calls to Med4Home customers who gave their consent. Therefore, even with the supplemented record, evidence of Relators' relevant personal knowledge is insufficient and a rational trier of fact could not find for Relators that Defendants either presented or were paid for a false claim. *Urquilla-Diaz,* 780 F.3d at 1050.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Relators' motion for partial summary judgment. Without reaching the issue of scienter, the Court concludes that Lincare did not violate [31] the False Claims Act by contacting Medicare beneficiaries who consented to contact. As a corollary, Holdings did not violate the False Claims Act by sharing patient information and documents with Diabetic Experts so that Diabetic Experts could contact those beneficiaries who had consented to contact.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Relators Matt Peoples and Gerry Phalp's motion for partial summary judgment (DE 217) is **DENIED**.

2. Defendants Lincare Holdings, Inc. and Lincare, Inc. d/b/a Diabetic Experts of America's motion for summary judgment (DE 220) is **GRANTED**.

3. The Court further finds that Relators' claims were not "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment," and declines to entertain motions for attorneys' fees and expenses. *See* 31 U.S.C. § 3730(d)(4).

*16 4. All motions to seal are **GRANTED**. The Parties shall contact the clerk's office within 1 year of this order to make provision for handling and disposal of all sealed materials filed in the case.

5. All other pending motions are **DENIED AS MOOT**.

6. The Clerk is directed to **CLOSE** the case.

7. The Court will enter a separate judgment following this order pursuant to FED. R. CIV. P. 58.

**DONE and ORDERED** in Chambers at Miami, Miami-Dade County, Florida, this 11th day of January, 2016.

**All Citations**

Slip Copy, 2016 WL 3961840

### Footnotes

1    Lincare, Inc. did business as Diabetic Experts of America. In the July 13, 2015 summary judgment order, the Court found that Diabetic Experts of America was a subpart of Lincare, Inc. and not a separate supplier. (DE 283 at 46). Nevertheless, as in the previous summary judgment order, the Court refers to Lincare, Inc. and Diabetic Experts of America separately in order to address the Parties' arguments. Diabetic Experts of America is referred to here as "Diabetic Experts" or "Diabetic"; Lincare, Inc. is referred to as "Lincare"; Lincare Holdings, Inc. is referred to as "Holdings."

2    In the July Order, the Court found, as an alternative and independent ground for partial summary judgment in favor of Defendants on the Original Exemplars, that there was no record evidence presented to support a jury finding that Defendants had scienter for those claims. (DE 283). Relators do not ask the Court to reconsider that conclusion, but instead argue that the scienter finding is inapplicable to any Med4Home claims. (DE 285 at 7). By virtue of the conclusions reached below, the Court need not consider the Parties' arguments regarding scienter as to the New Exemplars. Similarly, Defendants' additional arguments that the claims should be time limited and confined to the Original Exemplars in the SAC are moot.

3    Med4Home is not explicitly included in the SAC. Med4Home is, nevertheless, a subsidiary of Defendants and Relators did allege generally that Diabetic Experts impermissibly called customers of Defendants' subsidiaries. (DE 43). However, the Court found at the August 21, 2015 status conference that the SAC contained no theory of liability regarding the purchase of sales leads from Alliance or any other third party and that Relators may not pursue that unpleaded theory in this case. Defendants accurately observed that "[t]he potential source of leads under Relators' SAC theory is exclusively

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)

2016 WL 3961840

limited to the referrals allegedly generated from the Lincare Holdings' database." (DE 285 at 11). As the Eleventh Circuit remarked in *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, "It is too late for [relator] to switch horses now." *Mastej*, 591 Fed.Appx. 693, 710 (11th Cir. 2014).

4    Save for a brief mention, the false assignment of benefits ("AOB") argument is absent from Relators' supplement. (DE 294). Because there is no direct evidence indicating that claims actually were submitted using Med4Home or Reliant AOBs, the Court treats those claims as waived, or alternatively, as disposed of for the reasons set forth in the July Order. Likewise, the Court declines to separately consider Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) because it is specifically addressed to "Relators' AOB theory." (DE 222 at 5).

Furthermore, despite Relators' claims that Diabetic Experts placed unsolicited telephone calls to Reliant customers, sold them diabetic testing supplies, and billed the government, it is undisputed that no Reliant exemplars are presented. Absent exemplar evidence, as discussed below, Relators lack sufficient personal knowledge concerning claims submission and billing to support claims based on Reliant transactions. Accordingly, the Court focuses on the allegedly improper telemarketing to Med4Home customers.

5    Relators also wish to submit supplementary evidence of the fact that Med4Home is not a subpart of Lincare—as distinguished from Diabetic Experts—but rather is a separate entity. As discussed in greater detail below, because the New Exemplars contain consents to contact, this point is not germane to the Court's analysis.

6    "DMEPOS" is durable medical equipment, prosthetics, orthotics, and supplies.

7    *See, e.g., United States ex rel. Graves v. Plaza Med. Centers Corp.*, Case No. 10-23382-CIV, 2014 WL 5040284, at *4 n.4 (S.D. Fla. Oct. 8, 2014) (Moreno, J.); *Mastej*, 591 Fed.Appx. at 710.

8    (DE 306-1 at 5).

9    (DE 306-2 at 3).

10   Med4Home only appears on Matt Peoples's resume. There is no mention of Med4Home or Reliant in his disclosure. (DE 306-2).

11   An "affiliate" as that term is defined by CMS means a person or organization that is related to another person or organization through a compensation arrangement or ownership. 42 C.F.R. § 424.57(a).

12   CMS enters into agreements with "DME MACs" to administer certain aspects of Medicare. *See* 42 U.S.C. § 1395u(a). Noridian is a DME MAC.

13   Peoples worked for a slightly shorter time, from December 2008 until October 2009. (Matt Peoples October 17, 2014 Deposition DE 142-3 40:24–41:2).

14   Notably, Peoples's resume does not say that he worked for Diabetic Experts at all; he worked for "Med4Home (subsidiary of Lincare)." (DE 306-2 at 8). Relators' confusion regarding corporate organization generally and the specific question of what entity they worked for runs throughout the summary judgment record. Relators assert that before the relevant time period, Diabetic Experts operated as an extension of Med4Home. (DE 229 ¶ 6). Defendants' corporate compliance officer, Jenna Pedersen, unequivocally stated that there was never an entity operating as "Med4Home doing business as Diabetic Experts of America." (DE 241 ¶ 6; Jenna Pedersen Nov. 20, 2014 Deposition DE 241-9 at 125:20-126:6). In any case, as described in the July Order, Diabetic Experts was a subpart of Lincare during the relevant time period. (DE 283 at 46) ("Therefore, the Court concludes as a matter of law that Diabetic Experts was not a separate supplier from Lincare, and was, instead, doing business as a subpart of Lincare in Missouri.").

15   "She was the one who did it primarily. There may have been others. I don't know." (Gerry Phalp Oct. 16, 2014 Deposition DE 217-13 at 178:20-22).

16   Relators' lack of knowledge regarding billing is consistent with Defendants' organizational structure. As Paula Boomershine, a regional billing collection manager responsible for Diabetic Experts, Med4Home, and Lincare, explained in her deposition, "[w]e did not do the submission [to Medicare]. It was all done at corporate through their setup there; so we didn't actually do the submission." (Paula Boomershine November 25, 2014 Deposition DE 231-28 at 16:17-19).

17   *See* Peoples October 17, 2014 Deposition DE 142-3 50:3-6: "Well, I mean, as far as I know I placed the orders for shipment, but I didn't actually ship ... or talk to the shipping department, no."

18   Relators have also submitted a September 16, 2009 statement by Ina Schaefer. (DE 295-3). The handwritten statement predates this litigation, was sent to Lincare, is not compliant with the statute permitting the use of unsworn declarations (28 U.S.C. § 1746), and contains hearsay regarding the alleged practice of shipping supplies before determining how many supplies the beneficiary had on hand. (DE 295-3 at 6-8); *see Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012). There is no evidence in the New Exemplars that Diabetic Experts continued shipping once they learned that the beneficiary wished to stop receiving diabetic supplies.

United States ex rel Phalp v. Lincare Holdings, Inc., Slip Copy (2016)
2016 WL 3961840

19    Smith created these call sheets of Med4Home customers by accessing information in a database that she claims was inaccessible to Diabetic Experts sales representatives. (*See* DE 231-19 at 136:5-138:9; *see also* Kent Hermes November 21, 2014 continued Deposition DE 231-9 at 330:22-331:20 (discussing database that was not accessible to Diabetic Experts representatives)). This fact—inaccessibility—is contradicted by the testimony of Phalp and Fleming. (Oct. 16, 2014 Gerry Phalp Deposition DE 217-13 at 175:20-22; 178:1-6; Maxine Fleming July 30, 2014 Declaration DE 100-4 ¶ 9). Accordingly and to the extent that it is relevant, the Court assumes for this discussion that Diabetic Experts representatives could access Med4Home customer information through a database.

20    "Claim" means "any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b).

21    (DE 283; *see generally* SAC DE 43).

22    It bears noting that even in the context of allowing amendments to conform the pleadings to evidence, a district court's discretion in deciding whether to allow a new issue to be injected into the proceedings is not unlimited. *See Diaz v. Jaguar Restaurant Group, LLC*, 627 F.3d 1212, 1214 (11th Cir. 2010) (reversing district court for allowing party to raise new issue at trial).

23    Notably, in the context of the public disclosure bar under 31 U.S.C. § 3730(e)(4), the Supreme Court also does not permit a relator with direct and independent knowledge about one discrete fraud to use a qui tam complaint as a vehicle to "claim smuggl[e]" other false claims. *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 476 (U.S. 2007).

24    Permitting Relators to learn the "bare essentials" of their case in discovery is not only inconsistent with courts' "important gatekeeping function where FCA claims are involved," but also an incentive to file speculative qui tam suits. *Keeler*, 568 Fed.Appx. at 801 n.23 ("A line of decisions from the Eleventh Circuit—*Clausen, Corsello, Atkins, and Solvay*—make clear that this court has an important gatekeeping function."); *see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 220, 229, 231 (1st Cir. 2004). Nevertheless, as noted above, the Court considers the New Exemplars together in order to draw all reasonable inferences in favor of Relators.

25    *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009).

26    As discussed above, it is possible that the "Supplier" in New Exemplar 1 is, in fact, Lincare. If the "Supplier" is Lincare, Diabetic Experts may use the consent as the supplier because it is a subpart of Lincare.

27    The Court has also considered Relators' citations to the Federal Register concerning "Beneficiary Signature for Nonemergency Ambulance Transport Services" and a failed proposal to eliminate the "assignment of benefits form" for diabetic supplies. (*See* DE 216-2; 217-16). The citations do not persuade the Court to revisit its ruling on Relators' item specificity argument.

28    But, if another covered item was provided within the last 15 months, no consent is required. 42 U.S.C. § 1395m(a)(17)(iii). It is not clear how Relators' proposed interpretation of "covered item" would function in the context of the 15-month contact window provided by exception (iii).

29    https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/Downloads/DMEPOSTelemarketingFAQs.pdf (last viewed Nov. 18, 2015) (emphasis added).

30    New Exemplar 1 is not false for an additional reason not applicable to New Exemplars 2 and 3. New Exemplar 1 indicates that Diabetic Experts called on a Lincare customer who had also received unit dose medication, potentially from Med4Home. For the reasons set forth in the Court's July Order, there is no False Claims Act liability if the customer received a covered item from Lincare in the previous 15 months. The unrebutted October 13, 2015 Pedersen Affidavit (DE 301-1 at 2-3) demonstrates that Lincare furnished a covered item on February 14, 2008 and Diabetic Experts made the call on May 11, 2009.

31    The Court reiterates its observation in the July Order that this finding under the False Claims Act does not constitute an approval of Defendants' business practices. If the appropriate agency were concerned with the manner in which Defendants engaged with their customers, it could always initiate proceedings directed to Defendants' eligibility to participate in Medicare. But, absent false claims, that is not the purview of a district court. *See* 42 U.S.C. § 1395m(a)(17)(C); 42 C.F.R. § 424.57(e); *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 717 (6th Cir. 2013) (noting that "compliance may of course be enforced administratively through suspension, disqualification, or other remedy."); *see also* Additional (DMEPOS) Supplier Enrollment Safeguards, 75 Fed. Reg. at 52631 ("We believe that if CMS or the NSC through on-site inspection obtains or develops evidence that a DMEPOS supplier has made prohibited

2016 WL 3961840

contacts with Medicare beneficiaries in violation of the provisions found in this section that CMS or the NSC may revoke that supplier's billing privileges.").

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Board of Water and Sewer Com'rs of City of Mobile v...., Not Reported in...
2009 WL 2210648

2009 WL 2210648
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. Alabama,
Southern Division.

The BOARD OF WATER AND
SEWER COMMISSIONERS OF the
CITY OF MOBILE, et al., Plaintiffs,
v.
The ALABAMA DEPARTMENT OF
TRANSPORTATION, et al., Defendants.

Civil Action No. 08–0718–WS–C.
|
July 20, 2009.

**Attorneys and Law Firms**

Frank G. Taylor, James E. Atchison, Vaughan Drinkard, Jr., The Atchison Firm, P.C., Mobile, AL, for Plaintiffs.

Allen E. Graham, Cooper C. Thurber, Lyons, Pipes & Cook, Kenneth A. Watson, Matthew C. McDonald, Miller, Hamilton, Snider & Odom, Kirkland E. Reid, Jones Walker LLP, William J. Gamble, Jr., Mobile, AL, Jim R. Ippolito, Jr., Department of Transportation State of Alabama, Montgomery, AL, for Defendants.

**ORDER**

WILLIAM H. STEELE, District Judge.

**\*1** This matter is before the Court on the motion of plaintiff Mobile Baykeeper, Inc. ("Baykeeper") for leave to file an amended complaint in intervention. (Doc. 28). The purpose of the amendment is to add a state official as a defendant, so that Baykeeper can pursue certain equitable relief against him under the doctrine of *Ex parte Young*. The motion comes in response to the Court's recent order granting the motion to dismiss filed by the Alabama Department of Transportation ("ALDOT")— the only defendant sued by Baykeeper—on the grounds of Eleventh Amendment immunity. (Doc. 23). ALDOT opposes the motion. (Doc. 30).

The Court dismissed Baykeeper's complaint without leave to amend, relying on *Wagner v. Daewoo Heavy Industries America Corp.,* 314 F.3d 541 (11th Cir.2002) (en banc). (Doc. 23 at 4 & n. 3). The Court did not dismiss the action, since the complaint filed by the Board of Water and Sewer Commissioners survives.

Baykeeper argues that, pursuant to Federal Rule of Civil Procedure 15(a)(1), it is entitled to amend as a matter of right despite the Court's dismissal of its complaint. (Doc. 28 at 2). On the contrary, "we find it appropriate to adopt the rule that after a complaint is dismissed the right to amend under Rule 15(a) terminates...." *Czeremcha v. International Association of Machinists and Aerospace Workers,* 724 F.2d 1552, 1556 (11th Cir.1984).

Baykeeper next argues that it should be granted leave to amend pursuant to Rule 15(a)(2). (Doc. 28 at 2). Even following dismissal of the complaint, the liberal policy of amendment under that rule continues, at least if the action has not been dismissed. *Czeremcha,* 724 F.2d at 1556. Under this rule, leave should be given "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *McKinley v. Kaplan,* 177 F.3d 1253, 1258 (11th Cir.1999) (internal quotes omitted); *see also Vanderberg v. Donaldson,* 259 F.3d 1321, 1326 (11th Cir.2001) (the same standard governs motions to amend pursued post-judgment through Rule 59(e)).

ALDOT does not address this standard. Although its brief may hint at undue delay or futility, (Doc. 30 at 4), these suggestions are insufficiently developed to form a basis for denying leave to amend.

ALDOT is left to argue that leave to amend should be denied because the Court's order dismissing the complaint expressly did so without leave to amend. (Doc. 30 at 3–4). That order, being interlocutory, is subject to reconsideration by the Court. E.g., *Todd v. Baxter Healthcare Corp.,* 235 F.3d 1307, 1315 (11th Cir.2000). Reconsideration is appropriate, inter alia, "to correct clear error or manifest injustice." *Gibson v. Mattox,* 511 F.Supp.2d 1182, 1185 (S.D.Ala.2007) (internal quotes omitted). Moreover, since ALDOT did not request that

**Board of Water and Sewer Com'rs of City of Mobile v...., Not Reported in...**

2009 WL 2210648

dismissal be without leave to amend, (Docs. 5, 6), and since Baykeeper consequently was not on clear notice that it risked such a result, a lower threshold for reconsideration should obtain.

**\*2** "A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, *never* filed a motion to amend nor *requested leave to amend before the district court.*" *Wagner,* 314 F.3d at 542 (emphasis added). Baykeeper did not seek leave to amend prior to the Court's order dismissing its complaint, but it did seek leave to amend three business days afterwards. The Court concludes that *Wagner* does not clearly supersede *Czeremcha* and like cases in this context.

First, the facts in *Wagner* were that the plaintiff "never sought to amend his complaint in the district court, either before or after the motion to dismiss was granted; instead, he merely appealed the district court's adverse ruling." *Wagner v. Daewoo Heavy Industries Corp.,* 289 F.3d 1268, 1273 (11th Cir.), *vacated,* 298 F.3d 1228 (11th Cir. 2002). Because *Wagner* did not involve a plaintiff who sought leave to amend in the district court following dismissal, its holding cannot easily be stretched to cover such a situation. Second, the evil which the *Wagner* rule was designed to remedy is that of piecemeal appeals and

the attendant waste of appellate resources, 314 F.3d at 543, not delayed action in the trial court. Third, *Wagner* declared that its rule was in accord with that of most sister circuits, and the cases it cited for this proposition appear uniformly to involve litigants who first sought leave to amend in the appellate court. *Id.* at 543–44. Fourth, *Wagner* did not address *Czeremcha* or any of the similar cases requiring a district court to employ Rule 15(a)(2) to a post-dismissal motion for leave to amend, and "we would be hesitant to infer that the en banc court ... overruled such well-established law sub silentio." *Cannon v. Berry,* 727 F.2d 1020, 1022 (11th Cir. 1984).

For these reasons, the Court upon reconsideration removes that portion of its order on motion to dismiss that purported to deny Baykeeper leave to amend. With that restriction no longer in play, Baykeeper's motion for leave to file an amended complaint is due to be, and is, **granted.** Baykeeper is **ordered** to file and serve its complete first amended complaint in intervention on or before **July 27, 2009.** [1]

DONE and ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2210648

---

Footnotes

1   Baykeeper's first amended complaint in intervention, (Doc. 29), which was filed without leave of Court, is **stricken.** The Court notes that this document is only a brief addition to the complaint in intervention rather than a complete pleading. The Court does not recognize partial pleadings.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

United States v. HPC Healthcare, Inc., --- Fed.Appx. ---- (2018)
2018 WL 526039

2018 WL 526039
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America, et al., Plaintiff,
Nancy Chase, ex rel., Plaintiff-Appellant,
v.
HPC HEALTHCARE, INC., a
Florida corporation, Defendant,
LifePath Hospice, Inc., a Florida corporation,
Good Shepherd Hospice, Inc., a Florida
corporation, Mobile Physician Services,
P.A., a Florida Professional Association,
Chapters Health, Inc., a Florida corporation,
Ronald Schonwetter, M.D., Chapter Health
Systems, Inc., et al., Defendants-Appellees.

No. 16-16670
|
(January 24, 2018)

Appeal from the United States District Court for the
Middle District of Florida, D.C. Docket No. 8:10-
cv-01061-JSM-TGW

**Attorneys and Law Firms**

Tillman James Finley, Marino Finley, PLLC,
Washington, DC, Natalie Khawam, Whistleblower Law
Firm, PL, Tampa, FL, Mark Dawson Kiser, Trenam Law,
John S. Vento, Tampa, FL, Elyse MacNamara, Daniel
Marino, Marino Finley, PLLC, Washington, DC, for
Plaintiff-Appellant

Joseph H. Lang, Jr., Adam P. Schwartz, Cathleen Bell
Bremmer, Blaise Nolan Gamba, Erin Hoyle, Carlton
Fields Jorden Burt, PA, Tampa, FL, Gabriel L. Imperato,
Beverly A. Pohl, One Financial Plz, Fort Lauderdale, FL,
Christina Lehm, Broad & Cassel LLP, Fort Lauderdale,
FL, for Defendants-Appellees LifePath Hospice, Inc.,
Good Shepherd Hospice, Inc., Chapters Health, Inc.

Frank Robert Jakes, Johnson Pope Bokor Ruppel &
Burns, LLP, Tampa, FL, Margaret R. Knaust, Johnson
Pope Bokor Ruppel Burns, ST Petersburg, FL, Darryl R.
Richards, Johnson Pope Bokor Ruppel & Burns, LLP,
Tampa, FL, for Defendants-Appellees Mobile Physician
Services, P.A., Richard M. Wacksman

Jack Fernandez, Nathan M. Berman, Zuckerman
Spaeder, LLP, Tampa, FL, for Defendant-Appellee
Ronald Schonwetter

William Jung, Paul M. Sisco, Jung & Sisco, PA, Tampa,
FL, for Defendant-Appellee Sayed Hussain

A. Brian Albritton, Phelps Dunbar, LLP, Tampa, FL, for
Defendant-Appellee Diana Yates

Douglas Hallward-Driemeier, Colleen A. Conry, David
E. Rhinesmith, Ropes & Gray, LLP, Washington, DC,
Andrew J. O'Connor, Brien T. O'Connor, Ropes &
Gray, LLP, Boston, MA, Mark P. Rankin, Shutts &
Bowen, LLP, Tampa, FL, for Defendant-Appellee JSA
Healthcare Corporation

Philip Matthew Luka, Trombley & Hanes, PA,
Tampa, FL, Enu Mainigi, Jennifer G. Wicht, Jennifer
Nicole Wimsatt Pusateri, Williams & Connolly, LLP,
Washington, DC, for Defendant-Appellee Sunrise Senior
Living Services, Inc.

Audra Bryant, Richard Burton Bush, Bush & Augsprger,
PA, Tallahassee, FL, Lisa J. Augspurger, Bush &
Augspurger, PA, Orlando, FL, for Defendant-Appellee
Superior Residences, Inc.

Joseph H. Lang, Jr., Carlton Fields Jorden Burt, PA,
Tampa, FL, Beverly A. Pohl, Broad & Cassel LLP, Fort
Lauderdale, FL, for Chapter Health System, Inc.

Adam P. Schwartz, Carlton Fields Jorden Burt, PA,
Carlton Fields Jorden Burt, PA, Tampa, FL, for
Defendant-Appellee Chapters Health System, Inc.

Before TJOFLAT and MARTIN, Circuit Judges, and
MURPHY, [*] District Judge.

**Opinion**

MARTIN, Circuit Judge:

United States v. HPC Healthcare, Inc., --- Fed.Appx. ---- (2018)

2018 WL 526039

**\*1** In this qui tam action, relator Nancy Chase appeals from the District Court's dismissal of her complaint alleging that several health care providers violated the federal and Florida False Claims Acts. The District Court dismissed the complaint for failure to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) for claims alleging fraud. It also ruled that the complaint failed to state a claim with respect to Ms. Chase's conspiracy and retaliation claims. Ms. Chase now appeals both the dismissal of her complaint and the denial of her request to file an amended complaint. After careful review, we affirm.

## I. BACKGROUND

### A. THE PARTIES

The admission and billing practices of Defendant Chapters Health System, Inc., ("Chapters") and its subsidiaries are at issue in this case. Chapters is a Florida non-profit that provides hospice services. It has three subsidiaries: Chapters Health, Inc., LifePath Hospice, Inc., and Good Shepherd Hospice, Inc. Chapters Health manages and coordinates the activities of Chapters Health System and its entities. LifePath and Good Shepherd provide hospice and palliative care services. Collectively, these defendants are the "Chapters Defendants." [1] Approximately 80 percent of the Chapters Defendants' patients are Medicare or Medicaid beneficiaries.

JSA Healthcare Corporation, Sunrise Senior Living Services, Inc., and Superior Residences, Inc., are for-profit health care and assisted living providers. Mobile Physician Services, P.A., is a for-profit provider of at-home health care. These providers referred patients to Chapters for hospice services. Collectively, these defendants are the "Referral Defendants."

Ms. Chase, the relator, is a licensed social worker. From 1992 to 2012, she was employed by LifePath. During her employment with LifePath, she worked as a social services specialist, patient/family counselor, and psychosocial consultant. As a psychosocial consultant from 1994 to 2009, Ms. Chase's primary responsibilities included "training counselors, providing clinical supervision towards licensure, providing consultation to entire teams regarding counselor functions, dealing with any difficult or challenging cases, and providing leadership input in the psychosocial capacity." Ms. Chase also served

on LifePath's ethics committee and a committee that developed corporate policies. In 2012, she was fired.

### B. THE ALLEGATIONS

In her complaint, Ms. Chase alleges that the Chapters Defendants fraudulently billed Medicare and Medicaid by admitting and recertifying patients who were not eligible for hospice care. Specifically, she alleges that the Chapters Defendants engaged in six schemes that resulted in false claims being made to the government. Ms. Chase identifies the schemes as (1) providing hospice care to ineligible patients; (2) providing hospice care to patients without properly executed documentation; (3) providing patients higher levels of care than medically necessary; (4) falsifying documents and patient records to conceal patient ineligibility for hospice services; (5) submitting claims for services that were not provided; and (6) providing services that were not in keeping with patient care plans. In addition, Ms. Chase alleges that Chapters unlawfully gave incentives to the Referral Defendants in exchange for their referral of patients for hospice care. Finally, Ms. Chase says that her former employer LifePath retaliated against her for pointing out the alleged fraud.

### C. PROCEDURAL HISTORY

**\*2** Ms. Chase filed this lawsuit under seal in 2010. She amended her complaint three times to add allegations and parties in September 2010, May 2012, and August 2012. In 2015, the United States and the State of Florida declined to intervene on Ms. Chase's behalf. Then in March 2016, Ms. Chase filed a fourth amended complaint, which was served on the defendants and is the operative complaint in this case. The complaint made five claims: (1) the submission of false claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and the analogous Florida False Claims Act, Fla. Stat. § 68.082(2)(a); (2) making or using false statements or records material to false claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and the Florida False Claims Act, Fla. Stat. § 68.082(2)(b); (3) conspiracy to commit violations of the False Claims Act and Florida False Claims Act; (4) retaliation by LifePath, in violation of 31 U.S.C. § 3730(h); and (5) discrimination by LifePath, in violation of Fla. Stat. § 68.088. [2]

The defendants moved to dismiss all counts. Then on September 22, 2016, the District Court dismissed the

United States v. HPC Healthcare, Inc., --- Fed.Appx. ---- (2018)

2018 WL 526039

complaint with prejudice. It found the complaint failed to meet the heightened pleading requirement for claims alleging fraud under Federal Rule of Civil Procedure 9(b) and dismissed the counts alleging substantive violations of the federal and Florida False Claims Acts. It also found that the complaint failed to state a claim for the remaining counts of conspiracy, retaliation, and discrimination. The court dismissed the complaint with prejudice because it found that Ms. Chase had repeatedly failed to cure deficiencies in her complaint and further amendment would be futile. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. Starship Enters. of Atlanta, Inc. v. Coweta Cty., 708 F.3d 1243, 1252 (11th Cir. 2013). We accept the facts alleged in the complaint as true and construe all inferences in the light most favorable to the plaintiff. Id. We review a district court's denial of leave to amend for an abuse of discretion. Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam). However, we review de novo the underlying legal conclusion of whether a particular amendment to the complaint would be futile. Id.

## III. DISCUSSION

### A. FALSE CLAIMS
Any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the False Claims Act. 31 U.S.C. § 3729(a)(1)(A)-(B).[3] A "claim" includes direct requests for government payment as well as reimbursement requests made under a federal benefits program. Universal Health Servs., Inc. v. United States, —— U.S. ——, 136 S.Ct. 1989, 1996, 195 L.Ed.2d 348 (2016); see 31 U.S.C. § 3729(b)(2)(A). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." Corsello, 428 F.3d at 1012. In the healthcare context, a False Claims Act violation typically involves billing for services not provided or not medically necessary. E.g., U.S. ex rel. Sanchez v. Lymphatx, Inc.,

596 F.3d 1300, 1302 (11th Cir. 2010) (per curiam); U.S. ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1303 (11th Cir. 2002). But a provider may also be liable under the False Claims Act if it falsely certifies that it is in compliance with federal health care laws that are a condition of payment. See McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259–60 (11th Cir. 2005); see also Universal Health Servs., 136 S.Ct. at 1996 ("A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."). Ms. Chase alleges that the defendants submitted false claims by fraudulently billing for certain hospice services and by falsely certifying compliance with federal health care laws.

*3 At the pleading stage, a complaint alleging violations of the False Claims Act must satisfy two requirements. First, the complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal, a complaint must contain enough specific factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quotation omitted). Second, the complaint must satisfy Rule 9(b)'s heightened pleading requirement for claims alleging fraud. That is, it must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see Clausen, 290 F.3d at 1308–09 (holding Rule 9(b) applies to False Claims Act claims). Under Rule 9(b), the plaintiff must plead "facts as to time, place, and substance of the defendant's alleged fraud," including "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." Clausen, 290 F.3d at 1310 (quotation omitted).

The District Court concluded that Ms. Chase's complaint failed to meet Rule 9(b)'s heightened pleading standard for claims alleging fraud. The court acknowledged that Ms. Chase had "describe[d] a private scheme in detail" regarding "disturbing medical practices," but it ruled that she had failed to satisfy Rule 9(b) with her conclusory allegations that false claims were submitted as a result of that scheme. We conclude that the District Court properly dismissed these claims.

The submission of a false claim is "the sine qua non of a False Claims Act violation." Clausen, 290

F.3d at 1311. "Because it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances." Corsello, 428 F.3d at 1013. Therefore, unless a relator alleges with particularity that false claims were actually submitted to the government, our precedent holds that dismissal is proper. See Clausen, 290 F.3d at 1311 (explaining that a plaintiff cannot "merely [ ] describe a private scheme in detail but then [ ] allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government").

The key inquiry is whether the complaint includes "some indicia of reliability" to support the allegation that an actual false claim was submitted. Id. One way to satisfy this requirement is by alleging the details of false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills. See Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1326 (11th Cir. 2009); United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358 (11th Cir. 2006). In other circumstances, this Court has deemed indicia of reliability sufficient where the relator alleged direct knowledge of the defendants' submission of false claims based on her own experiences and on information she learned in the course of her employment. See U.S. ex rel. Walker v. R&F Props. of Lake Cty., Inc., 433 F.3d 1349, 1360 (11th Cir. 2005) (holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ who was required to bill under a doctor's provider number and whose conversations about the defendant's billing practices with the office manager formed the basis for the relator's belief that fraudulent claims were actually submitted to the government). However, the basis of this direct knowledge must be pled with particularity. See Sanchez, 596 F.3d at 1302–03 & n.4.

Ms. Chase's complaint lacked the "indicia of reliability" required by this Court's precedent because it did not include the underlying factual bases for her assertions. The complaint alleges that Chapters admitted ineligible patients for hospice care, delayed discharges when patients were no longer eligible for care, billed for improperly elevated levels of care or care not provided, falsified certain documents and patient records to conceal these practices, and made false claims as a result of

this conduct. But the complaint does not give examples of specific patients who were ineligible for care, details about why they were ineligible, who at Chapters made particular falsifications, when the falsifications occurred, or when the fraudulent bills were submitted to Medicare. See Clausen, 290 F.3d at 1310 (explaining that to satisfy Rule 9(b), "a plaintiff must plead facts as to time, place, and substance of the defendant[s'] alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them") (quotation omitted). This Court has explained that a relator may not simply "portray[ ] the scheme and then summarily conclude[ ] that the defendants submitted false claims to the government for reimbursement." Atkins, 470 F.3d at 1359.

*4 Although Ms. Chase details a scheme, her complaint does not include specific examples of the conduct she describes or allege the submission of any specific fraudulent claim. Neither does Ms. Chase allege the basis of her knowledge of the defendants' fraudulent billing practices—a process she was far removed from as a social worker. See id. (affirming dismissal of complaint despite inclusion of specific examples of patients, dates, and services because relator lacked direct knowledge of defendants' submissions of false claims); cf. Walker, 433 F.3d at 1360. In light of all these deficiencies, we conclude that Ms. Chase failed to provide the required "indicia of reliability" to support her allegations of false claims for hospice services.

We also conclude that Ms. Chase did not adequately plead a False Claims Act violation predicated on illegal kickbacks under a false certification theory. The complaint alleged that the defendants falsely certified that they were in compliance with the Anti-Kickback statute and the Stark law. The Anti-Kickback statute prohibits a healthcare provider from financially inducing a person to refer a Medicare patient, and it likewise prohibits that person from receiving any remuneration in exchange for the referral. 42 U.S.C. § 1320a-7b(b)(1), (b)(2). The Stark law prohibits "a physician" from referring Medicare patients to a healthcare provider if the doctor has a "financial relationship" with that provider. 42 U.S.C. § 1395nn(a)(1)(A).

Ms. Chase alleged that the Referral Defendants engaged in separate kickback schemes with the Chapters Defendants, whereby Chapters conferred certain benefits

**United States v. HPC Healthcare, Inc., --- Fed.Appx. ---- (2018)**

2018 WL 526039

on the Referral Defendants in exchange for patient referrals in violation of federal law. But her allegations fall far short of satisfying Rule 9(b). For example, she fails to identify a single individual from Sunrise, JSA, or Superior who made a referral to Chapters in exchange for a benefit, a single patient that was improperly referred, who at Chapters provided the bribes, or when those exchanges took place. See Clausen, 290 F.3d at 1310. Ms. Chase also alleged that Chapters and Mobile Physicians Services (owned by LifePath's medical director) improperly referred ineligible patients to each other. But she again fails to allege any specific facts supporting this conclusory allegation. Without details to support her conclusory allegations of wrongdoing, Ms. Chase's complaint lacks the necessary "indicia of reliability" under Rule 9(b). We therefore affirm the dismissal of the substantive False Claims Act counts.

### B. CONSPIRACY

Ms. Chase also alleged that the defendants violated the False Claims Act's conspiracy provision. Section 3729(a)(1)(C) imposes liability on any person who conspires to commit a violation of the Act. 31 U.S.C. § 3729(a)(1)(C). To state a claim of conspiracy to violate the False Claims Act, the plaintiff must allege (1) an unlawful agreement between defendants to commit a violation of § 3729(a)(1); (2) an act performed in furtherance of the conspiracy; and (3) that the United States suffered damages as a result. See Corsello, 428 F.3d at 1014 (interpreting the pre-amendment version of the statute); 31 U.S.C. § 3729(a)(1)(C). [4] Rule 9(b)'s heightened pleading standard applies to claims brought under the conspiracy provision. Corsello, 428 F.3d at 1014.

The District Court dismissed the conspiracy claim saying that the complaint failed to allege an agreement to defraud the government. We agree. Ms. Chase's complaint alleged merely that "Defendants knowingly conspired with each other" to violate §§ 3729(a)(1)(A) and 3729(a)(1)(B) of the False Claims Act. On appeal, Ms. Chase argues that she sufficiently alleged an agreement between the Chapters Defendants and each of the Referral Defendants. But the complaint fails to identify the people from any of the Referral Defendants involved in the agreement or any specific facts that show an agreement to violate the False Claims Act. We therefore conclude that she falls far short of stating a conspiracy claim. Compare Corsello, 428 F.3d at 1014 (dismissing conspiracy claim where the "bare

legal conclusion" that defendants "conspired to defraud the Government" was not supported by specific factual allegations that they had entered an agreement), with U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 193–94 (5th Cir. 2009) (relying on "specific language" between two named coconspirators made during a particular meeting where the relator was present to conclude that the plaintiff had sufficiently alleged an unlawful agreement).

### C. RETALIATION

**\*5** In order to show retaliation under the False Claims Act, the plaintiff must show that she was "discriminated against in the terms and conditions of [her] employment" for engaging in protected activity. [5] 31 U.S.C. § 3730(h)(1). Unlawful discrimination includes discharge, demotion, suspension, threats, and harassment. Id. The False Claims Act defines protected activity as "lawful acts done by the employee ... in furtherance of an action under [the False Claims Act] or other efforts to stop 1 or more violations of [the False Claims Act]." Id. To show retaliation, the plaintiff must establish a causal connection between the retaliation and the protected activity; that is, she must show that the retaliation was "because of" the protected activity. Id. This requires the plaintiff to show that the employer was at least aware of the protected activity. Sanchez, 596 F.3d at 1304.

In the section of her complaint asserting her retaliation claim, Ms. Chase alleged that she was demoted in 2009 "because she raised ethical issues concerning violations of the Acts." She also alleged that she was removed from two committees and later fired after she raised ethical concerns about the failure to honor patients' advance medical directives. Ms. Chase alleged that her demotion, her removal from committees, and her termination all constituted unlawful retaliation.

The District Court correctly found that Ms. Chase's raising of ethical concerns about adherence to advance medical directives was not protected activity because this conduct is not related to a False Claims Act violation. We also agree that Ms. Chase's allegation that she was demoted "because she raised ethical issues concerning violations of the [False Claims] Acts" is a legal conclusion that fails to satisfy federal pleading requirements. See Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (quotation

omitted). Finally, we reject Ms. Chase's argument that she sufficiently pled her retaliation claim by alleging —in a different section of her complaint unrelated to the retaliation claim—that she "objected to the default enrollment" of certain patients and noted specific Medicare and Medicaid requirements. Even assuming that this objection constituted protected activity, Ms. Chase failed to plead a causal link between that objection and any of the actions she alleged constituted retaliation (i.e., her demotion, her removal from committees, or her termination). And the complaint is devoid of any allegations that the decision-makers at LifePath were aware of this objection. See Sanchez, 596 F.3d at 1304; U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998) (stating that "because of" language in § 3730(h)(1) requires the employee to show that the employer had knowledge of the protected activity and was motivated to retaliate, at least in part, by the protected activity). We therefore conclude that the District Court properly dismissed the retaliation and discrimination claims.

## D. DENIAL OF LEAVE TO AMEND THE COMPLAINT

Under Federal Rule of Civil Procedure 15(a), a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). But a district court need not allow an amendment if (1) there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies in previous amendments; (2) allowing amendment would cause undue prejudice to the defendant; or (3) amendment would be futile. Corsello, 428 F.3d at 1014. The District Court denied Ms. Chase leave to amend because it determined she had "repeated chances to cure the deficiencies in her complaint" but had

failed to do so. It also found that any further amendments would be futile.

*6 Ms. Chase argues she should be allowed at least one opportunity to address the deficiencies identified by the District Court because this was the first time her complaint was subjected to adversarial testing. In certain circumstances, it may be appropriate for a relator to be allowed to amend the complaint after it is first subjected to adversarial testing, but Ms. Chase's failure to properly ask for leave to amend forecloses her argument that the District Court abused its discretion. See Long v. Satz, 181 F.3d 1275, 1279–80 (11th Cir. 1999) (per curiam). To properly request leave to amend, a plaintiff must (1) file a motion for leave to amend, and (2) "either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." Id. at 1279. This Court has assumed that a request to amend included in a response to a motion to dismiss (what Ms. Chase did here) is "the functional equivalent of a motion" for leave to amend. Atkins, 470 F.3d at 1362. But Ms. Chase made no attempt to satisfy the second requirement. In her response to the motion to dismiss, she did not identify any new allegations that would make amendment worthwhile. Neither has she provided further details about the substance of her proposed amendments on appeal. Because Ms. Chase did not address "how the complaint could be amended to save the meritless claim," id. (quotation omitted), we conclude that the District Court did not abuse its discretion in dismissing the complaint with prejudice.

**AFFIRMED.**

**All Citations**

--- Fed.Appx. ----, 2018 WL 526039

Footnotes

\*    Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

1    The complaint also names as defendants several people who worked for Chapters and its subsidiaries.

2    The District Court determined that the Florida False Claims Act mirrored the federal False Claims Act, so there was no need to address them separately. Ms. Chase does not challenge this as error on appeal or otherwise argue that her state law claims should be analyzed differently from her federal law claims. We therefore address only her federal claims.

3    In 2009, Congress amended and renumbered the False Claims Act via the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1621 (2009). The complaint alleges conduct that falls on either side of FERA's effective date. But because Ms. Chase's complaint and briefing cite only to the amended version of the statute, we analyze her claims under the current version.

4    It is not clear whether damages remain a required element under the new conspiracy provision following the 2009 amendments. See John T. Boese, Civil False Claims and Qui Tam Actions, § 2.01(F) (4th ed. 2011). We need not answer

**United States v. HPC Healthcare, Inc., --- Fed.Appx. ---- (2018)**

2018 WL 526039

that question here, though, because we conclude that Ms. Chase failed to sufficiently allege an agreement between the defendants.

5  The District Court treated the requirement for showing retaliation under the federal False Claims Act as identical to the requirement for showing discrimination under the Florida False Claims Act. See Fla. Stat. § 68.088 (prohibiting discrimination by an employer against an employee "because of" the employee's protected activity). Ms. Chase does not challenge this as error on appeal. We therefore assume, without deciding, that the District Court was correct to treat these claims the same.

**End of Document**                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00392-WS-N   Document 174-1   Filed 02/15/18   Page 32 of 56

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)
2017 WL 6017775

2017 WL 6017775
Only the Westlaw citation is currently available.
United States District Court,
N.D. Alabama, Middle Division.

UNITED STATES EX REL.
Stephen HEADEN, Plaintiff,
v.
ADAMS AND ASSOCIATES, INC., d/b/
a the Gadsden Jobs Corps Center; Lorraine
Lane; and Shaileen Viera, Defendants.

Case No.: 4:16-CV-1164-VEH
|
Signed 12/05/2017

**Attorneys and Law Firms**

Jon C. Goldfarb, L. William Smith, H. Wallace Blizzard, III, Wiggins Childs Pantazis Fisher & Goldfarb, LLC, Birmingham, AL, Daniel E. Arciniegas, Yezbak Law Offices, Nashville, TN, for Plaintiff.

Albert L. Vreeland, II, Whitney R. Brown, Lehr Middlebrooks & Vreeland PC, Birmingham, AL, for Defendants.

**Opinion**

**MEMORANDUM OPINION**

VIRGINIA EMERSON HOPKINS, United States District Judge

**I. INTRODUCTION**

 *1 On July 14, 2016, the Plaintiff-Relator, Stephen Headen, filed this action against Adams and Associates, Inc. d/b/a the Gadsden Jobs Corps Center ("Adams"), Lorraine Lane, Juvenel Levros, and Shaileen Viera to recover, on behalf of the United States, damages and civil penalties arising from false statements and claims allegedly made by the Defendants in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729–3733, as amended ("the Act" or the "FCA"). (Doc. 1). On November 18, 2016, the government filed its notice of non-intervention. (Doc. 9). Thereafter, Levros was terminated as a defendant when the Relator filed an Amended Complaint which made no claims against Levros. (Doc. 41).

The Amended Complaint, which is now the operative pleading, alleges that all Defendants are liable for: "Substantive Violations of the False Claims Act" (Count One); "Implied False Certification in Violation of the False Claims Act" (Count Two); and conspiracy to violate the False Claims Act (Count Three).[1] The case comes before the Court on the Defendants' Motion to Dismiss (the "Motion"). (Doc. 45). For the reasons stated herein, the Motion will be **GRANTED**.

**II. LEGAL PRINCIPLES**

The Defendants state that their motion is brought "pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6)." (Doc. 45 at 1). The Eleventh Circuit Court of Appeals has stated:

Rule 9(b) applies in FCA cases. *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308–09 (11th Cir. 2002). An FCA complaint must therefore "state with particularity the circumstances constituting fraud or mistake." FED.R.CIV.P. 9(b). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quotation marks omitted). An FCA complaint "satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (quotation marks omitted).

Because the submission of an actual claim to the government for payment is "the sine qua non" of an FCA violation, *Clausen*, 290 F.3d at 1311, a plaintiff-relator must "plead the submission of a false claim with particularity," *United States ex rel. Matheny v. Medco Health Solutions Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). To do so, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *Id.*

**United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)**

2017 WL 6017775

Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311 (emphasis added). Instead, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

**\*2** This Court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins, 470 F.3d at 1358*. Providing exact billing data—name, date, amount, and services rendered-or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted. *See, e.g., Hopper, 588 F.3d at 1326; Atkins, 470 F.3d at 1358*. However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim. *See Clausen, 290 F.3d at 1312 & n. 21* (listing some of the types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"); *see also Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1512 (11th Cir. 1988)* ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule.").

Under this Court's nuanced, case-by-case approach, other means are available to present the required indicia of reliability that a false claim was actually submitted. Although there are no bright-line rules, our case law has indicated that a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims. *See U.S. ex rel. Walker v. R & F Properties of Lake County, Inc., 433 F.3d 1349, 1360 (11th Cir. 2005)* (holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ whose conversations about the defendant's billing practices with the defendant's

office manager formed the basis for the relator's belief that claims were actually submitted to the government).

By contrast, a plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation. *See Atkins*, 470 F.3d at 1359 (holding that Rule 9(b) was not satisfied where the relator was a doctor who did not allege first-hand knowledge of the hospital's submission of false claims). Additionally, a corporate outsider likely does not have the required access to learn enough about the defendants' billing practices. *See Clausen, 290 F.3d at 1314* (noting that a corporate outsider's lack of information about the defendants' billing practices makes it more difficult to gather the factual specifics necessary to meet Rule 9(b)'s requirements).

At a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted. *See Corsello v. Lincare, Inc., 428 F.3d 1008, 1013–14 (11th Cir. 2005)* (finding insufficient indicia of reliability after noting that the relator "did not explain why he believes fraudulent claims were ultimately submitted"). It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, *see id.* at 1014, to base his knowledge on rumors, *see Atkins, 470 F.3d at 1359*, or to offer only conjecture about the source of his knowledge, *see United States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1303 n. 4 (11th Cir. 2010)*.

*U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 Fed.Appx. 693, 703–05 (11th Cir. 2014)*.

## III. ALLEGATIONS IN THE AMENDED COMPLAINT

The Amended Complaint, in pertinent part, alleges:

> 11. Defendant Adams and Associates, Inc. ("Adams") operates and does business as the Gadsden Job Corps Center (the "center") in Gadsden, Alabama. Defendant Adams also operates at least fourteen (14) other, similar facilities in several states. The Gadsden Job Corps Center advertises space for approximately two hundred fifty-six (256) enrolled residential student[s] as well as approximately thirty (30) enrolled non-residential students.

> **\*3** 12. Under the auspices of the Gadsden Job Corps Center, [Adams] offers a GED program, a high school

diploma through Etowah County Public Schools, career technical training in six (6) vocational areas, and collegiate classes at Gadsden State Community College for certain students. Defendant Adams advertises that the center provides "a full range of services to our students including residential dorms, medical and dental care, career and social counseling, academic and vocational training, transportation and a living allowance."

13. Defendant Adams advertises that the Gadsden Job Corps Center offers Career Technical Training, Academic Opportunities (High School Diploma or GED), Room and Board, Medical and Dental Care, Recreational Activities, Field Trips, Spending Money, Real World Work Experience, Graduation Bonus, and Job Placement Assistance. Defendant Adams advertises that the Gadsden Job Corps Center Offers technical training programs in Advanced Human Services, Carpentry, Culinary Arts, Nurse Assistant/Home Health Aide, Office Administration, and Security & Protective Services. Adams advertises that the Gadsden Job Corps Center offers academic programs in Math & Reading, Mentoring, General Education Diploma (GED), High School Diploma, Community College for Qualified & Motivated Students, English Language Learner (ELL), Tutoring, Study Groups, Counseling, Leadership, and Driver's Education.

14. Defendant Lorraine Lane is the former Center Director and an agent of defendant Adams and Associates. Defendant Lane was the highest ranking official at the Gadsden Job Corps Center during a portion of the relevant time period. Defendant Lane was the official in charge of all aspects of the Gadsden Job Corps Center including enforcement of the statutory "zero tolerance" policy prohibiting drug use and violence described herein.

15. Defendant Viera is the CSIO [2] Supervisor and an agent of defendant Adams and Associates. Defendant Viera was the official in charge of discipline of student enrollees including enforcement of the statutory "zero tolerance" policy prohibiting drug use and violence described herein.

16. Defendant Adams is an "operator and service provider" who has entered into an agreement with the U.S. Department of Labor pursuant to 29 U.S.C. § 3197 and receives approximately $27,000 per enrollee

annually. Defendant Adams is paid based upon anticipated enrollment and has to return or take a credit against future payments for each slot for each enrolled student which is not filled by an enrolled student or which is vacated when an accepted enrolled student leaves the center for any reason. In order to qualify, defendant Adams was required to submit certify [sic] that it provided the services required by the Job Corps Act [3] and to further certify that it complied with the material provisions of the act. In particular, Section 3197 requires an "[assurance the entity will comply with basic health and safety codes, which shall include the disciplinary measures described in section 3202(b) of this title.]" [4]

17. 29 U.S.C. § 3202(a) requires the Secretary and directors of Job Corps to "stringently enforce standards of conduct within the centers ... [which] shall include provisions forbidding" acts of violence and the use, sale, or possession of a controlled substance or alcohol. [5]

18. Section 3202(b) requires the director to dismiss an enrollee from the Job Corps, *inter alia*, if the director determines retention jeopardizes the enforcement of standards and specifically establishes a "zero tolerance" policy for the certain infractions, including "an act of violence, for use, sale, or possession of a controlled substance, for abuse of alcohol, or for other illegal or disruptive activity." Section 3202(b)(2)(ii) states " 'zero tolerance' means a policy under which an enrollee shall be automatically dismissed from the Job Corps after a determination by the director that the enrollee has carried out an action" which specifically includes, (1) an act of violence, (2) the use, sale or possession of a controlled substance, or (3) abuse of alcohol. [6]

*4 19. 29 U.S.C. § 3195 requires the Secretary to establish specific standards and procedures, which "at a minimum ... [include] informing enrollees that drug tests will be administered to the enrollees and the results received within 45 days after the enrollees enroll in the Job Corps." [7]

20. The center is therefore required to administer drug tests to new enrollees upon enrollment and is required by statute to expel any enrolled student who tests positive for the use of a controlled substance after 45 days. [8] The center is also required by statute to expel any enrolled student if the enrolled student is found to

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

use, sell or possess any controlled substance at any time after enrollment.

21. Section 3202 prohibits the use of controlled substances. Section 3195 requires the center to administer drug tests at enrollment and again within 45 days in order to enforce a zero tolerance policy against continued drug use by enrolled students.[9] The U.S. Department of Labor Office of Job Corps Policy and Requirements Handbook requires that each student be tested for controlled substances at the time of admission and then re-tested at an interval between and 40 days after an initial positive test.[10] The handbook also requires that an enrolled student must be tested on suspicion of use of a controlled substance at any time.

22. Section 3202 prohibit[s] acts of violence. This section states the standards of conduct shall include "zero tolerance" for acts of violence and requires the director to dismiss any enrollee from the Job Corps who commits and [sic] act of violence.

23. The plaintiff/relator was employed by defendant Adams from approximately March 3, 2014[,] until approximately August 26, 2015.[11] During his employment, Mr. Headen was aware that defendant Adams did not follow the statute and failed to administer drug tests as required. Mr. Headen was also aware that defendant Adams ignored drug use including failing to administer tests as required or by ignoring positive drug tests in violation of federal statute.

24. All of the funds Defendant Adams received for all of the students in the program came from the federal government through the Department of Labor. There were no state, county or local funds which paid for the students to attend or participate in the program. There were no charitable funds which paid for the students to attend or participate in the program. Defendant Adams did not offer scholarships or tuition waivers since the students were not required to pay any tuition, which was paid by the federal government.

25. Funding and enrollment levels were openly discussed at Adams, including by defendant Lane, who emphasized the need to keep numbers up as close as possible to the maximum of 290. The students enrolled were listed on a roster which was distributed every day. The plaintiff/relator and other employees conducted several head counts daily which were used to produce

the roster. Students who were on sick leave continued to be listed on the roster, which meant Adams was being paid by the federal government as if they were enrolled. Adams would list students who were commuters on the roster as if they were enrolled from time to time, depending upon where the actual number of on campus students happened to be.

26. The plaintiff/relator had specific personal knowledge that defendant Adams, by and through its agents Lane, Viera and others, intentionally ignored the statutory "zero tolerance" policy against acts of violence, drug use and alcohol abuse.

**\*5** 27. The plaintiff/relator had specific personal knowledge that defendant Adams, by and through its agents Lane and others, claimed that enrolled students who had left the program were actually present and attending programs after these students had actually left the program. The plaintiff/relator had specific personal knowledge that defendant Adams claimed enrolled students were using residential facilities after they had moved out and were no longer enrolled or residents.

28. Defendant Adams, through Lane and Viera, had a policy and practice of failing to drug test, ignoring positive drug tests, and/or ignoring obvious drug use throughout the relevant time period. Nicholas Johnson and NeQuia Underwood were two students who were obviously using drugs and/or abusing alcohol during their enrollment, but that drug use and alcohol abuse was ignored by defendant Lane. When issues with Nicholas came up, Lane would instruct staff not to file a case not because that would create a paper record of the issue. Nicholas Johnson was allowed to remain enrolled until May or June 2015, when he was finally expelled from the program after multiple instances of fighting.

29. Defendant Adams, through Lane and Viera, had a policy and practice of ignoring and failing to document acts of violence throughout the relevant time period. Students Rashawn Lockley, Jamal Morgan, Brian James, KenDarius Birmingham, Jessie Rollins, James Spearman, Daryl Page, Johnny Ward, Quentin Slaughter and Nicholas Johnson had multiple instances of fighting during their enrollment. These issues were not documented based on direct instruction from defendant Lane. Lane instructed the staff to alert her about any instances of fighting before filing a written case note. When staff alerted her to instances

2017 WL 6017775

of fighting, including instances involving these specific students, Lane instructed staff not to create a case note about the incidents. Daryl Page and Johnny Ward were still enrolled as students when Headen was terminated. Quentin Slaughter was eventually expelled but was allowed to remain because, according to defendant Lane, the student numbers were low at the time. Nicholas Johnson was eventually expelled in May or June 2015, but only after multiple instances of violence.

30. Defendant Adams, through Lane, had a policy and practice of claiming that enrolled students who had left the program were actually present and attending programs after these students had actually left the program. Headen and other employees were routinely sent on trips across the state to pick up students who did not return to the campus after the weekend. Often, these students had informed Lane, or her assistant Epiphany Cherry, that they did not intend to return. Headen and other employees were sent in an Adams vehicle to contact the students and at times to convince them to return to the campus. Many times, Headen and other employees, such as Ross Arrington, were told to offer these students paying jobs if they would come back. However, some students refused to return at all and were then listed as being on sick leave while still on the roster. Students who refused to return were carried for seven (7) days, and at times even longer, on the roster which meant that Adams was being paid by the federal government as if they were present. One student, Timothy Bradham, who was from the Troy, Alabama area, informed Adams, and Cherry, that he was leaving the center. Mr. Headen and another employee were sent to attempt to convince Bradham to return. Bradham refused to return, and told Mr. Headen. Mr. Headen in turn told Cherry and Lane that Bradham refused to return. Despite Bradham's refusal to return, Bradham was listed on the roster for the following week as if her [sic] were on sick leave. Bradham was eventually dropped from the roster after seven (7) days, when a new group of students would arrive.

**\*6** 31. Defendant Adams, through defendant Lane, terminated Mr. Headen on or about August 26, 2015. Defendant terminated Mr. Headen, supposedly for using inappropriate and unprofessional language in a text message he sent to NeQuia Underwood, who was his wife's cousin, from his cell phone to her cell phone during hours when he was not at work and she was not on campus.

32. Mr. Headen had several conversations with NeQuia Underwood, his wife's cousin and an enrollee in the Gadsden Job Corps program. Upon information and belief, Ms. Underwood tested positive for controlled substances when she enrolled in the Gadsden Job Corps program. Ms. Underwood continued to abuse alcohol and to use controlled substances while she was enrolled. Defendant Adams, through Lane, Viera and other agents, ignored Ms. Underwood's repeated alcohol abuse and continued drug use, failed to drug test Ms. Underwood, and/or, in the alternative, ignored positive drug tests. Mr. Headen learned that Ms. Underwood had been using drugs and continued to use drugs while enrolled in the Job Corps program.

33. Upon information and belief, defendant Adams continues to operate in the same manner under current Center Director Levros. Former Director Lane was promoted to a position of greater authority and now supervises the Gadsden Job Corps Center as well as other Job Corps centers owned and operated by defendant Adams.

(Doc. 41 at 5-15, ¶¶ 11-33).

## IV. ANALYSIS

### A. Count One

**\*7** Count One alleges that the Defendants are liable for violation of 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). Those sections impose liability on "any person who[:] ... (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; ... (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [and] ... (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). The court will address each subsection in turn.

*1. The Realtor Fails To Allege with Sufficient Particularity that the Defendants Knowingly Presented,*

Case 1:13-cv-00392-WS-N   Document 174-1   Filed 02/15/18   Page 37 of 56

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

*or Caused To Be Presented, a False or Fraudulent Claim for Payment or Approval [31 U.S.C. § 3729(a)(1)(A)]*

The Amended Complaint alleges two separate violations of this subsection of the FCA: 1) the continued enrollment of students who violated the "zero tolerance" policy; and 2) the creation of inaccurate rosters of students.

### a. Failure to Follow "Zero Tolerance" Procedures

The Amended Complaint first alleges that the Defendants failed to follow statutory "zero tolerance" procedures by: failing to administer drug tests as required (doc. 41 at 10, ¶ 23), and failing to expel enrollees who engaged in violence, or participated in the use, sale, or possession of a controlled substance or alcohol. (Doc. 41 at 11, ¶ 26). The Amended Complaint includes the names of several students who allegedly violated the policy and were not expelled. (*See* doc. 41 at 11-12, ¶ 28 (Nicholas Johnson and NeQuia Underwood—drugs and alcohol); doc. 41 at 12-13, ¶ 29 (Rashawn Lockley, Jamal Morgan, Brian James, KenDarius Birmingham, Jessie Rollins, James Spearman, Daryl Page, Johnny Ward, Quentin Slaughter, and Nicholas Johnson–fighting)). The Relator further alleges that the federal government is the only source of funding for Adams (doc. 41 at 10, ¶ 24), and that Adams "is paid based upon anticipated enrollment and has to return or take a credit against future payments for each slot for each enrolled student which is not filled by an enrolled student or which is vacated when an accepted enrolled student leaves the center for any reason" (doc. 41 at 7, ¶ 16). The Relator alleges that "[f]unding and enrollment levels were openly discussed at Adams, including by defendant Lane, who emphasized the need to keep numbers up as close as possible to the maximum of 290." (Doc. 41 at 10, ¶ 25). [12]

None of these factual allegations set out a violation of the Act. [13] "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello,* 428 F.3d at 1012 (*citing Clausen,* 290 F.3d at 1309) (emphasis added). Instead, "to state a claim under the False Claims Act with particularity, the complaint must allege facts as to time, place, and substance of the defendant's alleged fraud, [and] the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them. *Corsello,*

428 F.3d at 1012; *see also Clausen,* 290 F.3d at 1308 ("Rule 9(b) prevents '[s]peculative suits against innocent actors for fraud,' and ... under Rule 9(b) allegations of fraud 'must include facts as to time, place, and substance of the defendant's alleged fraud.' ") (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.,* 19 F.3d 562, 566–67 (11th Cir. 1994)). The Amended Complaint only alleges, generally, that the Defendants submitted "false and fraudulent claims, records, and statements" (doc. 41 at 15, 17, ¶¶ 36, 44). It does not identify, for example, the titles of the forms or reports Adams submitted to the government for payment, how often they were submitted, or who submitted them. [14] Also, the Relator has neither produced, nor referenced in his Amended Complaint, specific billing data evidencing any such claims, records, and statements. [15] Furthermore, the Amended Complaint contains no facts which establish that the Relator would have had direct, first-hand knowledge of the Defendants' submission of false claims gained through his employment with the Defendants. Indeed, the Amended Complaint fails to even identify in what capacity the Relator was employed by Adams. [16]

**\*8** The Relator attempts to circumvent the requirement of particularity by pleading, and arguing, that a false claim must have been made, since the only source of funds for Adams was the government. *See* doc. 48 at 8 ("Those specific factual allegations clearly allege that it was common knowledge that the federal government was the sole payer for enrolled students and that employees were told to take steps ensure that enrollment was kept at the maximum") (citing doc. 41 at 10, ¶¶ 24-25); doc. 48 at 11 ("The plaintiff's Amended Complaint likewise alleges that these false rosters were submitted to the federal government, since the federal government was the sole source of funds for the program") (citing doc. 41 at 7-8, 10-11, ¶¶ 16, 24-25); doc. 48 at 12 ("the plaintiff alleged it was openly discussed that the federal government was the sole source of funds for the Gadsden Job Corps Center and provided specific factual allegations about the role of the individual defendants in perpetrating that fraud" (citing doc. 41 at 3-4, 5-11, ¶¶ 4-7, 11-27; doc. 48 at 13 ("In this case the plaintiff not only alleged that fraudulent practices occurred, but also clearly connected those payments to the federal government as the sole source of funds for the program") (citing Doc. 1 ¶¶ 18, 25-30); doc. 48 at 14 ("The plaintiff's Amended Complaint likewise alleges that both false statements

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

resulted in payment by the federal government, since the federal government was the sole source of funds for the program.") (citing doc. 48 at 7-8, ¶¶ 16). The Relator has cited no authority, and the Court has found none, for the proposition that the existence of only one payer, without more, establishes that a false claim was made. Indeed, the Court has found no cases which have addressed the issue either way. However, it is often the case that, even when the government is the only payer, the Eleventh Circuit finds the allegations of a false claim to be lacking in particularity. *See, e.g., Klusmeier v. Bell Constructors, Inc.*, 469 Fed.Appx. 718 (11th Cir. 2012) (relator's allegation of violations of government construction contracts not relevant to whether defendant submitted fraudulent claims related to those contract violations); *Jallali v. Nova Se. Univ., Inc.*, 486 Fed.Appx. 765, 765 (11th Cir. 2012) (relator's allegation that college falsely asserted compliance with federal regulations in submitting claims for federal student aid to federal government lacked specificity required by Rule 9). The Relator asks this Court to infer the existence of a false claim, something it cannot do. *See, Corsello*, 428 F.3d at 1013 ("Although we construe all facts in favor of the plaintiff when reviewing a motion to dismiss, we decline to make inferences about the submission of fraudulent claims because such an assumption would 'strip[ ] all meaning from Rule 9(b)'s requirements of specificity.' ") (quoting *Clausen*, 290 F.3d at 1312 n. 21).

The facts of this case are very similar to the facts in *Klusmeier v. Bell Constructors, Inc.*, 469 Fed.Appx. 718 (11th Cir. 2012). In that case, the defendant, Bell, was awarded two government contracts by the United States Army Corps of Engineers for the construction of a pump station and levees. The procedures under which Bell was paid required it to submit to the government a monthly request for payment and to certify, in each monthly invoice, that the payment requested was for work performed according to the contract's specifications. The relators alleged that some of the work Bell did failed to comply with the contractual specifications, and that the defendant billed the government for non-compliant work. The Eleventh Circuit affirmed the district court's dismissal, writing:

> Here, Relators' allegations fail to show that Bell's monthly invoices actually included a false or fraudulent request for payment. Although Relators allege details as to how Bell violated its contracts, and allege some details as to when the monthly invoices were submitted,

Relators fail to establish that the contract violations actually resulted in the submission of false claims. *See Atkins*, 470 F.3d at 1359 (concluding relator failed to establish a link between detailed allegations of improper practices and the actual submission of false claims relating to those violations). Relators merely speculate that because Bell violated the contract in some instances, and because Bell submitted some invoices, false claims "must have been submitted, were likely submitted or should have been submitted...." *Clausen*, 290 F.3d at 1311. Assuming arguendo that Bell violated the contract and requested payment under the contract, this does not show that Bell's monthly invoices actually billed for the non-compliant work, and we decline to make such an assumption. *See id.* at 1312 n. 21 ("We cannot make assumptions about a False Claims Act defendant's submission of actual claims...."). Thus, the Complaint, despite the inclusion of some detailed factual allegations, has failed to sufficiently plead that Bell's submissions included an actual false or fraudulent claim.

Moreover, Relators lack the type of knowledge that normally will support an FCA complaint. *See United States ex rel. Walker v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (noting that knowledge developed from relator's employment by the defendant and conversations with billing employees can support a FCA complaint). Although Relator Gene Klusmeier alleges he was present on the construction site and observed some of the contract violations, his personal knowledge of the contract violations is not relevant to whether Bell submitted fraudulent claims related to those contract violations. *See id.* (finding personal knowledge of billing practices relevant to allegations of false bills); *see also Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 Fed.Appx. 893, 895 (11th Cir. 2008) (holding that relator's first-hand knowledge of billing practices could not support relator's allegation that the services related to the bills were performed improperly). Thus, Relators' personal knowledge of the contract violations does not support the allegation that Bell submitted requests for non-compliant work.

**\*9** *Id.* at 721–22.

Another Eleventh Circuit opinion, *Jallali v. Nova Se. Univ., Inc.*, 486 Fed.Appx. 765, 766 (11th Cir. 2012), is

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

also instructive. In *Jallali*, the Eleventh Circuit, finding *Klusmeier* persuasive, wrote:

> In this case, Jallali[,] [the Relator] [,] alleges that Nova Southeastern failed to comply with 34 C.F.R. §§ 602.22 and 668.14.1 He further alleges that federal regulations required Nova Southeastern to certify compliance with § 602.22 and 668.14 each time it requests federal student aid payments. Finally, he alleges that Nova Southeastern did request federal student aid payments. But, these allegations do not satisfy Rule 9(b) under our precedent. Jallali's complaint does not allege facts identifying the time, place, or substance of the allegedly fraudulent claims for payment. The complaint does not allege facts showing that Nova Southeastern actually certified compliance with § 602.22 and 668.14. Nor does the complaint allege that noncompliance with these regulations renders Nova Southeastern ineligible to receive federal student aid payments. Nor does Jallali possess personal knowledge of Nova Southeastern's billing practices.

We see no substantive distinction between *Klusmeier* and this case. Jallali, 486 Fed.Appx. at 767.

Similarly, in *Britton ex rel. U.S. v. Lincare Inc.*, 634 Fed.Appx. 238, 240 (11th Cir. 2015),

> The relator, Willie Britton, was employed as a delivery person for defendant Lincare. Britton delivered nebulizers to Lincare patients, explained the doctor's prescription, and demonstrated proper breathing technique while operating the nebulizer. Lincare's internal guidelines, however, provide that these explanations and demonstrations are to be performed

> by a "clinician only." Britton has no respiratory training or certification to credential him as a clinician. The assistance he provided, Britton claims, should have been performed by a "Health Care Specialist," such as a Licensed Practical Nurse, Registered Respiratory Therapist, or Certified Respiratory Therapist. Britton says that Lincare is forced to rely on delivery personnel like him to complete these educational tasks because its one Licensed Healthcare Representative in the Birmingham area is unable to serve all of Lincare's clients.

Britton, 634 Fed.Appx. at 239. The Eleventh Circuit affirmed the dismissal of the relator's claims, writing:

> Here, Britton's complaint alleges that he performed services that Lincare's internal documents reserved for clinicians. However, "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." Clausen, 290 F.3d at 1311. Britton is unable to muster any facts tending to show that Lincare asked the Government to pay amounts it does not owe. He disclaims any knowledge of Lincare's billing practices, and does not allege the "who," "what," "where," "when," and "how" of fraudulent submissions to the government. Nor does Britton allege that the United States actually paid a false claim, or that Lincare intended for the government to rely on false statements in deciding whether to pay a false claim. See Hopper, 588 F.3d at 1329–30 (holding that actual payment of a claim is an element of § 3729(a)(2), and dismissing the relator's action because even if actual payment need not be pled with particularity, the complaint failed to allege that the defendants intended for the government to rely on their false statements in deciding whether to pay a false claim).

**\*10** *Id.* at 240–41; *see also, Atkins,* 470 F.3d at 1359 ("As the plaintiff did in *Clausen,* Atkins has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims. He cites particular patients, dates and corresponding medical records for

Case 1:13-cv-00392-WS-N   Document 174-1   Filed 02/15/18   Page 40 of 56

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

services that he contends were not eligible for government reimbursement. Just like the *Clausen* plaintiff, though, Atkins fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement.") (emphasis in original). The Court sees no distinction in the allegations in the instant case and these cases. [17]

Furthermore, assuming Adams was not entitled to reimbursement for these enrollees, [18] the pleadings leave open the possibility that Adams made no claim for payment for those enrollees. The existence of these alternate explanations means that the factual allegations in the Amended Complaint fail to satisfy even the "notice pleading" standard of Rule 8. *See Twombly*, 550 U.S. at 567 (noting that where there was "an obvious alternative [and legal] explanation" for the conduct alleged the plaintiffs had not "nudged their claims across the line from conceivable to plausible"); *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013) ("[W]hen a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment."; "[W]ithout such plausible allegations of presentment, a relator not only fails to meet the particularity requirement of Rule 9(b), but also does not satisfy the general plausibility standard of *Iqbal*.") (italics in original).

**b. Inflated Rosters**

**\*11** The Amended Complaint also alleges that the Defendants "claimed that enrolled students who had left the program were actually present and attending programs after these students had actually left the program," and "claimed enrolled students were using residential facilities after they had moved out and were no longer enrolled or residents." (Doc. 41 at 11, ¶ 27). In his brief, the Relator argues:

> In this case, the plaintiff has alleged all payments for every student come from the federal government, which does not appear to be the subject of reasonable dispute.

Doc. 41 ¶ 16. In addition, in the Amended Complaint, the plaintiff further alleged that no state, local or private funds were received to support student enrollment. *Id.* ¶ 24. Finally, the plaintiff has alleged that the source of funding and enrollment levels were openly discussed and were discussed in a context which clearly related federal government funding to the policy violations which the plaintiff witnessed. *Id.* ¶ 25. The rosters, which the plaintiff participated in developing several times daily, were known to be the documents which triggered payment and employees were instructed as such. *Id.* These allegations have sufficient indicia of reliability in this case on a motion to dismiss.

The plaintiff's Amended Complaint also alleges with particularity that these rosters showed that (1) the defendants falsely claimed specific students were enrolled when they were not, that (2) the defendants ignored the "zero tolerance" statutory requirement and allowed ineligible students to remain enrolled, and (3) the defendants had a consistent policy and practice of these types of violations throughout his employment. Doc. 41 ¶¶ 23-30. The plaintiff's Amended Complaint likewise alleges that these false rosters were submitted to the federal government, since the federal government was the sole source of funds for the program. *Id.* ¶¶ 16, 24-25.

(Doc. 48 at 10-11). In sum, unlike the "zero tolerance" allegations, in these allegations the Relator actually alleges that the Defendants were paid based on enrollment figures, and those enrollment figures were inflated. Furthermore, he claims that he took part in the creation of these inflated rosters.

This claim fails for some of the same reasons the zero tolerance claim failed. First, there is <u>no</u> allegation in the Amended Complaint that any rosters were ever presented to the government for payment. For that reason alone, any claim that payment was based upon the creation of false rosters fails. Second, even if there were such allegations, there are no specifics as to when a roster was presented to the government, by whom, for what amounts, etc. Accordingly, the claim fails to satisfy Rule 9(b). [19]

**2. The Realtor Fails To Allege with Sufficient Particularity that the Defendants Knowingly Made, Used, or Caused To Be Made or Used, a**

2017 WL 6017775

*False Record or Statement Material to a False or Fraudulent Claim [31 U.S.C. § 3729(a)(1)(B) ]*

This claim, which is based on the same facts as the claim under subsection A, fails for the same reasons the previous claim failed.

*3. The Realtor Fails To Allege with Sufficient Particularity that the Defendants Knowingly Made, Used, or Caused To Be Made or Used, a False Record or Statement Material to an Obligation To Pay or Transmit Money or Property to the Government, or Knowingly Concealed or Knowingly and Improperly Avoided or Decreased an Obligation To Pay or Transmit Money or Property to the Government [31 U.S.C. § 3729(a)(1)(G) ]*

*12 In the instant case, the Relator argues:

> The plaintiff's Amended Complaint alleges funds were provided by the federal government to [Adams] on a rolling basis. Doc. 41 ¶ 16. Therefore, at scheduled intervals, [Adams], through Director Lorraine Lane, would have to account for students who left the program early, but for whom [Adams] had already been paid. Id. ¶¶ 24-25, 30. Therefore, [Adams] would be required to repay monies receive or not receive more money for future use. Id. ¶ 25. Therefore, the plaintiff is alleging that false statements were either false claims when submitted or reverse false claims if not accounted for at each accounting period. Id. ¶¶ 42-49[.]

(Doc. 48 at 17). This type of claim is sometimes called a "reverse false claim." It too must meet Rule 9(b)'s heightened pleading standard. *Matheny*, 671 F.3d at 1222. As shown above, the Relator has failed to allege with particularity that Adams sought payment based on enrollment in the first place, let alone for enrollees who were not enrolled, or failed to repay money it received for enrollees who subsequently left.

The Relator cites to *Matheny* for the proposition that " '[a]n express contractual obligation to remit excess government property is a definite and clear obligation for FCA purposes.' " (Doc. 48 at 18) (*quoting Matheny*, 671 F.3d at 1223). Importantly, however, the *Matheny* court also wrote:

> Here, the Complaint contains detailed allegations relating to the Defendants' contractual obligation to identify, report, and remit excess government money in accordance with the CIA's instructions.... Relators have alleged an express contractual obligation on behalf of the Defendants to remit Overpayments within thirty days of identification and defined that obligation in detail with references to particular contract sections. These factual allegations are sufficient to plead with particularity the existence of an obligation to pay money to the government.

*Matheny*, 671 F.3d at 1223–24. Unlike *Matheny*, in the instant case the Relator has pled no facts establishing that he would be in a position to know how the Defendants were paid, or identifying any particular payment, or failure to return same. He merely returns to his same refrain that there must be an overpayment because the government was the only source for payment. (Doc. 48 at 18) ("There is no such difficulty [in identifying the overpayment] in this case, since all funds for every student for every purpose were paid by the federal government."). This claim too fails to satisfy the requirements of Rule 9(b).

**B. Count Two**

Count Two is entitled "Implied False Certification in Violation of the False Claims Act." (Doc. 41 at 17). As the Supreme Court has noted:

> According to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)
2017 WL 6017775

material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim "false or fraudulent" under § 3729(a)(1)(A).

**\*13** *Universal Health Servs., Inc. v. United States,* 136 S. Ct. 1989, 1995, 195 L.Ed. 2d 348 (2016).[20] "[T]he implied certification theory can be a basis for liability ... where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc.*, 136 S. Ct. at 2001.

Count Two alleges that the Defendants

falsely implied and/or certified that they complied with applicable statutory, regulatory and contractual requirements and knowingly presented and caused to be presented to the United States Government and state governments participating in the Job Corps program, false and fraudulent claims, records, and statements in order to obtain reimbursement for various services provided pursuant to 29 U.S.C. § 3191 et seq.

(Doc. 41 at 17, ¶ 44). In his brief, the Relator alleges that the Defendants

submitted documents which certified to the federal government that it had proper procedures in place to ensure that it followed the statutory scheme and ... that defendant [Adams], in fact, followed the statutory scheme as required. The plaintiff's certification theory is based on the simple idea that if the Gadsden Job Corps Center was not eligible to receive any payments

at all from the federal government, then all receipts for all students were fraudulent.

(Doc. 48 at 19) (internal citations omitted).

As discussed previously, it is not clear from the allegations in the Amended Complaint that the Defendants were required to comply with any of the statutes set out therein. Even if they were, "[i]t is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (internal quotations and citations omitted). Again, the Relator has failed to satisfy Rule 9(b)'s requirement to plead these claims with particularity. Count Two is due to be dismissed.

**C. Count Three**

Count Three alleges that the Defendants engaged in a conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C). "To state a claim [for conspiracy to violate the FCA], the plaintiff must show (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello*, 428 F.3d at 1014 (internal quotations and citations omitted). Rule 9(b) applies to this claim as well. *Id.* For the same reasons the other claims failed, this claim does as well. The Relator has failed to plead any of the elements of the conspiracy claim with particularity.[21],[22] Count Three is due to be dismissed.

**V. CONCLUSION**

**\*14** Based on the foregoing, the Motion To Dismiss is due to be **GRANTED**, and this case **DISMISSED with prejudice**.[23] A Final Order will be entered.

**DONE** and **ORDERED** this 5th day of December, 2017.

**All Citations**

Slip Copy, 2017 WL 6017775

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

Footnotes

1　These are the same counts that were set out in the original Complaint.

2　The acronym "CSIO" is not defined in the Amended Complaint.

3　The Court notes that provisions concerning the Job Corps are now codified at 29 U.S.C. §§ 3191-3212.

4　The Court notes that the statute, in context, provides:

　　To be eligible to operate a Job Corps center, an entity shall submit to the Secretary, at such time and in such manner as the Secretary may require, information related to additional selection factors, which shall include ... [a]n assurance the entity will comply with basic health and safety codes, which shall include the disciplinary measures described in section 3202(b) of this title.

　　29 U.S.C.A. § 3197(a)(3)(J).

5　The Court notes that the statute provides:

　　The Secretary shall provide, and directors of Job Corps centers shall stringently enforce, standards of conduct within the centers. Such standards of conduct shall include provisions forbidding the actions described in subsection (b)(2)(A).

　　29 U.S.C.A. § 3202(a).

6　The Court notes that the statute provides:

　　**(b) Disciplinary measures**

　　**(1) In general**

　　To promote the proper behavioral standards in the Job Corps, the directors of Job Corps centers shall have the authority to take appropriate disciplinary measures against enrollees if such a director determines that an enrollee has committed a violation of the standards of conduct. The director shall dismiss the enrollee from the Job Corps if the director determines that the retention of the enrollee in the Job Corps will jeopardize the enforcement of such standards, threaten the safety of staff, students, or the local community, or diminish the opportunities of other enrollees.

　　**(2) Zero tolerance policy and drug testing**

　　**(A) Guidelines**

　　The Secretary shall adopt guidelines establishing a zero tolerance policy for an act of violence, for use, sale, or possession of a controlled substance, for abuse of alcohol, or for other illegal or disruptive activity.

　　**(B) Drug testing**

　　The Secretary shall require drug testing of all enrollees for controlled substances in accordance with procedures prescribed by the Secretary under section 3195(a) of this title.

　　**(C) Definitions**

　　In this paragraph:

　　**(i) Controlled substance**

　　The term "controlled substance" has the meaning given the term in section 802 of Title 21.

　　**(ii) Zero tolerance policy**

　　The term "zero tolerance policy" means a policy under which an enrollee shall be automatically dismissed from the Job Corps after a determination by the director that the enrollee has carried out an action described in subparagraph (A).

　　29 U.S.C.A. § 3202(b).

7　The Court notes that the statute provides:

　　**(a) Standards and procedures**

　　**(1) In general**

　　The Secretary shall prescribe specific standards and procedures for the recruitment, screening, and selection of eligible applicants for the Job Corps, after considering recommendations from Governors of States, local boards, and other interested parties.

　　**(2) Methods**

　　In prescribing standards and procedures under paragraph (1), the Secretary, at a minimum, shall—

　　　　(A) prescribe procedures for informing enrollees that drug tests will be administered to the enrollees and the results received within 45 days after the enrollees enroll in the Job Corps[.]

　　29 U.S.C. § 3195(a)(1)-(a)(2)(A).

8　The Court notes that the way this sentence reads, an enrollee would only be expelled for a positive drug test result obtained more than 45 days after his or her enrollment. The 45-day period in the statute refers to the deadline when

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)
2017 WL 6017775

test results must be <u>received</u>. The Court reads the statute as providing a zero tolerance policy for drug use, <u>whenever</u> it is discovered.

**9**  As noted by this Court, *supra* note 8, that is not what the statute says.

**10**  The Court notes that the Relator provides no citation for this allegation, which, because it calls for additional testing "40 days after an initial positive test," implies that there is in fact no "zero tolerance" policy.

**11**  The Court notes that neither here, nor elsewhere in the Amended Complaint, does the Relator state in what capacity he was employed by Adams, or what his job duties entailed.

**12**  The gist of the Relator's argument is that Adams did not expel students because every student it lost would mean less money for it. The Relator argues that Adams was paid based on enrollees, but then insists that it should not have been paid for enrollees who should have been expelled. The Relator never explains why, if payment was based on enrollment alone, and enrolled students received Jobs Corps services, a claim for payment for these students would be "false." Whatever other consequences there might be to Adams for keeping such students enrolled, the Amended Complaint does not state that the Defendants failed to provide all of the services for which the government contracted. Regardless, as shown *infra*, the failure to set out any particular claims dooms this allegation.

**13**  Nor is it clear that Defendants were actually required to follow the procedures alleged by the Relator. The Relator argues that the Defendants violated 29 U.S.C.A. § 3197(a)(3)(J), which provides:

> To be eligible to operate a Job Corps center, an entity shall submit to the Secretary, at such time and in such manner as the Secretary may require, information related to additional selection factors, which shall include ... [a]n assurance the entity will comply with basic health and safety codes, which shall include the disciplinary measures described in section 3202(b) of this title.

29 U.S.C.A. § 3197(a)(3)(J) (emphasis added). Section 3202(b), which is referenced in section 3197(a)(3)(J), describes the zero tolerance policy. The plain wording of section 3197(a)(3)(J) clearly applies only to <u>information</u> given to the Secretary in order to be eligible for initial <u>selection</u> as a Jobs Corps center. It does not describe requirements or procedures for <u>payment</u> to established centers. Furthermore, the Amended Complaint pleads the following:

> The U.S. Department of Labor Office of Job Corps Policy and Requirements Handbook requires that each student be tested for controlled substances at the time of admission and then re-tested at an interval between and 40 days after an initial positive test. The handbook also requires that an enrolled student must be tested on suspicion of use of a controlled substance at any time.

(Doc. 41 at 9, ¶ 21). As noted *supra* note 10, this allegation undercuts the Relator's argument by implying the absence of a zero tolerance policy.

**14**  The Court gives no weight to the generalized allegations, found throughout the Complaint, that vaguely refer to false claims which were submitted by Lane, or "the defendants." No specific false claims have been pleaded.

**15**  The Relator correctly notes that "the Eleventh Circuit only requires that a complaint 'contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis.' " (Doc. 48 at 9) (quoting *Clausen*, 290 F.3d at 1310-11). He then argues:

> The plaintiff has satisfied this standard by alleging that (1) all funding came from the government, (2) that the source of funding and the need to keep enrollment maximized was openly discussed, (3) that such discussions clearly related to the violations the plaintiff actually witnessed and (4) identifying specifically the students kept as enrolled despite these violations.

(Doc. 48 at 10). None of these allegations establish, with particularity, that <u>a false claim was made</u>.

**16**  The Defendants contend that his job title was "Dorm Supervisor." (Doc. 46 at 7). The Court need not determine whether someone employed in that capacity is a "corporate outsider," since the Plaintiff-Relator, who is the master of his Amended Complaint, has failed to allege facts establishing that he was a "corporate <u>insider</u>," or learned of the billing practices, <u>and the submission of false claims</u>, through his employment with Adams.

**17**  Both sections of the FCA under which Relator's claim purportedly arises require proof of scienter. *See* 31 U.S.C. ¶ 3729(a)(1)(A), (B). The Relator's alleges that the Defendants: "knowingly presented and caused to be presented to the United States Government and state governments participating in the Job Corps program, false and fraudulent claims, records, and statements" (doc. 41 at 15, ¶ 36); "defendants and their agents and employees knowingly made, used, and/ or caused to be made or used false records and statements in order to get such false and fraudulent claims paid" (doc. 41 at 15, ¶ 37); "defendants and their agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease defendants' obligation to repay money to the United States Government that defendants improperly and/or fraudulently received" (doc. 41 at 16, ¶ 38). These threadbare allegations, which find no factual support anywhere in the Amended Complaint, are insufficient allegations of scienter under Rule 8. *See U.S. ex rel. Barrett v. Beauty Basics, Inc.*, No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *5 (N.D. Ala. June 11,

United States ex rel. Headen v. Adams and Associates, Inc., Slip Copy (2017)

2017 WL 6017775

2015) (Blackburn, J.) (factually unsupported allegation that "with full knowledge that [it] did not meet the requirements for accreditation under NACCAS standards, [defendant] then represented to the United States Department of Education that it met NACCAS standards" insufficient). The Relator argues that Lane

> was the individual in charge of all aspects of the Gadsden Job Corps Center, including the "zero tolerance" policy and the official rosters submitted claiming that students not present were enrolled. Doc. 41 ¶ 6, 16, 23-30. While the Amended Complaint does not allege a specific date for a specific certification, such specific allegations are not required in order for these allegations to be reliable. The plaintiff's Amended Complaint alleges a policy and practice of these same violations throughout his employment. Id. at 23-30. The plaintiff also alleges Lane was aware that specific students were not eligible but remained in the program for an extended period of time. Id. at 31-32. The plaintiff also alleges that students were moved back and forth between "commuter" status and "resident" status in order to fill vacant slots. Id. ¶ 25. Since funds were dispersed on a periodic basis, these certifications by Ms. Lane as Center Director, along with a description of Ms. Vierra's role as CSIO Supervisor in charge of discipline, are reliable and sufficient to plead scienter.

(Doc. 48 at 16-17). Assuming that these allegations establish the Defendants' knowledge that regulations were not being followed, or rosters were being inflated, none of these facts establish that any Defendant knew that <u>a false claim was being submitted.</u>

18  Which, as discussed *supra* note 12, it not at all clear in the Amended Complaint.

19  Furthermore, the Relator does not explain under what rule or regulation rosters are submitted by jobs corps centers for payments. Neither the jobs corps statutory provisions (29 U.S.C. §§ 3191-3212), nor the regulations concerning same (20 C.F.R. Part 670) discuss "rosters".

20  The Defendants note: "False certification is not an independent basis for relief; rather it is a species of the explicit false claims prohibited by statute." (Doc. 46 at 17) (citing *United States v. Beauty Basics Inc.*, No. 2:13-CV-1989-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (Hopkins, J.)). The Relator responds that this theory was set out as a separate claim "out of an abundance of caution." (Doc. 48 at 18). He also notes, correctly, that under Rule 8(a) and (d) he is allowed to plead in the alternative. *Id.* The Court addresses the theory as merely another method of making a claim pursuant to 31 U.S.C. § 3729(a)(1)(A).

21  The Relator notes in his brief that "funding and enrollment were openly discussed" and the federal government was the only source of funds. (Doc. 48 at 21). These allegations do not establish, even under notice pleading standards, an agreement to conspire to defraud the government.

22  In addition to failing to satisfy Rule 9(b), the conspiracy claim must be dismissed because the underlying FCA claims are due to be dismissed. As one court has noted:

> [S]econdary liability for conspiracy [for conspiracy to violate the FCA] cannot exist without a viable underlying claim. The FCA provides ... that any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ... is liable to the United States Government for a civil penalty[.]" Liability for conspiracy under the FCA is governed by traditional notions of civil conspiracy. *See United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (containing general discussion of civil conspiracy in FCA context).

*U.S. ex rel. Coppock v. Northrup Grumman Corp.*, No. CIV.A. 3:98-CV-2143-, 2003 WL 21730668, at *14 (N.D. Tex. July 22, 2003). The Court finds this logic persuasive, and adopts it.

23  The Relator has not requested leave to amend. Even if he had, the Court notes that he has already amended once.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1886351, Med & Med GD (CCH) P 304,036

2012 WL 1886351
Only the Westlaw citation is currently available.
United States District Court,
N.D. Alabama,
Northeastern Division.

UNITED STATES of America, ex.
rel. Floyd H. WILSON, Plaintiff,
v.
CRESTWOOD HEALTHCARE, L.P., d/b/a
Crestwood Medical Center, et al., Defendants.

Civil Action No. CV–11–S–3361–NE.
|
May 18, 2012.

**Attorneys and Law Firms**

Earl E. Cloud, Jr., Walter A Dodgen, Jr. Cloud & Cloud,
Huntsville, AL, for Plaintiff.

Jack W. Selden, Kimberly Bessiere Martin, Bradley Arant
Boult Cummings Llp, James R Sturdivant, Sirote &
Permutt PC, Birmingham, AL, Walter A. Dodgen, Jr.,
David B. Block, Stephen D. Davis, II, Maynard Cooper
& Gale PC, Richard L. Morris, Fred L. Coffey, Jr., Sirote
and Permutt PC, Huntsville, AL, for Defendants.

**Opinion**

**MEMORANDUM OPINION AND ORDER**

C. LYNWOOD SMITH, JR., District Judge.

**\*1** Relator, Floyd H. Wilson, commenced this *qui
tam* proceeding on behalf of the United States, alleging
violations of the False Claims Act, 31 U.S.C. § 3729 *et
seq.,* by Crestwood Healthcare L.P., doing business as
"Crestwood Medical Center," Dr. Smita S. Shah, Dr.
James Eugene Speed, Dr. Stephen G. Tygart, Dr. Pamela
Hudson, and a number of fictional defendants described
only as "Does 1–25." [1] Relator filed his complaint, under
seal, on September 16, 2011. The United States ultimately
elected to decline to intervene in the action on January
24, 2012. [2] The complaint was unsealed on January
30, 2012. [3] The case presently is before the court on
four motions: three virtually identical motions to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6), for

failure to state a claim upon which relief can be granted, [4]
and a motion to strike relator's response to the motions to
dismiss. [5]

**I. FACTUAL ALLEGATIONS OF THE COMPLAINT**

**A. Parties**
Relator, Floyd H. Wilson, is a Tennessee-based
contractor. [6] Wilson's contracting company is called
"Capital Investors Properties Group, Inc." [7] Defendant
Crestwood Healthcare L.P., doing business as Crestwood
Medical Center ("Crestwood"), owns and operates a
hospital in Huntsville, Alabama. [8] Defendant Dr. Pamela
Hudson is the Chief Executive Officer of Crestwood,
a position she has held since 2007. [9] Defendants Dr.
Smita S. Shah, Dr. James Eugene Speed, and Dr. Stephen
G. Tygart (the "defendant physicians") are physicians
who leased office space for their medical practices from
Crestwood. [10]

**B. The Corporate Integrity Agreement**
Prior to December of 2000, Crestwood was owned by
Healthcare Corporation of America ("HCA"). [11] On
December 12, 2000, HCA entered into a "Corporate
Integrity Agreement" with the Department of Health
and Human Services. [12] That agreement was for a
term of eight years. [13] When HCA sold Crestwood,
Crestwood was released from its obligations under the
HCA Corporate Integrity Agreement itself. [14] From that
time forward, Crestwood was subject to a supplemental
integrity agreement. [15] Under that agreement, Crestwood
was required to

> implement and maintain with respect to its operations ...
> an effective program to prevent and detect violations
> of the legal requirements applicable to the delivery of
> goods and services in connection with any healthcare
> benefit and that such program will comply with the
> provisions of the U.S. sentencing guidelines related to
> corporate compliance programs and will be mindful
> of any applicable guidance issued by [the Department
> of Health and Human Services] and ... maintain such
> program for no less than five years.... [16] Crestwood had

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)

2012 WL 1886351, Med & Med GD (CCH) P 304,036

an affirmative obligation to ensure that its provision of healthcare and its billing policies complied with federal law, and to report any potential violations to the Department of Health and Human Services. [17]

**C. The Lease Agreements**

**\*2** Crestwood entered into a "Ground Lease Agreement" with relator's development company in 1999. [18] Relator developed the property for use as the "Vincent Medical Building," and leased the premises back to Crestwood through January of 2011. [19] Crestwood, in turn, subleased space in that building to the defendant physicians and other medical practitioners. [20] Relator's complaint focuses on the terms of those subleases.

One of the subtenants was a medical practice called "General Surgical Associates." [21] Crestwood and General Surgical Associates executed a sublease for a two-year term to commence in November of 2004. [22] Allegedly, the sublease deliberately understated the area of the demised premises, resulting in a benefit to General Surgical Associates of more than $100,000 over the course of the lease. [23]

The defendant physicians were all subtenants of Crestwood for unspecified periods of time between calendar years 2000 and 2010. [24] Allegedly, thesubleases all contained terms favorable to them. They were charged for less square footage than they actually occupied. [25] They were charged lease rates that were not only below the market rate, but also below the rates Crestwood was paying relator under the master lease, by between $1.00 to $3.00 a square foot. [26] The subtenants were not required to reimburse Crestwood for their use of Crestwood-owned equipment. [27]

Under the terms of the subleases, the subtenants were supposed to pay Crestwood their share of the operating expenses of the premises as "additional rents." [28] At the commencement of the subleases, the operating expenses were estimated at $3.00 a square foot per month, to be adjusted to reflect rising costs in the future . [29] Although actual operating expenses for Crestwood rose as high as $6.50 a square foot per month, the subtenants were never charged more than $3 per square foot per month. [30] Likewise, the subtenants were not required to

pay their utility costs, in contravention of the subleases. [31] Utility costs in comparable buildings over the same time period were greater than $2.00 a square foot per month. [32] Crestwood's failure to charge utility costs to the subtenants saved them between $18,000 and $27,000 a year. [33] Additionally, Crestwood did not charge the subtenants the expense it incurred in paying ground lease expenses. [34] That failure to charge expenses saved the subtenants an additional $100,000. [35]

Crestwood provided custom leasehold improvements in the premises subleased by the defendant physicians. [36] None of those three physicians was charged for any cost associated with those improvements. [37] As a result, Shah saved $240,000, Speed $260,000, and Tygart $260,000. [38]

**D. False Claims**

The final paragraph in the "allegations" section of the complaint states that Crestwood "knowingly and intentionally violated Federal Law" by providing all of the compensation outlined in the complaint in exchange for illegal Medicare and Medicaid referrals from the subtenants. [39] "Defendants then knowingly submitted false claims to federal and state governments based on referrals from those physicians." [40] Relator does not identify any particular false claim by date, physician, patient, type of service, or any other indicium.

## II. MOTION TO DISMISS STANDARD

**\*3** Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). [41] This rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While that pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly,* 544 U.S. 544, 550 (2007), it does demand "more than an unadorned, thedefendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949 (2009) (citations omitted).

2012 WL 1886351, Med & Med GD (CCH) P 304,036

A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *[Twombly,* 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557.

To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face."

*Id.,* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly. First,* the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second,* only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157–158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged—but it has not "show [n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*\*4* In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

Iqbal, 556 U.S. at ——, 129 S.Ct. at 1949–50 (emphasis added).

When ruling upon a motion to dismiss, the court must assume that the well-pleaded facts set forth in the plaintiff's complaint are true. *See* Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 453 (1994) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint"); Marsh v. Butler County, 268 F.3d 1014, 1023 (11th Cir.2001) *(en banc)* (setting forth the facts in the case by "[a]ccepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true"). Accordingly, that which is set out in this memorandum opinion as "the facts" for Rule 12(b)(6) purposes may, or may not, be the actual facts. *See, e.g.,* Williams v. Mohawk Industries, Inc., 465 F.3d 1277, 1281 n. 1 (11th Cir.2006).

The pleading standard is heightened in cases involving fraud or mistake. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Rule 9(b) serves three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)

2012 WL 1886351, Med & Med GD (CCH) P 304,036

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1036 n. 25 (4th Cir.1997) (quoting *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 549 (8th Cir.1997)). Claims brought pursuant to the False Claims Act are considered fraud claims, and are subject to the pleading requirements of Rule 9(b). *See, e.g., United States ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1222 (11th Cir.2012).

### III. DISCUSSION

#### A. The False Claims Act, Anti–Kickback Statute, and Stark Statute

The False Claims Act allows private citizens to bring civil actions on behalf of the United States—a so-called "*qui tam* action." 31 U.S.C. § 3730(b). The person bringing such an action is known as the "relator." A *qui tam* action does not allege that the relator personally suffered damages. Rather, the relator prosecutes the action to recover losses suffered by the United States, but is entitled to a share of any damages awarded to the government. That share ranges between fifteen and twenty-five percent, if the government decides to participate in the prosecution of the case, *or* twenty-five and thirty percent, if the government declines to exercise that option. *See* 31 U.S.C. §§ 3730(d)(1)-(2).

**\*5** The False Claims Act imposes liability on persons who defraud the federal government. The statute provides for a civil penalty of between $5,000 and $10,00 to be imposed for each violation, and treble damages for losses actually suffered by the government. 31 U .S.C. § 3729(a)(1). In relevant part, the False Claims Act imposes that liability on any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

> ...

> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3927(a)(1)-(3), (7). [42]

Congress has enacted statutory provisions to curtail fraud in the medical industry, particularly with regard to the federally-funded Medicare and Medicaid programs. The Anti–Kickback Statute, 42 U.S.C. § 1320a–7b, imposes criminal liability on anyone who, among other things,

> knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

> ... in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, ...

42 U.S.C. § 1320a–7b(b)(1). The statute likewise penalizes those who make payments in return for receiving referrals. 42 U.S.C. § 1320a–7b(b)(2). Additionally, the Stark Statute, 42 U.S.C. § 1395nn, prohibits hospitals and other medical providers from presenting claims to federal health care programs if those claims are the result of referrals from physicians with whom the hospital has a financial relationship. *See* 42 U.S.C. § 1395nn(a)(1).

In recognition of the fact that legitimate relationships may exist between hospitals and physicians who practice in or refer patients to hospitals, exceptions and safe harbor provisions were included in both the Anti–Kickback Statute and the Stark Statute. *See, e.g.,* 42 U.S.C. §§ 1320a–7b(b)(3); 1395nn(e). Federal regulations outline the requirements which must be met in order to submit a claim to the government, when that claim would ordinarily be barred by the statutes. *See, e.g.,* 42 C.F.R. § 411.357(a)(4). Among other requirements, any lease agreement between a referring physician and treating hospital must be made at fair market value, and, be consistent with an arms' length transaction. *See* 42 U.S .C. § 1395nn(h)(3).

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)

2012 WL 1886351, Med & Med GD (CCH) P 304,036

Relator's False Claims Act theory is premised on violations of the Anti–Kickback Statute and the Stark Statute. He avers that the lease agreements between Crestwood and the defendant physicians were arranged in exchange for patient referrals, and violated both statutes: *i.e.,* the rent was below market value, violating the Stark Statute, and the reduced rent and other financial benefits constituted remuneration, in violation of the Anti–Kickback Statute. Thus, he alleges, any Medicare or Medicaid claims arising from referrals from the defendant physicians to Crestwood would be in contravention of federal law and, therefore, fraudulent. For the purposes of ruling on the motions to dismiss, the court will assume that relator's factual assertions regarding the lease arrangements are sufficient to establish violations of the Anti–Kickback Statute and Stark Statute.

**B. Relator's Claims**

**1. Count I**

**\*6** Relator alleges violations of subsections (a)(1) and (a)(2) of the False Claims Act in Count I of his complaint. The Eleventh Circuit has consistently held that, in order to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b), a relator bringing an action under to subsection (a)(1) of the False Claims Act must allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1222 (11th Cir.2012) (quoting *Hopper v. Solvay Pharmaceuticals, Inc.,* 588 F.3d 1318, 1324 (11th Cir.2009)). *See also Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1012 (11th Cir.2005); *United States ex rel. Clausen v. Laboratory Company of America, Inc.,* 290 F.3d 1301, 1310 (11th Cir.2002).

"The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen,* 290 F.3d at 1311 (citations omitted).

> Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act. The submission of a claim is thus not ... a 'ministerial act,' but the *sine qua non* of a False Claims Act violation.

*Id.* (emphasis in original, citation omitted). Thus, the relator must make specific allegations with regard to underlying violations of federal law: *i.e.,* the actions that make the claims submitted to the government fraudulent, *and,* with regard to the *claims themselves.* As the Eleventh Circuit explained in *Corsello,*

> Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government. *Clausen,* 290 F.3d at 1311. In short, Corsello provided the "who," "what," "where," "when," and "how" of improper practices, but he failed to allege the "who," "what," "where," "when," and "how" of fraudulent submissions to the government.

*Corsello,* 428 F.3d at 1014. *See also Hopper,* 588 F.3d at 1326 (ruling that Rule 9(b) was not satisfied when the relator merely piled "inference upon inference" without alleging any particular details about the submission of claims); *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1359 (11th Cir.2006) (ruling that a relator's complaint fails "for want of sufficient indicia of reliability" when it merely "portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement"). *Cf. Matheny,* 671 F.3d at 1225 (denying motion to dismiss where "Relators pled specifics relating to the submission of a specific statement in a specific document, submitted by a specific person during a specific review, as required by a particular government contract"); *Hill v. Morehouse Medical Associates, Inc.,* No. 02–14429, 2003 WL 22019936, at \*4–5 (11th Cir. Aug. 15, 2003) (denying motion to dismiss where relator provided detailed description of billing process, physicians and patients involved, diagnosis codes, and confidential documents containing additional information).

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)
2012 WL 1886351, Med & Med GD (CCH) P 304,036

**\*7** Actions brought pursuant to subsection (a)(2) of the False Claims Act do not require allegations that false claims were submitted to the government, because that subsection of the statute lacks the "presentment clause" that is contained in subsection (a)(1). *Hopper,* 588 F.3d at 1327–29 (citing *Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662 (2008)). Instead, a relator bringing a subsection (a)(2) claim must allege "that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim." *Id.* at 1327. "[G]eneral allegations of improper government payments to third parties, supported by factual or statistical evidence to strengthen the inference of fraud ... could satisfy the particularity requirements of Rule 9(b)." *Id.* (bracketed alteration supplied). However, the *Hopper* court did not reach the question of whether the pleading standard for the "payment clause" of subsection (a)(2) actually is more relaxed than the high standard applied to the "presentment clause" in subsection (a)(1), because the court determined that the relator did not allege that the defendants intended for the government to rely on their false statements. *Id.*

Here, relator has failed to provide, or even to attempt to provide, the "who," "what," "where," "when," and "how" of fraudulent claim submissions to the government. As with the relators in *Clausen, Corsello, Atkins,* and *Hopper,* relator has provided a detailed explanation of the illegal scheme that, he alleges, precipitated false claims. But, as with the relators in the *Clausen, Corsello, Atkins,* and *Hopper* cases, he provides no details regarding the submission of any claims. Relator only makes one statement regarding the actual submission of false claims: "Defendants then knowingly submitted false claims to federal and state governments based on referrals from those physicians." [43] With regard to the government actually paying false claims, relator makes a similarly conclusory assertion: "The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid, but for the Defendants' unlawful conduct." [44] He provides none of the "factual or statistical" support that the *Hopper* court stated *could* be sufficient to plead a violation of the "payment clause." The allegations in Count I of the complaint, alleging violations of subsections (a)(1) and (a)(2) of the False

Claims Act, "do not 'come up short.' Rather, they do not come UP at all." [45]

### 2. Count II

Relator alleges violations of subsection (a)(3), conspiracy to defraud the United States, in Count II of his complaint. To state a False Claims Act claim for conspiracy to defraud the government, a relator must show:

> **\*8** (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.

*Corsello,* 428 F.3d at 1014 (internal quotation and citation omitted). Subsection (a)(3) claims, like those brought under the other subsections of the False Claims Act, are subject to the heightened pleading standard of Rule 9(b). *Id.*

Here, relator alleges that the improper real estate dealings and patient referrals that form the basis of his claims in Count I constitute a conspiracy to defraud the government. [46] Assuming for the sake of discussion that relator sufficiently alleged the first two elements of a conspiracy claim, he failed to allege the third. As discussed in the preceding subpart of this opinion, plaintiff failed to plead that the United States suffered damages in a manner sufficient to satisfy Rule 9(b). Like his claims in Count I, relator's claim in Count II is not sufficiently pleaded.

### 3. Count III

Relator alleges violations of subsection (a)(7) in Count III of his complaint. That subsection is the so-called "reverse false claim" provision of the False Claims Act. To assert a reverse false claim, a plaintiff must allege the existence of five elements:

> (1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant makes, uses, or causes to be made or used a false statement; (4) for the purpose

Case 1:13-cv-00392-WS-N    Document 174-1    Filed 02/15/18    Page 52 of 56

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)
2012 WL 1886351, Med & Med GD (CCH) P 304,036

to conceal, avoid, or decrease an obligation to pay money to the government; and (5) materiality of the misrepresentation.

*United States ex rel. Mastej v. Health Management Associates, Inc.,* ——F.Supp.2d ——, No. 2:11–cv–89– FtM–29DNF, 2012 WL 523623, at *7 (M.D.Fla. Feb. 26, 2012) (citations omitted).

Here, relator has made no specific allegations to support a reverse false claim. Instead, he merely makes a conclusory assertion that defendants "used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the government." [47] His theory *appears* to be that, under its agreement with the Department of Health and Human Services, Crestwood was required to remit to the government any funds that it received to reimburse false claims. [48] However, that theory is not specifically developed in the complaint. In fact, relator "fails to allege any amounts owed to the government by ... defendants or otherwise provide any other information that puts defendants on notice as to the substance of the ... claims." *Id.* at *8. For that reason, Count III fails to meet the requirements of Rule 9(b).

**C. Relator's Attempt to Salvage His Complaint**

Relator's response brief, filed in opposition to the motions to dismiss, contains over four, full, *single-spaced,* pages of "background." [49] In those pages, relator sets forth details that were absent from his complaint, citing to numerous exhibits attached to the response. He provides a more specific account of the events that led to the Corporate Integrity Agreement between HCA and the government, and the sale of Crestwood by HCA. [50] He also provides more detailed information about the lease agreements between the various parties, and the contracting relationship between his company and Crestwood. [51] Of significance to the motions before the court, relator cited deposition testimony of the defendant physicians, taken in the course of prior litigation in state court. [52] Dr. Speed testified that he and Dr. Tygart referred roughly half of their patients to Crestwood, and that they provided service to Medicare patients. [53] Similarly, Dr. Shah testified that she referred patients to Crestwood, and that about 40% of all of her patients received Medicare benefits. [54] Finally,

relator stated that he and Terry Brown, the Chief Financial Officer of Crestwood, had "ongoing and continuing conversations" about Crestwood's Medicare compliance. [55] Brown allegedly told him that Crestwood "would take [its] chances" on the false claims. [56]

*9 The defendant physicians jointly filed a motion to strike the response, while Crestwood and Hudson filed a reply brief, in which they urged the court to disregard the additional facts. [57] Relator then filed a response to the motion to strike, in which he requested that he be afforded the opportunity to amend the complaint, should the court find it deficient.

Defendants correctly state that, when evaluating a motion to dismiss premised upon Federal Rule of Civil Procedure 12(b)(6), courts generally does not consider allegations outside of the complaint itself. *See, e.g., St. George v. Pinellas County,* 285 F.3d 1334, 1337 (11th Cir.2002) ("The scope of the review must be limited to the four corners of the complaint."). There is an exception to that general rule: *i.e.,* when an extrinsic document is "(1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Speaker v. United States Department of Health and Human Services Centers for Disease Control & Prevention,* 623 F.3d 1371, 1379 (11th Cir.2010). That exception can apply to documents referenced in the complaint, *Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 959 (11th Cir.2009), or submitted by a defendant. *Speaker,* 623 F.3d at 1379. Thus, relator may rely on the language of the compliance agreements and leases in arguing that his complaint is sufficiently well-pleaded (although it would have been preferable to attach them to the complaint itself).

Nonetheless, the issue of whether relator may properly rely on documents outside the four corners of his complaint is moot. Even assuming the background information presented in relator's response is true, it fails to elevate the allegations in his complaint to the level of specificity required by the Eleventh Circuit under Rule 9(b). Relator *still* has failed to allege any false claims with specificity. The mere fact that the defendant physicians admitted they referred some patients to Crestwood, and had some Medicare patients, falls far short of the "who," "what," "where," "when," and "how" required to satisfy Rule 9(b). *Corsello,* 428 F.3d at 1014. Relator's argument that his conversations with Brown provide his allegations

with sufficient indicia of reliability is stronger, but still ultimately fails.

Relator relies on two Eleventh Circuit cases: *Matheny,* and *United States ex rel. Walker v. R & F Properties of Lake County, Inc.,* 433 F.3d 1349 (11th Cir.2005). [58] Relator states that in *Walker,* "the court found the relator's information substantiated by an officer of the corporation." [59] However, that characterization glosses over a critical fact in *Walker*—the relator in that case was a former employee of the defendant. *Walker* involved a medical practice that billed Medicare for the full cost of services performed by physician's assistants and nurse practitioners in situations in which it was only permissible to bill for a portion of those services. *Walker,* 433 F.3d at 1353–54. The relator based her complaint, in part, on a conversation that she had with one of the defendant's managers. *Id.* at 1359. However, that conversation was in the course of the relator's employment with the defendant, in which she also was a firsthand witness to the billing scheme, and was in fact required to participate in it. *Id.* at 1360. The *Walker* relator was not a "corporate outsider," *Clausen,* 290 F.3d at 1311, and her conversation with one of the defendant's managers was not the sole source of her knowledge regarding false Medicare claims.

**\*10** *Matheny* is likewise distinguishable from the case at bar. Relator relies on *Matheny* to demonstrate that failure to comply with a Corporate Integrity Agreement can constitute a violation of the False Claims Act. [60] That principle is not in doubt. Rather, the problem with relator's complaint is its failure to allege with specificity the false claims that constituted violations of the agreement governing Crestwood. In *Matheny,* the relators were former employees of the defendant. *Matheny,* 671 F.3d at 1220. One of them was present at meetings where the failure to comply with the Corporate Integrity Agreement binding the company was discussed and the scheme to falsify reports was developed. *Id.* at 1225–26. Although he was told of the scheme by officers of the company, those conversations were part of his employment and, like the *Walker* relator, he was required to participate in the scheme. *Id.* at 1221. The *Matheny* relators identified the dates of the relevant meetings, and included specific information about accounts for which false Medicare claims were filed. *Id.* at 1226.

The differences between the specificity of the allegations in *Walker* and *Matheny,* on the one hand, and the case at bar, on the other, are striking. Perhaps most salient is the fact that, here, relator is a corporate outsider, while in those cases the relators were former employees of the defendants. There is no requirement that a relator be an employee or former employee, and the Eleventh Circuit has recognized the difficulty an outsider faces in satisfying Rule 9(b). *See Clausen,* 290 F.3d at 1314 ("We are not unsympathetic to the situation in which Clausen finds himself. Most relators in *qui tam* actions are insiders. As a corporate outsider, he may have had to work hard to learn the details of the alleged schemes...."). Nonetheless, a relator, be he an insider or an outsider, still must be able to state the "who," "what," "where," "when," and "how" of claims filed with the government. *Corsello,* 428 F.3d at 1014. *See also Clausen,* 290 F.3d at 1314 (stating that the pleading standard is not relaxed for corporate outsiders). Of more legal significance than their status as insiders, the relators in *Walker* and *Matheny* alleged specific details about the filing of fraudulent claims. Relator's bare assertion that claims were filed, and that the Crestwood CFO told him that there were fraudulent claims, does not meet that standard.

**D. Relator's Request for Leave to Amend his Complaint**

Federal Rule of Civil Procedure 15 states that a "court should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a)(2) (bracketed alteration supplied). "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint." *Corsello,* 428 F.3d at 1314 (citing *Bryant v. Dupree,* 252 F.3d 1161, 1163 (11th Cir.2001)). The court may disallow amendment, however, "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Id.* When a relator desires to amend his complaint, he must file a motion for leave to amend, and "must either attach a copy of the proposed amendment to the motion or set forth the substance thereof." *Atkins,* 470 F.3d at 1362.

**\*11** Here, relator has not attached a copy of his proposed amended complaint. The additional factual allegations he set forth in his response to the motions to dismiss, however, appear to constitute the substance

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)

2012 WL 1886351, Med & Med GD (CCH) P 304,036

of his proposed amendment. [61] Defendants argue that amendment would be futile. [62] The court agrees. As discussed in the previous subpart of this opinion, even taking into consideration the additional facts relator set out in his response brief, his allegations fall short of the mandate of Rule 9(b). He "does not profess to have firsthand knowledge of the defendants' submission of false claims." Atkins, 470 F.3d at 1359. His attempt to buttress his complaint with extrinsic evidence failed to identify a single false claim. Thus, the court may dismiss the case without allowing him an opportunity to amend his complaint.

**E. Claims Asserted Against "Does 1–25"**

The complaint names various fictitious defendants, stating that those unknown people "have served as admitting physicians, agents, representatives of one and another in the fraud and submission of false and fraudulent claims to the United States." [63] Federal courts do not allow fictitious party practice. See New v. Sports & Recreation, Inc., 114 F.3d 1092, 1094 n. 1 (11th Cir.1997) ("[F]ictitious party practice is not permitted in federal court."). Therefore, any claims asserted against fictitious defendants are due to be dismissed. See, e.g., Wiggins

v. Risk Enterprise Management Ltd., 14 F.Supp.2d 1279, 1279 n. 1 (M.D.Ala.1998) (dismissing sua sponte fictitious defendants).

## IV. CONCLUSION AND ORDERS

For the reasons set forth herein, the motion to dismiss filed by defendants Speed and Tygart, [64] defendant Shah, [65] and defendants Crestwood and Hudson, [66] respectively, are GRANTED. The motion to strike jointly filed by defendants Shah, Speed, and Tygart [67] is DENIED as moot. It is ORDERED that all claims asserted in this action be, and the same hereby are, DISMISSED with prejudice. Costs are taxed to plaintiff. The clerk is directed to close this file.

**DONE** and **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1886351, Med & Med GD (CCH) P 304,036

Footnotes

1    See doc. no. 1 (Complaint) ¶¶ 10, 12–14. See also Part III(E) of this opinion, infra, discussing the fact that federal courts do not permit fictitious party practice.

2    Doc. no. 7.

3    Doc. no. 8.

4    Doc. no. 20 (Motion to Dismiss of James Eugene Speed and Stephen G. Tygart); doc. no. 22 (Motion to Dismiss of Smita S. Shah); doc. no. 24 (Motion to Dismiss of Crestwood L.P. and Pamela Hudson).

5    Doc. no. 30.

6    Doc. no. 1 ¶ 9.

7    See id. ¶ 62.

8    Id. ¶ 10.

9    Id. ¶ 11.

10   Id. ¶ 13. Defendants note that the physicians, themselves, did not sublease the space, i.e., their medical practices were the actual parties to the agreements. Doc. no. 21, at 4 n. 1. For the purposes of this motion to dismiss, that distinction is not relevant.

11   Cf. doc. no. 1 ¶ 45.

12   Id. ¶ 35.

13   Id. ¶ 36.

14   See id. ¶ 44.

15   Id. ¶ 45.

16   Doc. no. 1 ¶ 44 (bracketed alteration supplied).

17   Cf. id. ¶ 43 (describing the affirmative reporting requirement in the HCA Corporate Integrity Agreement).

U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)

2012 WL 1886351, Med & Med GD (CCH) P 304,036

18    *Id.* ¶ 62.

19    *Id.* ¶¶ 53, 62, 65–66.

20    *See id.* ¶ 65.

21    Doc. no. 1 ¶ 47. Presumably, one or more of the defendant physicians owns that practice, but relator has not actually alleged how General Surgical Associates relates to any of the named defendants.

22    Doc. no. 1 ¶ 47.

23    *Id.* ¶ 48. The specifics of this transaction, as laid out in the complaint, are nonsensical. Relator states that the sublease began in November of 2004, and was extended beyond its two-year term, but was terminated in February of 2006, *i.e., before* the end of the initial lease terms. *Id.* ¶¶ 47–48. Additionally, he states that the demised premises comprised "4823 square feet of rentable space and 4306 square feet of useable space." *Id.* ¶ 48. He then states that General Surgical Associates paid a rental rate based on 4823 square feet of *useable* space, *i.e.,* the area he had previously identified as *rentable* space, and that the actual useable space was 5500 square feet, *i.e.,* and area larger than he initially stated the *rentable* space to be. *Id.* ¶ 48.

      Defendants have not relied on those inconsistencies in framing their arguments in favor of dismissal. The court highlights them here only as an explanation for the omission of specifics in its statement of the facts, as relator *did* attempt to include specifics in his complaint.

24    Doc. no. 1 ¶ 50.

25    *Id.*

26    *Id.* ¶¶ 50–52.

27    *Id.* ¶ 50.

28    *Id.* ¶ 55.

29    Doc. no. 1 ¶ 57.

30    *Id.*

31    *Id.* ¶¶ 59–60.

32    *Id.* ¶ 61.

33    *Id.*

34    Doc. no. 1 ¶¶ 62–63.

35    *Id.* ¶ 64.

36    *Id.* ¶¶ 72–74.

37    *Id.*

38    *Id.*

39    Doc. no. 1 ¶ 75.

40    *Id.*

41    In full text, Rule 12(b) provides that:

      Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

      (1) lack of subject-matter jurisdiction;

      (2) lack of personal jurisdiction;

      (3) improper venue;

      (4) insufficient process;

      (5) insufficient service of process;

      (6) failure to state a claim upon which relief can be granted; and

      (7) failure to join a party under Rule 19.

      A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

      Fed.R.Civ.P. 12(b).

42    In 2009, Congress amended and renumbered sections of the False Claims Act. Fraud Enforcement & Recovery Act of 2009, Pub. L. No. 111–21, § 4(a), 123 Stat. 1617, 1621–22. Those amendments do not apply to this case. *See id.* § 4(f), 123 Stat. at 1625. Citations herein refer to the False Claims Act as it existed *before* the 2009 amendments.

**U.S. ex rel. Wilson v. Crestwood Healthcare, L.P., Not Reported in F.Supp.2d (2012)**

2012 WL 1886351, Med & Med GD (CCH) P 304,036

The amendments to the relevant language of the statute were largely stylistic, and the current version of the statute is not substantively different from the prior version. The revised versions of the old subsections (a)(1), (a)(2), (a)(3), and (a)(7) appear at subsections (a)(1)(A), (a)(1)(B), (a)(1)(C), and (a)(1)(G), respectively, of the current 31 U.S.C. § 3927.

43   Doc. no. 1 ¶ 75.

44   *Id.* ¶ 80.

45   Doc. no. 21, at 9.

46   Doc. no. 1 ¶ 85 ("Through the acts described above, Defendants acting in concert with each other ... conspired to defraud the United States by knowingly presenting ... false or fraudulent claims....").

47   *Id.* ¶ 92.

48   *See* doc. no. 27 (Response in Opposition to Motions to Dismiss), at 7–8.

49   *Id.* at 2–6. The words "single-spaced" are emphasized because federal courts require that the text of all pleadings be double-spaced.

50   *Id.* at 2–3.

51   *Id.* at 3–5.

52   *Id.* at 5–6.

53   Doc. no. 27, at 5.

54   *Id.* at 6.

55   *Id.* at 7.

56   *Id.* (bracketed alteration supplied).

57   Doc. no. 29 (Reply Brief of Crestwood and Dr. Pamela Hudson); doc. no. 30 (Motion to Strike).

58   Relator also cites an unpublished opinion from the Southern District of Ohio, *United States ex rel. McDonough*, No. 2:08–CV–00114, 2012 WL 628515 (S.D.Ohio February 27, 2012). The relator in that case, like those in *Matheny* and *Walker*, was an insider, and the court applied a Sixth Circuit pleading standard that is not quite as stringent as that outlined by the Eleventh Circuit.

59   Doc. no. 27, at 7.

60   *Id.*

61   *See* doc. no. 31, at 4.

   [S]hould this court deem it inappropriate or find itself unable to consider, by judicial notice, lease documents referred to in the complaint and testimony of the parties in state court proceedings, under oath, Plaintiff would respectfully request Leave of Court to amend the complaint filed by Plaintiff to further clarify and allege the documents and elements from the Defendants['] sworn statements in the complaint filed by Plaintiff.

   *Id.* (bracketed alterations supplied).

62   Doc. no. 29, at 6–7.

63   Doc. no. 1 ¶ 14.

64   Doc. no. 20.

65   Doc. no. 22.

66   Doc. no. 24.

67   Doc. no. 30.

End of Document          © 2018 Thomson Reuters. No claim to original U.S. Government Works.