<u>IN THE UNTIED STATES DISTRICT COURT</u>
<u>FOR THE SOUTHERN DISTRICT OF ALABAMA</u>
<u>SOUTHERN DIVISION</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.*    * | |
| **LORI L. CARVER,**    * | |
|    * | |
| Plaintiff,    * | |
|    * | **CIVIL ACTION** |
| v.    * | |
|    * | **NUMBER:13-392** |
| **PHYSICIANS PAIN SPECIALISTS OF**    * | |
| **ALABAMA, P.C.,  et al.;**    * | |
| | |
| Defendants. | |

<u>THIRD AMENDED COMPLAINT</u>

The Plaintiff in the above styled Action, **UNITED STATES OF AMERICA ex rel. LORI**

**L. CARVER,** hereby amends the original Complaint and the First Amended Complaint filed in

this matter IN CAMERA and UNDER SEAL, for purposes of adding specific factual allegations

(most notably but not limited only to paragraphs 48(c), 65 and 72), and to revise the allegations to

reflect dismissed Defendants.

**IN THE UNTIED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* LORI L. CARVER, | * * * | |
| Plaintiff, | * * | |
| v. | * * | CIVIL ACTION |
| PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C., XIULU RUAN, M.D.; JOHN PATRICK COUCH, M.D.;   C & R PHARMACY, LLC; and CASTLE MEDICAL, LLC; | * * * * * * | NUMBER:13-392 |
| Defendants. | * * | |

## FALSE CLAIMS ACT COMPLAINT (THIRD AMENDED)

COMES NOW *Qui Tam* Plaintiff and Relator, **L.ORI L. CARVER**, on behalf of the UNITED STATES OF AMERICA, and files this Complaint against Defendants **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C., XIULU RUAN, M.D.,   JOHN PATRICK COUCH, M.D., C & R PHARMACY, LLC;   CASTLE MEDICAL, LLC;** (sometimes collectively referred herein as "Defendants") pursuant to the *Qui Tam* provisions of the False Claims Act, *as amended, 31 U.S.C. §§ 3729-3733* ("FCA") for various violations committed by the Defendants.   The violations are more specifically set forth and described in the Statement of Material Evidence attached hereto and incorporated herein as if fully set forth.

2

**INTRODUCTION**

1.      LORI L. CARVER ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against Defendants **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C.; XIULU RUAN, M.D.; JOHN PATRICK COUCH, M.D.;  C & R PHARMACY, LLC; CASTLE MEDICAL, LLC;**  for treble damages, penalties, attorney fees and costs, pursuant to the *qui tam* provisions of the False Claims Act, *as amended, 31 U.S.C. §§3729-3733* ("FCA") for violations committed by the Defendants.   The violations arise out of the submission of, or conspiracy to submit, false and/or fraudulent claims by Defendants for payment to federally-funded Medicare programs as well as other government agencies and federally-funded health care programs as a result of referrals that were illegal under the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b).*

2.      This Complaint describes Defendants' practices of implementing schemes, practices and conspiracies to defraud Medicare and other governmental agencies, as well as private pay insurers and worker's compensation insurers, in violation of the Prohibited Physician Referral provisions of *42 U.S.C. §1395nn* (sometimes referred to as the "Stark Law")*,* the Federal Anti-Kickback provisions of *42 U.S.C. §§1320a-7b* (sometimes referred to as the "Anti-Kickback Law").  These practices include, but are not limited to, unlawful financial relationships with outside testing entities for the receipt of compensation/benefits in exchange for sample referrals, unlawful financial relationships with outside pharmaceutical providers for the receipt of compensation/benefits in exchange for prescription of the provider's products, altering or restricting patient medical records/chart entries to enable the submission of false and fraudulent reimbursement claims to Medicare and other government agencies for unnecessary medical

treatment, and/or for the use of medical supplies and equipment not actually used, and/or to enable unlawful prescription referrals to a pharmacy Ruan and Couch owned, and to unlawfully control the prescription products sold to maximize the kickbacks received by Ruan and Couch, and/or the submission of unlawful reimbursement claims for in-house testing not actually performed or performed by less reliable means in order to increase reimbursement revenues, and/or the submission of reimbursement claims for physician office visits that did not take place.

3.     These illegal compensation schemes which violate the FCA, Stark and Anti-Kickback laws alleged herein were devised and implemented before Relator began her employment with Defendants, or were devised and implemented by the Defendants while Relator was employed but without Relator's input.  Relator was in no way a planner or initiator of the fraudulent schemes, and was ignored or overruled when she voiced objections to same.  Relator made inquiries regarding the methodology involved, avoided direct involvement as much as possible, and voiced objections when able to do so.  Despite same, the schemes continued and/or were increased during Relator's employment, and, upon information and belief, continue still, or continued until approximately May 20, 2015 when Defendants **RUAN** and **COUCH** were arrested.  The same or similar schemes may be continuing by other Defendants added herein, individually or in conspiracy with other physicians since said arrests.

4.     Relator brings this action based on her direct knowledge, and she is the original source of the facts alleged in the Second Amended Complaint.  None of the actionable allegations set forth in this Complaint are based on a prior public disclosure as referred to in *31 U.S.C. §3730(e) (4)*.  Any supplemental information or supplemental allegations set forth herein – including the

identification of the added defendants and more specific descriptions of the various schemes employed – does not invoke the Public Disclosure bar, grew directly from the independently known information provided by the Relator in her original and First Amended Complaints. Accordingly, Relator is the original source for the information as defined in *31 U.S.C. §3730(e)*.

## JURISDICTION AND VENUE

5.      The acts proscribed by *31 U.S.C. S 3729 et seq*. and complained of herein occurred in the Southern District of Alabama and Defendants among others, do business in the Southern District of Alabama. Therefore, this Court has subject matter jurisdiction over this case and all Defendants pursuant to *31 U.S.C. 3732(a)*, as well as under *28 U.S.C. § 1345*.

6.      This Court has personal jurisdiction over the Relator because she resides in the Southern District of Alabama and conducts business herein.

7.      This Court has personal jurisdiction over all Defendants because all Defendants are located within the Southern District of Alabama and act as the provider of healthcare services and products to Medicare, Medicaid, and/or other government administered health care insurance, or to private insurance beneficiaries within the Southern District of Alabama.  All said defendants thereby conduct business within the Southern District of Alabama, and have provided services and/or supplies to Defendants PPSA, RUAN and/or COUCH.  Each Defendant regularly performs services or provides supplies, and submits claims for payment to Medicare and Medicaid, as well as others, or alternatively has cooperated and conspired with other Defendants to do so, and accordingly is subject to the jurisdiction of this Court.

8.      Venue is proper within the Southern District of Alabama pursuant to *28 U.S.C. §§ 1391 (a)*

*(1)* and *(2)*, because Defendants PHYSICIAN'S PAIN SPECIALIST OF ALABAMA, XIULU

RUAN, JOHN PATRICK COUCH and C&R PHARMACY, LLC have or had offices within the

Southern District of Alabama.   Defendants CASTLE MEDICAL, LLC, have or had offices, or

employed authorized representatives, within the Southern District of Alabama.   All of said

Defendants have performed numerous acts proscribed by *42 U.S.C. § 1395nn, 42 U.S.C. § 1320a-*

*7b (b)* and *31 U.S.C. §3729, et seq*, within the Southern District of Alabama, or alternatively

conspired with said Defendants to commit such proscribed acts, using PPSA, RUAN, COUCH

and/or C&R PHARMACY as the nexus for same.

## PARTIES

9.      *Qui Tam* Plaintiff and Relator, **LORI L. CARVER** ("Relator"), resides in the Southern

District of Alabama and was employed as the clinical supervisor for Defendant **PHYSICIAN'S**

**PAIN SPECIALISTS OF ALABAMA, PC, ("PPSA")** since early 2011.  Relator began her

employment with said Defendant as a medical assistant in July 2010.  As both a medical assistant

and then as the clinical supervisor, Relator worked under the direct supervision of Defendants

**XIULU RUAN, M.D. ("RUAN")** and **JOHN PATRICK COUCH, M.D. ("COUCH")**, the

owners/shareholders of Defendant **PPSA**.


10.     Defendant **PHYSICIAN'S PAIN SPECIALISTS OF ALABAMA, PC ("PPSA")** is an

Alabama professional corporation that was incorporated on July 3, 1997 with its principle office

located at 2001 Springhill Avenue, Mobile, AL 36607.  It also operates a second clinic at 4682

Airport Blvd., Mobile, AL 36608.  Defendant **PPSA** provides healthcare services, describing its

general business purpose as "Pain Management Doctors." As a provider of healthcare services, Defendant provides medical care and treatment, orders outside testing and diagnostic measures, and prescribes narcotic medications for patients who are covered by federal healthcare programs within the Southern District of Alabama. Defendant **PPSA** acted both directly and/or in conspiracy with other defendants in violation of the False Claims Act, *31 U.S.C. §§3729-3733* ("FCA"), the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b*).

11.     Defendant **XIULU RUAN, M.D.** is a licensed Alabama physician residing and practicing medicine in the Southern District of Alabama.  Defendant **RUAN** is an owner and shareholder of Defendant **PPSA**.   Defendant **RUAN** is an owner and shareholder of Defendant **C&R PHARMACY**.  Defendant **RUAN** acted both directly and/or in conspiracy with other defendants in violation of the False Claims Act, *31 U.S.C. §§3729-3733* ("FCA"), the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b*).

12.     Defendant **JOHN PATRICK COUCH, M.D.** is a licensed Alabama physician residing and practicing medicine in the Southern District of Alabama.   Defendant **COUCH** is an owner and shareholder of Defendant **PPSA**.    Defendant **COUCH** is an owner and shareholder of Defendant **C&R PHARMACY.** Defendant **COUCH** acted both directly and/or in conspiracy with other defendants in violation of the False Claims Act, *31 U.S.C. §§3729-3733* ("FCA"), the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b*).

12.1    Defendant **CASTLE MEDICAL, LLC** ("**CASTLE MEDICAL**") is a Georgia based limited liability company properly qualified to do business, and at all material times doing business, in the Southern District of Alabama.   Defendant **CASTLE MEDICAL** operates an outside testing laboratory that provided urine drug screen ("UDS") testing for Defendants **PPSA, RUAN** and **COUCH**.   Defendant **CASTLE MEDICAL** acted both directly and/or in conspiracy with other defendants in violation of the False Claims Act, *31 U.S.C. §§3729-3733* ("FCA"), the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b*).

12.5    Defendant **C & R PHARMACY, LLC** is an Alabama limited liability corporation that was incorporated on or about November 18, 2010 with its principle office located at 2001 Springhill Avenue, Mobile, AL 36607.   Defendant **C & R PHARMACY** provides pharmaceutical/prescription filling services, describing its general business purpose as a "Pharmacy." As a pharmaceutical/prescription filling service, Defendant dispenses medications, narcotic and otherwise, to patients who are covered by federal healthcare programs within the Southern District of Alabama.   Defendant **C&R PHARMACY** acted both directly and/or in conspiracy with other defendants in violation of the False Claims Act, *31 U.S.C. §§3729-3733* ("FCA"), the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b*).

13.    All Defendants are health care providers and suppliers, or are the employees or agents of such, who participate in, facilitate or place themselves in the chain of recipients concerning the submission of reimbursement claims to federal healthcare programs.

## FEDERAL HEALTHCARE PROGRAMS

### The Medicare, Medicaid and Tricare Programs

14.     Title XVIII of the Social Security Act, *42 U.S.C. §§ 1395, et seq.*, established the Health Insurance for the Aged and Disabled, popularly known as the Medicare program. The United States Department of Health and Human Services ("DHHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer contracts with insurance companies or Medicare contractors on behalf of DHHS. Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

15.     CMS enters into contracts and pays for health care services provided to Medicare beneficiaries through insurance companies acting as Medicare ("fiscal intermediaries") contractors with the responsibility to process and pay health care claims under Medicare Part A which covers hospital and post-hospitalization services. *42 U.S.C. §§ 1395c-1395i-2 (1992)*. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services *42 U.S.C. §§ 1395k, 1395l, 1395x(s)*, outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors ("carriers") process and pay claims for these services.

16.     Defendants submitted or caused to be submitted fraudulent claims for reimbursement to the United States through several Medicare Part B contractors in and around the Southern District of Alabama.

17.     Medicaid is a federally assisted grant program for the states enabling it to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels of services, and administrative and operational procedures. The state directly pays the providers for Medicaid services, with the state obtaining the federal reimbursement share of the payment from accounts drawn on funds from the United States Treasury. *42 C.F.R. §§ 430.0-430.30* (1994). The State of Alabama, through the Alabama Medicaid Agency ("Alabama Medicaid") participates in the Medicaid program.

18.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through Alabama Medicaid in Alabama and the Southern District of Alabama.

19.     TRICARE Management Activity, formerly known as CHAMPUS, ("TRICARE") is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. *10 U.S.C. §§ 1079, 1086*; *32 C.F.R. Part 199*. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

20.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through TRICARE in the Southern District of Alabama.

21.     Defendants also provide healthcare to private insurance entities and worker's compensation carriers.  While not federal healthcare programs, the submission of false claims to private entities impacts the cost of medical care across the board, thereby increasing the overall cost to federal healthcare programs, and further escalating the healthcare crisis currently affecting the United States government and its citizens.

22.     Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from private insurance entities for healthcare services rendered in the Southern District of Alabama.

23.     Federal healthcare programs depend on physicians and other health care professionals to exercise independent judgment in the best interests of patient care. Financial incentives tied to referrals corrupt the health care delivery system in ways that harm the federal programs and their beneficiaries. Corruption of medical decision-making can result when a physician refers patient healthcare to an entity on the basis of the physician's financial relationship and self-interest instead of the patient's medical needs.

24.     Federal healthcare programs also depend on physicians and other health care professionals to submit claims for reimbursement based upon the provision of medical care and the use of medical supplies that are reasonable, necessary and actually employed in the healthcare provided to the programs' beneficiaries.  Submitting claims for reimbursement for services and supplies not actually used or not medically necessary, and/or which are directly tied to the financial interests of the physician provider, corrupt the health care delivery system in ways that harm the federal

programs and their beneficiaries. Corruption of medical decision-making can result when a physician performs procedures and runs tests on the basis of the physician's financial relationship and self-interest instead of the patient's medical needs.

## Defendants Participation in Federal HealthCare Programs

25.     As clinical supervisor, Relator has firsthand knowledge that Defendants **PPSA, RUAN, COUCH** and **C & R PHARMACY, LLC** accept and provide treatment to beneficiaries of Medicare, Medicaid, Tricare and other third party insurers.  It was an integral function of the revenues generated by the medical practice.  During Relator's employment with Defendant PPSA, its billing supervisor, Tammy Etheridge, acknowledged to Relator that more than 60% of Defendant PPSA's billing was to Medicare and other federal agencies.

26.     As a condition of the Defendants' participation in these federal healthcare programs, Defendants are responsible for compliance with the legal and proper billing and reimbursement rules required by these programs. This responsibility is both stated and implied throughout various claim forms, conditions of participation, and Medicare and Medicaid program participation documents, all of which contain certifications of truth and accuracy which are signed by the provider or its authorized representative(s) and submitted to the above referenced Federal HealthCare Programs for payment.

27.     Defendants regularly and routinely prepared the necessary reimbursement applications and material for submission to the appropriate Medicare, Medicaid or Tricare office.  Among other things, the applications certified that the providers would abide by relevant federal regulations,

including *42 C.F.R. §424.57*, and subsection (c)(l), mandating that a provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements", including the Federal Anti-Kickback Statute, the Stark law, and the Food and Drug Administration's rules and regulations.

28.     Defendants further certified and acknowledged "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions." Accordingly, Defendants expressly certified that each of their invoices submitted for payment of a claim by federal healthcare programs was in compliance with such laws, regulations and program instructions, including, but not limited to, the Federal Anti-Kickback Statute, the Stark law, and the Food and Drug Administration's rules and regulations.

28.1     Although Relator was not directly employed by Defendant **CASTLE MEDICAL,** Relator nevertheless has direct knowledge of their financial connections and relationships to Defendants **PPSA, RUAN, COUCH** and/or **C&R PHARMACY,** and/or knowledge of their facilitation and participation in all or some aspects of the various schemes and practices set forth below.   Based upon same, CASTLE MEDICAL is also responsible for compliance with the legal and proper billing and reimbursement rules required by these programs, and/or CASTLE MEDICAL routinely prepared the necessary reimbursement applications and material for submission to the appropriate Medicare, Medicaid or Tricare office, and/or CASTLE MEDICAL certified and acknowledged that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions, and/or CASTLE MEDICAL conspired with other Defendants or facilitated the violations at issue.   Accordingly, CASTLE

13

MEDICAL expressly certified an understanding that payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the Federal Anti-Kickback Statute, the Stark law, and the Food and Drug Administration's rules and regulations.

## APPLICABLE LAW

### The False Claims Act

29.     *Section 3729* of The False Claims Act ("FCA") provides in pertinent part and imposes liability on any person or entity who:

> "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; …".

30.     A proven violation of the FCA renders the person or entity liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. *31 U.S.C. § 3729(a) (1)-(3).*

31.     Falsely certifying compliance with the Stark law, the Anti-Kickback laws, and the Food and Drug Administration's rules and regulations in connection with a claim submitted to a

federally funded insurance program is actionable under the FCA.  *United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88 (3rd Cir. 2009) (citations omitted); United State ex rel. Repko v. Guthrie Clinic, 557 F. Supp. 522 (M.D. Penn., 2008) (citations omitted).*

32.     The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) (reprinted in 1986, U.S.C.C.A. 5266).*  Proof of a specific intent to defraud is not required. *31 U.S.C. § 3729(b)(1)(B).*

## Stark Law (Physicians Self-Referral Law)

33.     The "Stark" statute, *42 U.S.C. §1395nn,* commonly known as the Physician Self-Referral statute, prohibits physicians from making a referral to an entity for the furnishing of designated health services, if a physician has a direct or indirect financial relationship (ownership or compensation) with an entity that provides any of the health services identified in the statute ("designated health services" or "DHS").  The Stark law also prohibits entities from billing for services provided pursuant to a prohibited referral. If a financial relationship exists, all referrals and associated claims are illegal unless specifically exempted by statute. *42 U.S.C. § 1395nn (a) (1) (A) and (B).*  In other words, the physician cannot refer patients to the entity for DHS and the entity cannot submit a claim to CMS for such DHS unless the financial relationship fits in a statutory or regulatory exception.

34.     Liability under the Stark law requires three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship; and (3) none of the Stark exceptions apply.

35.     Under the Stark law, a physician has a "financial relationship" with an entity if he has either "an ownership or investment interest in the entity" or "a compensation arrangement" with it. *42 U.S.C. §1395nn (a) (2)*.   An ownership or investment interest in the entity may be an equity interest, a debt relationship or indirect ownership through controlling entities.

36.     A "compensation arrangement" where there is "any arrangement involving remuneration between a physician . . . and an entity . . . ." *43 U.S.C. § 1395nn (h) (1) (A)*.   "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *43 U.S.C. § 1395nn (h)(1)(B)*.   The exceptions concerning the definition of remuneration set forth in *43 U.S.C. § 1395nn(c)* are not applicable in this case.

37.     The Stark law defines "referral" as "the request by a physician for the item or service", and thereby makes the physician a "referring physician" under the Act. *43 U.S.C. § 1395nn(h)(5)(A)*.

38.     The Stark law defines Designated Healthcare Services to include outpatient prescription drugs and clinical laboratory services. *43 U.S.C. § 1395nn(h)(6)(J)* and *(A)* respectively.

39.     Once the *Qui Tam* Plaintiff or government establishes proof of each element of a violation of the Stark law, the burden shifts to the defendants to establish that the conduct was protected by an exception. *United States ex rel. Kosenske v. Carlisle HMA, Inc., at 95 (citation omitted).*

40.     In contrast to the Federal Anti-Kickback Statute, violations of the Stark law are civil matters. Stark law violations are not crimes. The Stark law is a strict liability statute that is violated whenever a prohibited referral is made or a prohibited claim is submitted, regardless of whether the health care provider intended, knew or should have known that the law prohibited the actions it took.

**Anti-Kickback Law**

41.     The Federal Anti-Kickback Act ("Anti-Kickback") makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person - (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program. *42 U.S.C. §1320a-7b (b) (1) and (2).*

42.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. *42 U.S.C. §1320a-7b(c)(1).* Any ownership interest or compensation arrangement that constitutes a financial relationship under the Stark law would also constitute remuneration as defined by the Anti-Kickback statute, unless a kickback safe harbor applies.

43.     Knowing and willful conduct is a necessary element of this criminal offense. *42 U.S.C. §1320a-7b(b)(1)*. An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v Stacks*, 157 F.3d 833, 837-8 (11th Cir. 1998). The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v Greber,* 760 F.2d 68 (3d Cir.), *cert denied*, 474 U.S. 988 (1985).

44.     HHS has published safe harbor regulations that define practices that are not subject to the prohibitions of the Anti-Kickback statute because such practices would unlikely result in fraud or abuse. *See 42 C.F.R. §1001.952.* The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

45.     The schemes alleged herein as violations of the FCA and the Anti-Kickback statute do not meet the requirements for any of the published safe harbor exceptions. The schemes alleged herein are likely to result in fraud or abuse.

## FACTS AND ALLEGATIONS

46. Paragraphs 1 through 45 are incorporated as if fully set forth herein.

47. Relator witnessed and otherwise was made aware of several schemes and practices at Defendants' clinics which amount to violations of the FCA and illegal compensation schemes whereby the defendants received kickbacks ("Stark payments") in exchange for the referral of designated healthcare services. These fraudulent schemes have resulted in false certifications of compliance, thereby tainting all resulting claims submitted to federal healthcare programs from at least July 2010 to the present.

48.   These schemes are detailed in Relator's Disclosure (attached hereto as Exhibit "A-1"), as amended/supplemented, and said Disclosure is hereby express incorporated herein as if fully set forth.   Said schemes are summarized as follows:

A.   **Re-use of Disposable Needles**.   Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN** and **COUCH** implemented and continued a policy to clean or attempt to clean, and then reuse, disposable needles in radiofrequency procedures, epidural procedures and pain pump re-fill procedures. This unlawful policy also amounted to an "off-label" use of such needles in violation of Food and Drug Administration rules and regulations.   Defendants thereafter sought and obtained reimbursements for these procedures from federal healthcare programs (and other private insurers) in amounts that reflected the expected use (and presumed cost) of the disposable needles.   This scheme not only generated fraudulent reimbursement revenues for the medical practice, but also significantly endangered patient health, safety and welfare.

Defendants directed staff to clean the needles and reuse them. Defendants admitted that the directive to do so was to reduce costs to the medical practice. Defendants sought and obtained full reimbursements from Medicare and other third party payors for the procedures.

Each and every certification requesting reimbursement/payment for these procedures was thereby rendered a false representation to the Federal government and others. The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known. Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments. This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements." Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

**B.**     **Urine Drug Screens.** Between 2010 and 2013, and both before and since said dates, Defendants knowingly and intentionally used inferior technology (panel read cups)

to conduct urine drug screens, but thereafter sought and obtained reimbursements from federal healthcare programs (and other private insurers) in amounts that reflected the use of more advanced technology (machine readers).   The decision to use the inferior technology was based upon the material/supply costs differences between the two methodologies, and the maximization of revenues for the Defendants.   Stated differently, Defendants billed Medicare and other third party payors for using the UDS machine readers but actually used the less expensive UDS panel read cups, thereby minimizing costs and increasing profits to the medical practice.   Defendants also billed Medicare for UDS testing on specimens that had been discarded and not tested.   Defendants knowingly received reimbursement from Medicare and other third party payors for services that had not been provided, and failed to reverse or correct same.   Defendants also ignored negative UDS results and unnecessarily conducted further in house testing solely to increase their revenues.   Defendants further ignored negative results and unnecessarily referred specimens to outside labs.  Defendants further re-submitted reimbursement requests for UDS testing that had been denied because it had been conducted contrary to Medicare's requirements, and falsely re-certified that it was done in compliance with said requirements, and obtained reimbursement for same.  Defendants manipulated the UDS testing procedure and violated rules and regulations concerning same.   This scheme generated fraudulent reimbursement revenues for the medical practice, further resulted in unnecessary medical costs due to the manipulation and increased need for referrals to outside testing laboratories.  This was because of the reduced reliability of the panel read cups compared to the machine readers, and the resulting greater frequency of "flagged" readings.

Each and every certification requesting reimbursement/payment for these tests was thereby rendered a false representation to the Federal government and others.   The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known.  Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments.   This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements."   Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

C.   **Urine Lab Testing Kick-backs.**  Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN, COUCH** and **CASTLE MEDICAL**, directly or as part of a conspiracy, also ignored, disregarded or suppressed negative or compliant UDS test results in order to refer a greater number of urine samples for outside testing. This scheme was to enable the Defendants to meet "quotas" to generate illegal compensation in the form of kick-backs from the outside urine testing laboratories.  This

scheme increased costs to federal healthcare programs (and other private insurers) by causing unnecessary medical treatment conducted only to facilitate the Defendants financial relationship with the labs.   Defendants **PPSA, RUAN** and **COUCH** illegally referred specimens to Defendant **CASTLE MEDICAL**, and Defendant **CASTLE MEDICAL** provided a benefit to Defendants **PPSA, RUAN** and **COUCH** for same. Defendant **CASTLE MEDICAL** then illegally and fraudulently billed Medicare and other third party payors for the testing.

Specifically, beginning in March of 2013, **CASTLE MEDICAL** and **RUAN**, acting on behalf of **PPSA** and **COUCH**, entered into an illegal agreement for UDS referrals.  Under the agreement, **CASTLE MEDICAL** would perform UDS services for patients who had private pay insurance at a fixed cost of ███████  In exchange, and based upon an expected quota of ██████ UDS referrals per month, **RUAN, PPSA** and **COUCH** would refer all UDS testing exclusively to **CASTLE MEDICAL**.  Under the arrangement, **RUAN, PPSA** and **COUCH** would bill private insurers for the UDS testing, and would retain revenue generated by reimbursement for same. **CASTLE MEDICAL** would bill all Medicare and other government payors for patients covered by such programs, and would retain all revenue generated by such reimbursements.  In June, 2013 **CASTLE MEDICAL** confirmed the specific details of this scheme in an internal memo titled "Account Review."

███████████████████████████████████

As further illustration of the illegal nature of this kickback scheme, in November and December of 2013, **RUAN** demanded a price reduction for his direct bill (private insurance) patients to ███ per UDS. In exchange, **RUAN** promised to increase his volume of Medicare patient referrals to make up **CASTLE MEDICAL**'s revenue lost due to the reduction. **CASTLE MEDICAL** agreed, and **RUAN** immediately began increasing referrals. This arrangement demonstrates that referrals were made purely for purposes of increasing revenue for all of the Defendants, and disregarded medical necessity required for submission of claims to the Federal Government.

The Defendants paid and received, in conspiracy with one another and others, illegal kickbacks and referral payments/benefits for the UDS testing. Said scheme corrupted the medical judgment of the Defendants by incentivizing them to refer services for secondary gain rather than for legitimate and necessary medical treatment, and said Defendants were so incentivized, and acted on the incentive. The Defendants failed to report the payments/benefits as required, actively took steps to conceal or hide the payments/benefits, and routed the payments/benefits through third persons and separately owned businesses/enterprises so as to minimize the risk of detection. Defendants solicited such illegal payments from others, and proposed "matching" arrangements to incentivize the illegal kickback payments – essentially extorting such payments under the continuing threat of losing the referrals. Defendants manipulated the referral system to maximize their illegal kickbacks. Defendants disregarded, ignored or manipulated in house screening procedures to inflate the volume of specimens for referral in order to meet "quotas" for the illegal kickbacks.

Each and every certification requesting reimbursement/payment for these tests was thereby rendered a false representation to the Federal government and others due to the corruption of the kickback scheme, and due to the unnecessary nature of the services billed. Each and every payment and receipt of illegal kickbacks amounted to a false representation as well. The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known, and would have disqualified the defendants from participation in the program(s) and payment pursuant to same. Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments. Defendants further knew the kickback scheme was illegal, compromised medical judgment, would disqualify participation in federal and private programs, and yet – despite such knowledge – devised and continued same. This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements." Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

**D.     Billing Physician Rates for Patient Medical Care Provided by Staff.**  Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN** and **COUCH** sought and obtained reimbursements from federal healthcare programs (and other private insurers) for physician office visits when patients were actually seen by staff.  This scheme generated fraudulent reimbursement revenues for the medical practice, and further endangered patient health, safety and welfare.  Defendants knew that Medicare paid less in reimbursements when patients presenting for office visits are not seen by an MD, but instead are seen by Physician's Assistants, Nurse Practitioners and other trained and skilled non-physician health care personnel.  They therefore implemented and continued a policy of billing for physician visits even when physicians were seldom, if ever, actually seeing the patients.

Defendants regularly refused to see patients who presented and requested to be seen by a physician, and refused or failed to see patients when staff recommended that same was necessary and appropriate.  Defendants pre-signed prescriptions to facilitate this scheme, and then implemented a policy of forging prescriptions to further facilitate the scheme.   The Defendants abused patient dependency on narcotic prescriptions to gain compliance and prevent complaints.   Defendants removed physician input into patient care, and thereby risked patient health, safety and welfare.   Defendants engaged in this scheme to increase patient volume and billing, and did so at the expense of appropriate care.

Each and every certification requesting reimbursement/payment for these office visits and similar services was thereby rendered a false representation to the Federal government and others.   The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known.   Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments.   This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements."   Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

**E.     Unnecessary Medical Procedures Scheduled and Performed.**   Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN** and **COUCH** implemented a scheme to schedule and render unnecessary medical services only to fill their schedules.   These procedures were unnecessary and not medically indicated.   To facilitate this scheme, Defendants further implemented a policy directing staff to change, alter, falsify or restrict patient medical records and chart entries in order to allow the scheduling of these unnecessary procedures, and to minimize the likelihood of

reimbursement denials by federal healthcare programs (and private insurers). Specifically, Defendants instructed staff to call patients and direct them to present at the clinics for a procedure to be performed by the Defendants, and did so only to fill their schedules. Defendants further restricted employees from charting positive notes that patients were "doing well" and had "no complaints" in order to allow such patients to be called and scheduled for these procedures and thereby reduced the likelihood that a third party payor would question the procedure as necessary. This scheme generated fraudulent reimbursement revenues for the medical practice, resulted in unnecessary medical treatment, constituted fraudulent alteration or restriction of patient medical records, and further endangered patient safety by exposing patients to risks associated with the procedures.

The Defendants abused patient dependency on narcotic prescriptions to gain compliance and prevent complaints. Defendants engaged in this scheme to increase patient volume and billing, and did so at the expense of appropriate care.

Each and every certification requesting reimbursement/payment for these procedures and similar services was thereby rendered a false representation to the Federal government and others. The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known. Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement

payments.   This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements."   Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

F.     **DNA Testing Kick-backs.**  Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN** and **COUCH**, directly or as part of a conspiracy, received and accepted illegal compensation in the form of kickbacks from an outside DNA testing laboratory in exchange for patient specimen referrals. [1]  This scheme promoted the Defendants' financial relationship with the outside testing lab, and corrupted the independent judgment of the physicians.

This scheme was to enable the Defendants to meet "quotas" to generate illegal compensation in the form of kick-backs from the outside testing laboratory.  This scheme increased costs to federal healthcare programs (and other private insurers) by causing unnecessary medical treatment conducted only to facilitate the Defendants financial

---

[1]     The DNA testing laboratory in question is NATURAL MOLECULAR TESTING CORPORATION, a Washington State corporation.  NATURAL MOLECULAR is not named as a Defendant herein because it has been driven to bankruptcy and dissolution, in part, because of multiple False Claims suits brought by the United States over the preceding five to six years.

29

relationship with the labs.   Defendants illegally referred specimens to the laboratory, and the laboratory paid Defendants **PPSA, RUAN** and **COUCH** for same.   The laboratory then illegally and fraudulently billed Medicare and other third party payors for the testing.

The Defendants paid and received, in conspiracy with one another and others, illegal kickbacks and referral payments for the DNA testing.   Said scheme corrupted the medical judgment of the Defendants by incentivizing them to refer services for secondary gain rather than for legitimate and necessary medical treatment, and said Defendants were so incentivized, and acted on the incentive.   The Defendants failed to report the payments as required, actively took steps to conceal or hide the payments, and routed the payments through third persons and separately owned businesses/enterprises so as to minimize the risk of detection.   Defendants solicited such illegal payments from others, and proposed "matching" arrangements to incentivize the illegal kickback payments – essentially extorting such payments under the continuing threat of losing the referrals.   Defendants manipulated the referral system to maximize their illegal kickbacks.   Defendants disregarded, ignored or manipulated the care provided to patients to inflate the volume of specimens for referral in order to meet "quotas" for the illegal kickbacks.

Each and every certification requesting reimbursement/payment for these tests was thereby rendered a false representation to the Federal government and others due to the corruption of the kickback scheme and due to the unnecessary nature of the services billed.   Each and every payment and receipt of illegal kickbacks amounted to a false representation as well. The false representations were material in that Medicare and other third party payors would

not have authorized and made the reimbursement payments if the truth had been known, and would have disqualified the defendants from participation in the program(s) and payment pursuant to same. Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments. Defendants further knew the kickback scheme was illegal, compromised medical judgment, would disqualify participation in federal and private programs, and yet – despite such knowledge – devised and continued same. This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements." Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

**G.    Pharmaceutical Prescription Kick-backs**. Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN, COUCH,** and **C&R PHARMACY** acting directly or in conspiracy, paid, received and/or accepted kick-back payments and benefits for the prescription of pharmaceuticals to patients at the practice. This scheme promoted the Defendants financial relationship with the pharmaceutical providers, and corrupted the independent judgment of the physicians. It also endangered

patient health, safety and welfare by encouraging pharmaceutical prescription for secondary gain instead of patient need.

Defendants prescribed medications to meet weekly, monthly or annual quotas and thereby achieve levels to generate the kickbacks.   Defendants used their captive pharmacy to control the sale of name brand drugs, to get around interval restrictions, and to evade detection by Medicare and other third party payors, as well as by regulatory authorities. Defendants prescribed pain medication/narcotics without patient complaints of pain, or before patients made complaints of pain.   Defendants prescribed medications, or prepared prescriptions to prescribe medications, in advance before patients were actually seen in the office.   Defendants prescribed medications "off-label" to increase prescription volume. Defendants prescribed medications in contradiction of FDA approval.    Defendants prescribed medications disproportionate to their patients' conditions and complaints. Defendants prescribed medication in dosages disproportionate to their patients' conditions and complaints.   Defendants prescribed medications in exchange for personal benefits, sexual favors and/or social interaction supplied by agents of conspirators.   Defendants prescribed medications in exchange for payment of office meals and tabs at social events. Defendants falsified reporting and other forms, accounting forms, and expense forms to characterize payments as seminars or other permissible payments.   Defendants falsified such documents to hide and conceal the kickbacks and benefits.   Defendants failed to report the payments to the U.S. Government and other State and Federal regulatory authorities.

Each and every certification requesting reimbursement/payment for these prescriptions was thereby rendered a false representation to the Federal government and others due to the corruption of the kickback scheme and due to the unnecessary nature of the services and medications billed. Each and every payment and receipt of illegal kickbacks amounted to a false representation as well. The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known, and would have disqualified the defendants from participation in the program(s) and payment pursuant to same. Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments. Defendants further knew the kickback scheme was illegal, compromised medical judgment, would disqualify participation in federal and private programs, and yet – despite such knowledge – devised and continued same. These schemes violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements." Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

**H.**     **Captive Pharmacy.**  Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN, COUCH,** and **C&R PHARMACY,** referred or facilitated the referral of patients to an in-house pharmacy – Defendant **C&R PHARMACY** - located at the West Mobile clinic in order to increase and control the purchase of brand name pharmaceuticals in order to meet "quotas" to generate illegal compensation in the form of kick-backs from the pharmaceutical providers.  This scheme enabled and facilitated the kick-back arrangement, and increased costs to federal healthcare programs (and other private insurers) by causing unnecessary medical expenses incurred only to facilitate the Defendants financial relationship with the pharmaceutical providers whose drugs were sold through the pharmacy.

Defendants prescribed medications to meet weekly, monthly or annual quotas and thereby achieve levels to generate the kickbacks.   Defendants used their captive pharmacy to control the sale of name brand drugs, to get around interval restrictions, and to evade detection by Medicare and other third party payors, as well as by regulatory authorities.

Each and every certification requesting reimbursement/payment for these prescriptions was thereby rendered a false representation to the Federal government and others due to the corruption of the kickback scheme and due to the unnecessary nature of the services and medications billed.  Each and every payment and receipt of illegal kickbacks amounted to a false representation as well.  The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known, and would have disqualified the defendants from

participation in the program(s) and payment pursuant to same. Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments. Defendants further knew the kickback scheme was illegal, compromised medical judgment, would disqualify participation in federal and private programs, and yet – despite such knowledge – devised and continued same. These schemes violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements." Accordingly, Defendants expressly certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

I.   **MRI Radiology Studies/Procedures.**   Between 2010 and 2013, and both before and since said dates, Defendants **PPSA, RUAN,** and **COUCH** referred patients for in-house radiology studies known as Magnetic Resonance Imaging – MRI.   These referrals were not medically indicated, were unnecessary, and were made only to increase the revenues of the practice.

Defendants instructed staff to perform MRIs on all new and existing patients, regardless of need, and regardless of whether said procedure duplicated studies recently performed at referring or concurrent health care providers.   Defendants instructed staff to threaten rejection or termination of the patients' treatment – and medications – if they resisted compliance with the order tests, and also made such threats themselves.   The Defendants admitted that this scheme was to cover the cost of the machine/staff, and to increase revenue to the practice by allowing the practice to bill Medicare and other payors for the unnecessary studies.   The Defendants abused patient dependency on narcotic prescriptions to gain compliance and prevent complaints.   Defendants engaged in this scheme to increase patient volume and billing, and did so at the expense of appropriate care.

Each and every certification requesting reimbursement/payment for these MRI studies and similar services was thereby rendered a false representation to the Federal government and others.   The false representations were material in that Medicare and other third party payors would not have authorized and made the reimbursement payments if the truth had been known.   Defendants knew the representations were false at the time they were made, intended them to be false, intended them to be misleading, and did, in fact, mislead Medicare and other third party payors to illegally and improperly secure reimbursement payments.   This scheme violated the legal and proper billing and reimbursement rules, violated certifications of truth and accuracy, violated the certification that the providers would abide by relevant federal regulations, and the certification that the provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements."   Accordingly, Defendants expressly

certified falsely an understanding that the payment of a claim by federal healthcare programs required compliance with such laws, regulations and program instructions, including, but not limited to, the FCA, Federal Anti-Kickback statute and the Stark law.

49.     These schemes, independently and in concert with one another, encouraged and resulted in numerous false or fraudulent claims for payment or approval from the United States Government, caused to be made or used numerous false records or statements material to false or fraudulent claims against the United States Government,  and constituted prohibited compensation arrangements where there is an improper arrangement involving remuneration between the defendants and other entities providing designated healthcare services in violation of the Stark law and the Federal Anti-Kickback statute.  Upon information and belief, these schemes are still in place and being used by the defendants, thereby constituting an ongoing pattern and practice of fraudulent claims and improper kickbacks.

## DEFENDANTS KNOWLEDGE OF FRAUD

50.     The Defendants, individually and through authorized officers, themselves devised and implemented the fraudulent schemes and compensation arrangements, or knowingly paid and accepted the compensation payments in exchange for the referral quotas.  Defendants therefore knew of the illegality of their conduct, and engaged in it despite such knowledge.  Defendants took steps to conceal the conduct, or conspired with others to take steps to conceal the conduct.

## ILLEGAL FINANCIAL RELATIONSHIPS OF DEFENDANTS

51.     Defendants paid, received and/or accepted compensation/benefits from outside testing labs for referrals of urine sample testing and DNA testing.  Defendants paid, received and/or accepted compensation/benefits from outside pharmaceutical suppliers in exchange for writing prescriptions.  Defendants further hold an ownership interest in the captive pharmacy to which patients were referred.

## COUNT I

### (False Claims Act – Presentation of False Claims *31 U.S.C. § 3729 (1)*)

52.     *Qui Tam* Plaintiff and Relator re-alleges, adopts and incorporates by reference paragraphs 1 through 51 as if fully set forth herein.

53.     From July 2010 through April 2013, and both before and after that time period, Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH**, knowingly submitted false and fraudulent claims and payment request certifications to agents and officials of the United States Government in violation of *31 U.S.C. Section 3729(a)(1)*.

54.     Said false and fraudulent claims included, but are not limited to the submission of claims for services and materials not actually provided, the submission of claims not approved, the submission of claims generated solely for purposes of billing Medicare and other third party payors, the submission of claims up-coded for greater reimbursement, the submission of claims for services or drugs "off label", and other schemes.

55.     The agents and officials of the United States Government were unaware of the false and fraudulent nature of the said claims and certifications submitted by the defendants.  If such agents and officials had been aware such false and fraudulent nature, they would never have reimbursed Defendants' claims for payment.  As a result of this conduct, the United States and the American taxpayers have suffered actual damages.

## COUNT II

### (False Claims Act; False Records or Statements *31 U.S.C. § 3729 (2)*)

56.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 55 as though fully set forth herein.

57.     From July 2010 through April 2013, and both before and after that time period, Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH** knowingly constructed or used, or caused to be constructed or used, false records, documents and statements in order to get the payment and/or approval of false or fraudulent claims and payment certifications by officials and agents of the United States government in violation of *31 U.S.C. Section 3729(a) (2)*.

58.     Said false and fraudulent construction or use of false records, documents and statements included, but was not limited to, the manipulation of medical records, the manipulation of billing records, the manipulation of testing records, the manipulation of pharmacy records, the manipulation of prescription records, the manipulation of drug dispensing records, the manipulation and false/fraudulent nature of certifications for billing reimbursements, and other schemes.

59.     The agents and officials of the United States Government were unaware of the false and fraudulent nature of the said claims and certifications submitted by the defendants.   If such agents and officials had been aware such false and fraudulent nature, they would never have reimbursed Defendants' claims for payment.   As a result of this conduct, the United States and the American taxpayers have suffered actual damages.

## COUNT III

### (False Claims Act- Stark Violation – Outside Testing Laboratories)

60.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 59 as though fully set forth herein.

61.     The unlawful compensation arrangements between Defendants **PPSA, RUAN** and **COUCH**, and Defendant **CASTLE MEDICAL** and other outside urine and DNA testing laboratories, are financial relationships under the Stark law.

62.     Defendants **PPSA, RUAN** and **COUCH** unlawfully referred patients to the outside urine and DNA testing laboratories, including Defendant **CASTLE MEDICAL** and others, for the furnishing of designated health services for which payment may be made under the Social Security Act in violation of the Stark law. *42 U.S.C. §1395nn (a)(1)(A).*

63.     Defendants **PPSA, RUAN** and **COUCH** conspired to and did knowingly refer patients to the said **CASTLE MEDICAL** and other outside laboratories notwithstanding the existence of the prohibited financial relationships among them in violation of the Stark law, and said Defendant

**CASTLE MEDICAL** and others unlawfully submitted claims to Medicare, Alabama Medicaid, and other Federal HealthCare Programs (as well as private pay insurers) for goods and services supplied to patients as a result and/or in connection with of such unlawful referrals.

64.    Defendant **CASTLE MEDICAL**, with full knowledge that such payments violated the Stark Law, paid illegal kickbacks and other illegal remuneration to Defendants, **RUAN, COUCH and PPSA**, to unlawfully induce them to use **CASTLE MEDICAL's** testing services.   **CASTLE MEDICAL** was fully aware that a majority of the patients of **RUAN, COUCH** and **PPSA** were Medicare, Medicaid or other federal healthcare program beneficiaries, and that claims for reimbursement would be unlawfully submitted to such federal healthcare programs for payment.

65.    The Defendants **PPSA, RUAN** and **COUCH** continued to receive kickback payments in exchange for referring patient samples for testing.   Under the scheme Defendants **PPSA, RUAN** and **COUCH** billed private pay insurers (direct bill) with the benefit of reduced UDS costs furnished by **CASTLE MEDICAL**, and in exchange, **CASTLE MEDICAL** billed Medicare, Medicaid, Tricare and other government agencies for services furnished pursuant to the unlawful referrals.  This arrangement directly resulted in the referral of samples for UDS testing that were medically unnecessary and otherwise unlawful.  The Defendants engaged in these acts prohibited by the Anti-Kickback statute, and did so with actual knowledge of the illegality of such kickbacks and billings.

66.    The said unlawful referrals made by the Defendants **PPSA, RUAN** and **COUCH** did not qualify for any other statutory or regulatory exception from the Stark law's referral prohibition.

67.     As a consequence of such unlawful referrals, claims and payments, the Defendants **PPSA, RUAN** and **COUCH,** and Defendant **CASTLE MEDICAL** have knowingly caused the submission of substantial fraudulent charges which Defendants **PPSA, RUAN** and **COUCH,** and Defendant **CASTLE MEDICAL** unlawfully billed (or facilitated to be billed) to Medicare, Medicaid, TRICARE and other Government healthcare payors (as well as to private pay insurers) for designated health services from July 2010 up and through April 2013, and both before and after such time period.   The agents and officials of the United States Government were unaware of the false and fraudulent nature of the said claims and certifications submitted by the defendants.   If such agents and officials had been aware such false and fraudulent nature, they would never have reimbursed Defendants **PPSA, RUAN** and **COUCH,** and Defendant **CASTLE MEDICAL** claims for payment.

68.     As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT IV

**(False Claims Act – Anti-Kickback Law– Outside Testing Laboratories)**

69.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

70.     In exchange for test referrals to the laboratories of Defendant **CASTLE MEDICAL** and others, the Defendants **PPSA, RUAN** and **COUCH** knowingly and willfully received kickback payments prohibited under the Anti-Kickback law. *42 U.S.C. §1320a-7b(b)(1).*

71.     Defendant **CASTLE MEDICAL**, with full knowledge that such payments violated the Anti-Kickback law, paid illegal kickbacks and other illegal remuneration to Defendants, **RUAN, COUCH and PPSA,** to unlawfully induce them to use **CASTLE MEDICAL's** testing services. **CASTLE MEDICAL** was fully aware that a majority of the patients of **RUAN, COUCH** and **PPSA** were Medicare, Medicaid or other federal healthcare program beneficiaries, and that claims for reimbursement would be unlawfully submitted to such federal healthcare programs for payment.

72.     The Defendants **PPSA, RUAN** and **COUCH** continued to receive kickback payments in exchange for referring patient samples for testing.  Under the scheme Defendants **PPSA, RUAN** and **COUCH** billed private pay insurers (direct bill) with the benefit of reduced UDS costs furnished by **CASTLE MEDICAL**, and in exchange, **CASTLE MEDICAL** billed Medicare, Medicaid, Tricare and other government agencies for services furnished pursuant to the unlawful referrals.  This arrangement directly resulted in the referral of samples for UDS testing that were medically unnecessary and otherwise unlawful.  The Defendants engaged in these acts prohibited by the Anti-Kickback statute, and did so with actual knowledge of the illegality of such kickbacks and billings.

73.     As a consequence of such unlawful referrals, claims and payments, the Defendants **PPSA, RUAN** and **COUCH**, and Defendant **CASTLE MEDICAL** have knowingly caused the submission of false and fraudulent charges which Defendants **PPSA, RUAN** and **COUCH**, and Defendant **CASTLE MEDICAL** unlawfully billed (or facilitated to be billed) to Medicare, Medicaid, TRICARE and other Government healthcare payors (as well as private insurers) for designated health services from July 2010 up and through April 2013, and before and after such time period, also did so both prior to and since said dates, all in violation of the Anti-Kickback statute.   The agents and officials of the United States Government were unaware of the false and fraudulent nature of the said claims and certifications submitted by the defendants.   If such agents and officials had been aware such false and fraudulent nature, they would never have reimbursed Defendants **PPSA, RUAN** and **COUCH**, and Defendant **CASTLE MEDICAL** claims for payment.

74.     As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT V

### (False Claims Act- Stark Violation – Pharmaceutical Prescriptions)

75.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 74 as though fully set forth herein.

76.     Defendants, with full knowledge that such payments violated the Stark Law, paid illegal kickbacks and other illegal remuneration to Defendants, **RUAN, COUCH and PPSA**,   to

unlawfully induce them to prescribe drugs to their patients.   Defendants were fully aware that a majority of the patients of **RUAN, COUCH** and **PPSA** were Medicare, Medicaid or other federal healthcare program beneficiaries, and that claims for reimbursement would be unlawfully submitted to such federal healthcare programs for payment.

77.    [omitted]

78.    [omitted]

79.    Defendants **RUAN** and **COUCH**, through Defendants, **PPSA** or **C&R PHARMACY**, then unlawfully submitted false claims, with false certifications, for payment to Medicare, Medicaid, Tricare and other federal healthcare agencies for the said **INSYS, IPM** and **MANFUSO** drugs, which were prescribed by them to their patients because of the illegal kickback payments they, **RUAN** and **COUCH,** received from other Defendants.  The agents and officials of the United States Government were unaware of the falsity or fraudulent nature of the said false claims and false certifications submitted by Defendants **RUAN, COUCH, PPSA** or **C&R PHARMACY** for payment. If such agents and officials had been aware of the falsity and fraudulent nature of such false claims, they would never have reimbursed the claims submitted by **RUAN, COUCH, PPSA** and **C&R PHARMACY** for payment.

80.    The prescriptions and kickbacks made by the Defendants did not qualify for any other statutory or regulatory exception from the Stark law's designated health services referral prohibition.

81.     The Defendants **PPSA, RUAN** and **COUCH** continued to receive unlawful kickbacks in exchange for writing said prescriptions while also continuing to bill Medicare, Medicaid, Tricare and other federal agencies for services furnished pursuant to the referrals prohibited by the Anti-Kickback statute, and did so with actual knowledge of the illegality of such kickbacks and billings.

82.     As a consequence of such unlawful referrals, the Defendants have knowingly caused the submission of false and fraudulent claims for payment to Medicare, Medicaid, Tricare and other federal healthcare agencies (as well as to private pay insurers) for designated health services from and before July 2010, through and after April 2013.

83.     As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT VI

### (False Claims Act – Anti-Kickback Law– Pharmaceutical Prescriptions)

84.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

85.     Defendants, with full knowledge that such payments violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(1), paid illegal kickbacks and other illegal remuneration to Defendants **RUAN, COUCH, and PPSA** to unlawfully induce them to prescribe Defendant drugs to their patients.  Defendants were fully aware that a majority of the patients of Defendants **RUAN,**

COUCH and PPSA were Medicare, Medicaid or other federal healthcare program beneficiaries, and that claims for reimbursement would be unlawfully submitted to such federal healthcare programs for payment.

86.     [omitted]

87.     [omitted]

88.     Defendants **RAUN** and **COUCH,** through defendants, **PPSA** and/or **C&R PHARMACY,** then unlawfully submitted false claims, with false certifications, for payment to Medicare, Medicaid, Tricare and other federal healthcare agencies for the said INSYS and IPM drugs, which were prescribed by them to their patients because of the illegal kickback payments **RUAN, COUCH, and PPSA** received from Defendants.   The agents and officials of the United States Government were unaware of the falsity or fraudulent nature of the said false claims and false certifications submitted by Defendants **RUAN, COUCH, PPSA or C&R PHARMACY** for payment. If such agents and officials had been aware of the falsity and fraudulent nature of such false claims, they would never have reimbursed the claims submitted by **RUAN, COUCH, PPSA and C&R PHARMACY** for payment.

89.     The Defendants **PPSA, RUAN** and **COUCH** continued to receive unlawful kickbacks in exchange for writing said prescriptions while also continuing to bill Medicare, Medicaid, Tricare and other federal agencies for services furnished pursuant to the referrals prohibited by the Anti-Kickback statute, and did so with actual knowledge of the illegality of such kickbacks and billings.

90.     As a consequence of such unlawful referrals, the Defendants have knowingly caused the submission of false and fraudulent claims for payment to Medicare, Medicaid, Tricare and other federal healthcare agencies (as well as to private pay insurers) for designated health services from and before July 2010, through and after April 2013.

91.     As a direct and proximate result of this conduct, the United States and American taxpayers have suffered substantial actual damages.

## COUNT VII

### (The False Claims Act – *31 U.S.C. § 3729*)

### Stark and Anti-Kickback Violations

92.     *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 91 as though fully set forth herein.

93.     The Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH,** before and from July 2010 through and after April 2013, knowingly presented or caused to be presented false and fraudulent claims for payment to federally-funded health insurance programs, in violation of *31 U.S.C. §3729(a)(1).*

94.     The Defendants, **PPSA, C&R PHARMACY, RUAN** and **COUCH,** in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to

be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, *inter alia, 31 U.S.C. §3729(a)(2)*.

95.     Said Defendants so manipulated the records to increase patient referrals to outside testing facilities, and to unlawfully increase the prescriptions written for products of pharmaceutical suppliers, and further to conceal this scheme to increase referral and prescription volumes.

96.     Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH**, received unlawful kick-backs, in violation of both the Stark law and Anti-Kickback law, for said referrals and prescriptions, and Defendant **CASTLE MEDICAL** paid said Kickbacks in violation of both the Stark law and Anti-Kickback law.

97.     The United States of America, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to pay for medical services and products provided to individuals insured by the Federal HealthCare Programs. Many of the false claims submitted were directly related to Stark and Anti-Kickback violations set forth previously in this Complaint.   The agents and officials of the United States Government were unaware of the false and fraudulent nature of the said claims and certifications submitted by the defendants.   If such agents and officials had been aware such false and fraudulent nature, they would never have reimbursed Defendants' claims for payment.

98.    As a result of Defendants' actions, the United States has been, and will continue to be, severely damaged.

## COUNT VIII

### (Conspiracy - *31 U.S.C. § 3729 (3), (4) and (7)*)

99.    *Qui Tam* Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 98 as though fully set forth herein.

100.    Defendant **CASTLE MEDICAL** and others, as usual and customary business practices, conspired to and paid kickbacks, both directly and indirectly, overtly and covertly, in cash and in kind, and in the form of cost manipulations in its "direct bill" scheme, to Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH** in exchange for patient referrals/prescriptions, and engaged in other illegal and prohibited financial arrangements with said Defendants, in violation of the Stark Law, *42 U.S.C. § 1395nn*, the Anti-Kickback Law, 42 *U.S.C. § 1320a-7b (b)* and various other federal laws and regulations.

101.    Separately, Defendant **CASTLE MEDICAL, INSYS, IPM, MANFUSO** and others intentionally and knowingly conspired with Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH** to submit false and fraudulent claims for payment to Medicare, Medicaid, Tricare and other federal agencies.

102.    Separately, Defendant **CASTLE MEDICAL** and others, each intentionally and knowingly conspired with Defendants **PPSA, C&R PHARMACY, RUAN** and **COUCH**, to create, make and use records, documents and papers in connection with false and fraudulent claims, with false

certifications, which were presented for payment to Medicare, Medicaid, Tricare and other federal healthcare agencies from and before July 2010, through and after April 2013.   Defendants, between and amongst themselves and others, conspired to defraud the United States by having false or fraudulent claims paid or allowed, and knowingly making, using, or causing to be made or used false records or statements to increase the obligations of payment by the United States, and also to evade detection and/or refusal of same.   The agents and officials of the United States Government were unaware of the false and fraudulent nature of the said claims and certifications submitted by the defendants.   If such agents and officials had been aware such false and fraudulent nature, they would never have reimbursed Defendants' claims for payment.

103.   As a result of Defendants' actions, the United States has been, and will continue to be, severely damaged.

## PRAYER FOR RELIEF

WHEREFORE, *Qui Tam* Plaintiff and Relator, LORI L. CARVER, acting on her behalf and on behalf of the UNITED STATES OF AMERICA, demands and prays that judgment be entered in favor of Relator and the United States against Defendants, jointly and severally, as follows:

(a)   that Defendants be ordered to immediately cease and desist all activities, policies and practices of the medical practice which endanger patient health and safety and expose patients to unnecessary risks;

(b)     that Defendants be ordered to immediately terminate any financial relationships with testing laboratories and pharmaceutical providers;

(c)     that Defendants be ordered to immediately cease the submission and or causing the submission of any further false claims or in any way from otherwise violating *31 U.S.C. §3729 et seq.*, or from further violating *42 U.S.C. §1395(nn) et seq.*, or from further violating *42 U.S.C. §1320(a)-7(b) et seq,*

(d)     that judgment be entered against Defendants for treble the amount of the actual damages incurred by the United States of America, plus civil penalties as provided by *31 U.S.C. §3729(a)*, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants together with penalties for specific claims to be identified at trial after full discovery.

(e)     that Relator be awarded the maximum relator's share allowed pursuant to the False Claims Act as cited and referenced herein;

(f)     that judgment be granted for Relator and the United States and against Defendants for any costs, including, but not limited to, court costs, expert fees and all statutory attorneys' fees recoverable under the False Claims Act, Stark Law, and/or Anti-Kickback Laws;

(g)     that the United States and Relator's recover any and all damages available to them as a result of Defendants' stated violations of the Stark Laws, Anti- Kickback Laws and the False Claims Act;

(h)     that Relator and the United States be entitled to any and other relief that they are entitled to, whether by law or equity;

(i)     that Relator and the United States be granted any other and further relief as this Court deems just and proper upon the evidence submitted.

## DEMAND FOR JURY TRIAL

Plaintiff and Relator, LORI L. CARVER, respectfully demands trial of these claims by struck jury.

DATED this 22nd day of November, 2017.

Respectfully Submitted,

/s/ Richard H. Holston
RICHARD H. HOLSTON, HOLSR5536
rhh@holstonvaughan.com
/s/ Gregory Vaughan
GREGORY VAUGHAN, VAUGG6227
gev@holstonvaughan.com

**OF COUNSEL:**

Holston, Vaughan & Rosenthal, LLC

P.O. Box 195
Mobile, Alabama 36601
(251) 432-8883 – Phone
(251) 432-8884 – Facsimile


/s/ Peter S. Mackey
PETER S. MACKEY, MACKP4325
PSMackey@bcmlawyers.com
WILLIAM M. CUNNINGHAM, JR., CUNNW0164
WMCunningham@bcmlawyers.com
PETER F. BURNS, BURNSP5689
PFBurns@bcmlawyers.com
/s/ Troy T. Schwant
TROY T. SCHWANT
TSchwant@bcmlawyers.com

**OF COUNSEL:**

Burns, Cunningham & Mackey, P.C.
P.O. Box 1583
Mobile, Alabama 36633
(251) 432-0612 – Phone
(251) 432-0625 – Facsimile

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on April 6, 2018 filed the foregoing pleading with the Clerk

of the Court and have served the following counsel for the United States of America via certified

U.S. Mail as follows:


Jeff Sessions, Esq.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Deidre L. Colson, Esq.
Asst. U.S. Attorney, Civil Division
U.S. Attorney, Southern Dist. Of AL
Riverview Plaza, Suite 600
63 South Royal Street
Mobile, AL 36602

deidre.colson@usdoj.gov

Natalie Waites Priddy, Esq.
Trial Attorney
United States Department of Justice
Civil Division, Fraud Section
600 E Street, N.W.  Bldg. BCN-6932
Washington, DC 20004
Natalie.A.Priddy@usdoj.gov

Castle Medical, LLC
Michael E. Upchurch, Esq.
Blair G. Mattei, Esq.
Frazer, Greene, Upchurch & Baker, LLC
P. O. Box 1686
Mobile, AL 36633
meu@frazergreene.com
bgm@frazergreene.com


Christy P. Peek, Esq.
Richard D. Sanders, Esq.
The Sanders Law Firm, P.C.
3530 Independence Drive.
Birmingham, AL  35209
cpeek@southernhealthlawyers.com
rsanders@southernhealthlawyers.com

**Defendants Upon Whom Service is not Required under Fed. R. Civ. P. 5(a)(2)**

Physicians Pain Specialists of Alabama, PC

John Patrick Couch

Xiulu Ruan

C & R Pharmacy, LLC