<u>**IN THE UNTIED STATES DISTRICT COURT**</u>

<u>**FOR THE SOUTHERN DISTRICT OF ALABAMA**</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* | * |
| **LORI L. CARVER,** | * |
| Plaintiff, | * |
| v. | * CIVIL ACTION |
| **PHYSICIANS PAIN SPECIALISTS OF ALABAMA, P.C., XIULU RUAN, M.D.; JOHN PATRICK COUCH, M.D.;** | * NUMBER:13-392 * |
| Defendants. | * |
| | * |

<u>**SECOND SUPPLEMENTAL DISCLOSURE STATEMENT OF MATERIAL EVIDENCE**</u>

Relator, Lori L. Carver, submits this Second Supplemental Disclosure Statement to provide further detail to Section C. The previously submitted statements are otherwise unchanged and are fully incorporated herein by reference:

C.  **URINE LAB TESTING ARRANGEMENTS:**

When I first came to work at the medical practice, most of the urine samples were sent to a company named Millennium Laboratories (Home office located at 16981 Via Tazon, San Diego, CA 92127, 858.451.3535) (Toll-Free: 877.451.3534) for outside testing when a "flagged" reading occurred. However, soon after I began to work there, Dr. Ruan began to send the urine samples taken from his patents to one of several different labs. The lab he directed the staff to use changed frequently, and Dr. Ruan explained to me that this was because the "deals" he was getting from the labs would vary, and he was maximizing his kickback benefit for referring the business. The


EXHIBIT A-1

amounts he received pursuant to this arrangement would vary from lab to lab, and would vary depending upon the identity of the third party payor. Some labs would pay him more if the third party payor was a specific, private-pay insurance company. I do not know which lab Dr. Ruan was using for Medicare at any given time during this period, but I am confident that he was sending the Medicare patient samples to whichever lab was paying him the highest amount for the referrals.

This was very confusing, and required the lab technician, **Amy Collins** (Last known contact number 661.487.4103), to use a complicated set of charts and Post-it notes on the wall at her desk to keep up with which labs received samples depending upon the identity of the third party payor. This also changed frequently. On more than a few occasions, I would observe a testing lab sales representative arrive at the practice and meet with Dr. Raun. Dr. Ruan would then come out of his office with the rep and both of them would walk to Amy's desk and Dr. Ruan would announce that "XYZ" Lab would now begin to receive all specimens for UDS testing for a particular list of third-party payors because "XYZ" had agreed to pay more money than whatever lab he had been using previously.

Millennium's local vendor representative was **Kristen Baker** (now believed to be in Arizona but still working with Millennium). After Kristen was promoted, **Molly** (last name unknown)(contact no. 205.586.4332) took over the local representative position.

Some months into Dr. Ruan's adoption of the multiple lab system based upon maximizing kickbacks, - i.e., when Millennium lost the urine testing business for Dr. Ruan - a regional company representative with Millennium (name unknown) joined both Kristen and Molly to meet Dr. Couch and Dr. Ruan in an attempt to regain the business. The events as they occurred at the dinner meeting were related to me by **Tammy Etheridge** (Past billing manager and office manager for the medical practice)(4623 Ashwood Drive, Seymour, IN 47274)(Last known contact # 812.528.2521), who had been told of the events on separate occasions by both Molly and Kristen.

Apparently, during the meeting, Dr. Ruan told the regional representative for Millennium that the labs he used had agreed to pay the practice referral fees in exchange for the urine sample testing business. Dr. Ruan offered Millennium an opportunity to match the referral payments. The regional representative became very upset, and the discussion was very contentious and heated. The regional representative stated that such an arrangement was illegal, and that Millennium would not participate in it in any way. Both Molly and Kristen should be able to confirm this conversation, and Tammy Etheridge can confirm what they told her about it.

This confrontation created discord between doctors Ruan and Couch. Dr. Couch told Dr. Ruan, in my presence, that the arrangements with these other labs was not something he approved of, and that he felt that Dr. Ruan was going to get both of them in trouble. Privately, Dr. Couch told me that he was afraid Dr. Ruan was going to get them both arrested, and that Dr. Ruan would flee to China and leave Dr. Couch to rot in jail. In fact, he made such a statement to me on numerous occasions, the last being in early 2013 shortly before my termination. Despite this, the medical practice – especially Dr. Ruan - continued to use the various labs for the testing. Dr. Couch did, thereafter, permit Millennium to perform some testing functions for his patients in the medical practice, but not close to enough to equal the business Millennium lost from Dr. Ruan.

Sometime February 2013 – a short time before my separation from the practice - Dr. Ruan directed the billing staff to exclusively use Castle Medical, (A Georgia based laboratory with a facility in Birmingham)(Previously identified by me in my initial Disclosure incorrectly as "White Castle" Laboratory) for the urine sample testing for the medical practice. I understand that Castle Medical is owned by the father of a local personal injury attorney Dr. Ruan is acquainted with professionally. Dr Ruan explained to me that "Castle" agreed to satisfy his request for referral payments at a sufficient amount to get the business exclusively, specifically in an amount of $7,000 monthly. Dr. Ruan stated to me that the deal requires him to send them a minimum number of samples for testing per week or per month in order to receive his referral payments. It is for this reason that Dr. Ruan insisted that samples be sent to Castle regardless of the "Big Machine's" reading. This clearly results in overpayments by Medicare and other third-party payors for unnecessary and unwarranted medical procedures ordered only for purposes of maximizing kickbacks.

The scheme worked as follows. PPSA would refer all UDS testing to Castle Medical. In exchange, Castle Medical agreed to perform the testing services at a fixed price of [redacted] for private pay insurance patients which were billed directly to the insurance companies by PPSA. The reimbursement received from the private insurance companies was kept by PPSA as revenue, and PPSA paid Castle Medical the [redacted] per sample. In exchange, Castle Medical would bill Medicare and other Federal Government payors directly to the federal government for all patients that had such coverage. In those instances, Castle Medical retained all of the reimbursement received. I recall one of the billing clerks or someone in the department explaining to me how this arrangement worked in basic terms, and noting that PPSA was no longer billing Medicare, but was only billing private pay insurance. (This was apparently not how it had worked prior to Castle Medical's involvement with PPSA). I did not fully understand what the employee was describing until I

3

saw the March, 2013 contract that was signed between Dr. Ruan and Castle Medical. This contract lays out the basic terms, the exclusivity of the arrangement, and the anticipated number of referrals ▮ that PPSA would send to Castle Medical. Joey – the Collector for Castle Medical – established an office at PPSA and eventually took over the UDS process to facilitate this scheme.

This comports perfectly with the admission Dr. Ruan made to me that he was receiving a kickback from Castle Medical in exchange for sending them the required number of UDS referrals. It also explains why I saw an overall increase in the volume of UDS samples sent to the lab immediately following Dr. Ruan's admission of the scheme. The arrangement maximized revenues for both Castle Medical and PPSA, and encouraged the referral of specimens solely for purposes of generating revenue as opposed to medical necessity.

This is further evidenced by events that took place some months after my separation, in November and December, 2013. I have seen emails which have further refreshed my recollection and confirmed the concerns I had about this exclusive arrangement with Castle Medical. Apparently, Dr. Ruan (acting consistently with his general nature of placing profits over patient care), demanded that Castle Medical reduce its direct bill cost to ▮ as of December 1, 2013. Dr. Ruan promised Castle Medical that he would increase the volume of specimens to make up for its losses caused by the price reduction. These were clearly referrals based upon increasing revenue for both Castle Medical and PPSA, and not based upon medical necessity.

In my position with PPSA, I was well acquainted with Dr. Ruan's ongoing efforts to maximize profits at the expense of patients. This arrangement that he entered in to with Castle Medical (while I was employed with PPSA), and later renegotiated to increase profits of all co-conspirators, was perfectly consistent with my direct observations of how he handled UDS referrals. His admission to me that he was receiving kickbacks confirms this, and it could further be confirmed through the medical billing documentation showing that PPSA only billed private insurers, despite sending a high volume of Medicare patient samples to Castle Medical.

After Castle became the exclusive lab for Dr. Ruan's UDS referrals, patients began to complain that they were getting billed by Castle for payments not covered by their insurance. I learned that on one occasion, not long after I was terminated, Justin Palmer (Dr. Couch's Physician's Assistant) became upset at the number of such complaints and confronted Joey (last name unknown)—the Castle employee who maintained an office at PPSA. Justin told Joey he would not use Castle because they were overbilling patents and sending collection letters.

4

I believe **Elaine McDonald** (Worked in billing) (Last known contact # 251.554.0836), **Melissa Gilezerra** (Medical records) (Last known contact # 251.753-6438) and/or **Monica Gray** (Was employed in medical records)(Last known contact # 251.455.5587) would be the employees who most frequently saw or received these payments and gave them to Dr. Ruan. However, I do not know if they had information on what the payments were for.

This information is related by me based upon:

a. Dr. Ruan's directives – made both to me and to the billing department – that they send urine samples to multiple testing labs depending on who the payor was;

b. Dr. Raun's admission to me that he did so because it maximized the "deals" he was getting in kickbacks from the various labs;

c. My direct observation of the complicated charts and "Post-it" note system used by billing to keep track of the labs Dr. Ruan wanted the samples sent to;

d. My conversations with staff directly involved in the billing system demanded by Dr. Ruan – primarily their complaints about its complicated and confusing nature;

e. My direct knowledge that Dr. Ruan stopped using Millennium for urine sample testing in favor of his multi-lab chart and "Post-it" note system, and the complaints/questions from Millennium sales reps Kristen and Molly regarding same;

f. My information gathered from interviewing Tammy Etheridge about what she was told by Kristen and Molly about the meeting between Millennium's regional representative, Kristen, Molly, Dr. Ruan, and Dr. Couch;

g. The reported admission by Dr. Ruan to the Millennium reps that he was paid kickbacks by the testing labs, and that admission's consistency with the admissions he made to me on numerous occasions;

h. My presence at the meeting wherein Dr. Couch expressed his concerns to Dr. Ruan about Dr. Ruan's use of a lab system designed to maximize kickbacks, and his concern that Ruan's improper conduct would get them all in trouble;

i. My first hand knowledge that in 2013 Dr. Ruan directed the staff to use Castle Medical exclusively:

5

j. Dr. Ruan's admission to me that Castle Medical paid him the most kickbacks (believed to be $7,000 per Dr. Couch) for the urine samples referred, and that this was based upon his referral of a predetermined quota of samples for testing;

k. My first hand observation of patient complaints about Castle's additional billings to patients, and my observation of Justin Palmer's outrage concerning same.

l. My refreshed recollection of the Castle Medical arrangement from the March, 2013 contract and other discovery documents now available to me.

Witnesses that can provide corroboration of the various aspects of this reported scheme include:

i. **Amy Collins** (Last known contact # 661.487.4103);

ii. **Kristen Baker** (now believed to be in Arizona but still working with Millennium);

iii. **Molly** (last name unknown) (with Millennium) (contact no. 205.586.4332);

iv. **Tammy Etheridge** (Past billing manager and office manager for the medical practice)(4623 Ashwood Drive, Seymour, IN 47274)(Last known contact # 812.528.2521);

v. **Elaine McDonald** (Works in billing)(Last known contact # 251.554.0836);

vi. **Justin Palmer** (Dr. Couch's Physician's Assistant);

vii. **Lou Paravate** (Castle Medical's local Sales Representative);

viii. **Rob Mitchell** (Castle Medical's Sales Manager); and

ix. **Joey** (Collector for Castle Medical).

*[signature]*
LORI L. CARVER, Relator

STATE OF ALABAMA
COUNTY OF MOBILE

I, the undersigned Notary Public in and for said County in said State, hereby certify that **LORI L. CARVER**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instruments, she executed the same voluntarily on the day the same bears date.

Given under my hand and seal this 22nd day of November, 2017.

*[signature]*
NOTARY PUBLIC
My Commission Expires: _____

MANDY N. LEE
My Commission Expires
July 5, 2021

Respectfully submitted,

Attorneys for Plaintiff/Relator
HOLSTON VAUGHAN, LLC

By *[signature]*
RICHARD HOLSTON, HOLSR 5536
GREGORY VAUGHAN, VAUGG 6227
Post Office Box 195
Mobile, AL 36601
(251) 432-8883
(251) 432-8884 Facsimile